J. B. TAYLOR and George Bennett et al., Plaintiffs,

v.

E. P. PERINI, Superintendent, Marion Correctional Institution, Defendant.

Civ. No. C69-275.

United States District Court, N. D. Ohio, W. D.

April 9, 1976.

Niki Z. Schwartz, Cleveland, Ohio, for plaintiffs.

Attorney General Office of Ohio, Columbus, Ohio, for defendant.

## ORDER

DON J. YOUNG, District Judge.

This action came on to be heard upon the first report of the Special Master, no objections thereto having been filed by any of the parties within the time heretofore fixed by the Court for the filing of same, and the Court being fully advised in the premises, it is ordered that the report is in all respects confirmed. Said report is attached hereto as Appendix B, incorporated herein by reference, and made a part hereof as fully for all intents and purposes as if set forth at length herein. The Court further finds and orders as follows:

(1) It is clear that all of the defendants in this action, E. P. Perini, George Denton, and William Gilbert, are responsible for the state of noncompliance demonstrated by the report of the Special Master. In addition, certain subordinates of the Director of the Department of Rehabilitation and Correction and the Superintendent of Marion Correctional Institution, particularly the Associate Superintendent for Treatment Services at Marion Correctional Institution, are responsible for their failure to effectuate the terms of the Court's order of September 12, 1972, attached hereto as Appendix A. It is hereby ordered that all of the named defendants, as well as their subordinates, proceed at once to effectuate full compliance with the Court's order of September 12, 1972.

(2) The progress of this case has shown beyond doubt that the defendants require assistance in implementing many of the terms of the Court's order of September 12, 1972. It is hereby ordered that all steps taken by the defendants and their subordinates to effectuate full compliance with that order be supervised, coordinated and approved by the Special Master, acting for the Court. In this connection, the Special Master shall have the authority to state to the defendant, their subordinates, and all persons acting in concert with them or any of them the actions required to be taken by them or any of them to effectuate full compliance with the Court's order of September 12, 1972, and to seek orders from the Court requiring any or all of said defendants, their subordinates, and persons acting in concert with them, or any of them, to show cause why they should not be punished as for contempt for failure to carry out such actions required.

(3) Because of the disclosures of noncompliance contained in the Special Master's report, it is hereby ordered that the Special Master shall continue to investigate the defendants' state of compliance with the Court's order of September 12, 1972, and

shall make supplemental reports to the Court in the event that further or continuing instances of noncompliance are discovered. For this purpose, the Special Master shall have all of the authority granted to him by the Court's order filed April 9, 1975.

█ (4) The report of the Special Master has demonstrated that full compliance with certain paragraphs of the Court's order of September 12, 1972, is complicated by the large number of inmates presently residing at Marion Correctional Institution. This is particularly true of those portions of the order which relate to job assignment, promotion, transfer, and removal. Any increase in the population of the institution will interfere further with the effectuation of these provisions of the Court's order of September 12, 1972. It is hereby ordered that the present maximum capacity of 1,143 inmates in the stockade and 275 inmates in the honor dormitory be observed and that no inmates be admitted to Marion Correctional Institution in excess of those maximum numbers.

IT IS SO ORDERED.

## APPENDIX A

### ORDER

September 12, 1972

JOURNAL ENTRY AND ORDER

DON J. YOUNG, District Judge.

The plaintiff class (the inmates of the Marion Correctional Institution—hereinafter referred to as plaintiffs or inmates) having filed their class action complaint herein on November 7, 1969, the Court having found same to be a proper class action, extensive discovery proceedings having taken place, and it appearing to the Court that the parties have waived hearing and Findings of Fact and Conclusions of Law on all issues covered by this Order, the following Order is entered without admission of any violation of the Constitutional rights, privileges or immunities of any of the members of the plaintiff class by defendant, and without a finding by the Court of whether the defendant has deprived any of the

members of plaintiffs' class of any such rights, privileges or immunities;

NOW, THEREFORE:

IT IS HEREBY ORDERED THAT defendant, his employees, agents, successors, assigns and all those in concert therewith (hereinafter collectively referred to as defendant) ARE ENJOINED FROM:

1. Engaging in any act or practice which has the purpose or the effect of discriminating against any member of the plaintiff class because of his race, color, or national origin, except insofar as specifically required by this Order.

2. Engaging in any form of racial harassment, intimidation or insult against any member of the plaintiff class.

IT IS FURTHER ORDERED THAT defendant, his employees, agents, successors, assigns and all those in concert therewith (hereinafter collectively referred to as defendant) ARE ENJOINED TO:

1. Refrain from obstructing, censoring, reading, copying, or delaying first class mail between any of the members of plaintiffs' class and any court of law, attorney-at-law, or public official; refrain from opening or inspecting any first class mail from any member of the plaintiff class addressed to any court of law, attorney-at-law, or public official; refrain from opening or inspecting any first class mail to any member of the plaintiff class from any court of law, attorney-at-law, or public official, except where conducted in the presence of the recipient for the limited purpose of detecting contraband.

2. Refrain from interfering with, or inhibiting by imposition of sanctions, threat of sanctions or harassment, efforts by members of the plaintiff class to assist one another in the preparation and conduct or defense of actions in any court of law involving the adjudication of the legal rights, privileges, or immunities of the assisted member of the plaintiff class. Defendant shall afford plaintiffs so desiring to work together a reasonable place to do so but may limit such activity to nonworking hours.

3. Provide to any inmate without charge, or on credit, paper, pencils, pens, notarial services and postage for use in the preparation and mailing of documents and correspondence pertaining to legal proceedings involving the adjudication of the rights, privileges or immunities of said inmate.

4. Permit plaintiffs without restriction to receive, possess and read newspapers, magazines, pamphlets, books and other printed matter from any source, with the exception of individual publications which either are obscene under the applicable constitutional criteria as established by the United States Supreme Court, or which constitute a clear and present danger to the security or safety of the Institution, such as publications providing instruction in picking locks, digging tunnels or making weapons. Publications of the excepted classes may be censored or prohibited only if pursuant to specific written regulations providing for:

a) Specific criteria of non-acceptability;

b) A specific decision making panel consisting of three or more persons not more than one of whom shall have primary responsibility in the area of custody;

c) Prompt notice to the addressee of:

1) Identification of the material;

2) The interim prohibition of the material and reason therefor;

3) His right to a prompt hearing before the panel;

d) A written decision including the reasons therefor not later than one week following the initial arrival at the Institution of the material in question;

e) A right of the recipient inmate to appeal an adverse finding by the panel to the Department of Corrections, and to have said appeal decided not later than two weeks thereafter;

f) The maintenance of records at the Institution of the proceedings described above for at least one year following the decision of the hearing panel, none of which to be placed, or referred to, in any inmate's file.

The effective date of this paragraph shall be stayed for sixty (60) days following entry of this Order to permit the promulgation of complying regulations should defendant desire to do so.

5. To the extent permitted by the terms and conditions governing funds that become available for library acquisitions from whatever source derived, such funds shall first be devoted to the purchase for the Institution Library for inmate use of each of the books (and at least three (3) copies of those with asterisks) and subscriptions to each of the periodicals listed on the Selected Bibliography entitled *The Black Experience,* attached hereto as Appendix A.*

6. Refrain from imposing any disciplinary sanctions on, or making any adverse disciplinary record references regarding, any member of the plaintiff class except for the violation of written regulations sufficiently definite and specific and sufficiently distributed and/or posted to provide each member of the plaintiff class with fair notice of what conduct is prohibited and of the permissible range of sanctions for each such violation. The effective date of this paragraph shall be stayed for sixty (60) days following entry of this Order to permit defendant to adopt complying regulations.

7. Refrain from imposing solitary confinement, punitive segregation, or correctional cell incarceration on any member of the plaintiff class unless consistent with the following conditions:

a) Such incarceration shall be for a fixed term not to exceed fifteen (15) consecutive days, nor shall any inmate be subjected to more than a total of thirty (30) days of such incarceration during any six month period;

b) Normal Institution meals (excepting only desserts) shall be provided;

c) Adequate clothing, bedding and toilet facilities shall be provided;

* Editor's Note: The list is found in the Special Master's Report, p. 215.

d) Normal medical care shall be provided;

e) At least one (1) book of the inmate's selection subject to general Institution rules governing reading matter shall be provided;

f) Inmates enrolled in an educational course shall be permitted to have their textbooks;

g) Normal mail privileges shall be permitted;

h) Clergymen, social services personnel and attorneys shall be permitted access to inmates so incarcerated;

i) Adequate light for reading in the daytime and adequate darkness for sleeping at night shall be provided;

j) Opportunity for exercise shall be provided not less than once every third day.

8. Within sixty (60) days of the entry of this Order, prepare and submit to this Court objective and reviewable written procedures for the nondiscriminatory assignment, promotion, transfer and removal of inmates to and from job assignments under the following terms and conditions:

a) There must be precisely worded, job related substantive criteria for job assignment, transfer and removal;

b) Any tests, the results of which will constitute criteria for job assignment must be job related;

c) Job assignment, transfer and removal shall not be employed for punitive purposes, and shall not be related to discipline for rule infractions except insofar as such infractions are job related and manifest inability on the part of the violator to function in the job in question;

d) There must be defined procedures for making job assignments, transfers and removals according to the specified substantive criteria, which procedures:

1) Shall provide for centralized responsibility for making such assignments;

2) Shall not allow for deference to the wishes of job supervisors or fellow inmates;

3) Shall not be dependent upon the self-initiative of inmates.

9. Within sixty (60) days of the entry of this Order, prepare and submit to this Court a plan for rectifying the present effects of past discrimination in job assignment with respect to all office jobs, the plumbing shop, the electric shop, the carpenter shop, the commissary, the hospital, the dental clinic, the cafeteria, the laundry, the trash run, porter jobs and the custodial school.

10. Within sixty (60) days of the entry of this Order prepare and submit to this Court in writing an affirmative action program reasonably calculated to insure the maintenance of a working atmosphere free of racial harassment, intimidation or insult, which program shall at a minimum include:

a) The promulgation and adoption of written rules applicable to all staff prohibiting all forms of racial discrimination, harassment, intimidation and insult, coupled with sanctions for their violation ranging from written reprimand to discharge depending upon the severity and repetition of violation.

b) A redefinition of all staff job descriptions to incorporate equal opportunity responsibility as an essential aspect of each such job, with the performance of such responsibility to be evaluated for purposes of retention, promotion and salary determinations;

c) An orientation program for all present and incoming staff regarding the Institution's commitment to the principle of Equal Opportunity, the fact that the staff members' commitment to the principle is a criterion of hire, retention, promotion and assignment, and the obligations of the Institution and each staff member under the Federal Equal Employment Opportunity Act and recently expanded jurisdiction of the Equal Employment Opportunity Commission.

d) A plan for the pre-hire administration to all candidates for staff positions of psychological examinations designed to disclose any propensity for racism, sadism or brutality, and to assist in selecting

candidates most likely to have a helping, client-service orientation.

e) A program for the in-service training of all staff members in human relations skills oriented toward the helping role of a correctional staff member and sensitivity to the nature, needs, aspirations and problems of the diverse racial, cultural, and ethnic groups which comprise the inmate population.

f) A program for the orientation of present and incoming inmates in the Institution's commitment to the principle of Equal Opportunity, the inmate's responsibility to abide by that principle, the fact that relevant evaluations of him will include his performance in that regard, together with instruction calculated to cultivate understanding of, and sensitivity toward, the nature, needs, aspirations and problems of the diverse racial, cultural, and ethnic groups which comprise both the inmate and staff populations of the Institution.

g) The designation of one or more staff members as Equal Opportunity Co-ordinator with primary job responsibility for implementing, coordinating, evaluating and reporting on the progress of all Institutional efforts to effectuate this Order. Notice shall be given to all staff and inmates of said designation and of said Co-ordinator's responsibility and receptivity to suggestions and grievances. Said Equal Opportunity Co-ordinator and the Superintendent shall report to this Court at three-month intervals until further notice of the progress of the various programs designed to effectuate this Order.

11. Within sixty (60) days of the entry of this Order prepare and submit to this Court a plan for the elimination of the present effects of past assignments of inmates to beds on the basis of racial criteria.

12. Remove from the files of each of the sixty-seven (67) inmates listed in this Court's Order of February 8, 1972 all references, if any, to participation in any form in this or related litigation, to refrain from communicating in any other form the fact of such participation to the Parole Board, and to certify to the Court in writing within two (2) weeks of the entry of this Order that defendant is in compliance with this paragraph; and thereafter plaintiffs' counsel or his designate shall have the right at any time during normal business hours to inspect any of said files.

13. To take the necessary steps to inform all staff members of the Marion Correctional Institution of the terms of this Order.

14. To file a written report with the Court within seventy-five (75) days of the entry of this Order setting forth the actions taken and progress made in effecting compliance with this Order.

15. To contemporaneously serve on plaintiffs' counsel copies of all documents required by this Order to be filed with the Court.

IT IS FURTHER ORDERED THAT this Court will retain continuing jurisdiction over this action, and the parties thereto for a sufficient length of time to make reasonably certain that the methods and practices provided herein have become permanently established. During such period of continuing jurisdiction, the Court will consider proposed modifications of this Order upon the application of any party.

IT IS FURTHER ORDERED THAT the Consent Order entered in this action on February 8, 1972 is hereby abrogated.

IT IS FURTHER ORDERED THAT defendant shall pay to plaintiffs' counsel reimbursement for out-of-pocket expenses and reasonable attorney's fees based upon services rendered in the handling of this action. In the event the parties are unable to agree upon the amount of payment under this paragraph, such issue shall be submitted to the Court for hearing and decision.

IT IS FURTHER ORDERED THAT all other issues in this cause be, and the same are hereby, continued until the further order of the Court.

## APPENDIX B

### FIRST REPORT OF THE SPECIAL MASTER ON THE DEFENDANT'S STATE OF COMPLIANCE

Submitted by Vincent M. Nathan,[*]
Special Master

### INTRODUCTION

The report which follows contains the results of an investigation which began on December 2, 1975, upon the appointment (as of the previous day) of the author as Special Master in the case of *Taylor v. Perini.* In the course of the investigation, the Special Master (and his Assistant in all but one instance) made eight trips to Marion to visit the institution. In the course of these visits, of one or two days duration, meetings were held with large numbers of staff, including both administrators and front line correctional officers. Much of one day was spent observing hearings held in Marion by members of the Adult Parole Authority. A large number of interviews with inmates were conducted.

One trip was made to Columbus, Ohio, to meet with staff employed by the Department of Rehabilitation and Correction. The Special Master and his Assistant were accompanied by two members of the Department's staff on a day long visit to Southern Ohio Correctional Facility at Lucasville, and the Superintendent of that Institution was both helpful and gracious on that occasion.

. Late in December, 1975, the Special Master authorized the formation of an Inmate Liaison Committee, consisting of one inmate from each living area (lock) in the institution. This 20 man committee began to function in January. In the course of regular meetings between that Committee, the Special Master, and his Assistant information was gained concerning the problems, attitudes, and perspectives of inmates generally.

During the entire course of this investigation, the Special Master has encountered a cooperative, friendly, and helpful attitude on the part of the staff of the Department of Rehabilitation and Correction, inmates, and the administration and staff of Marion Correctional Institution. Mr. Stephen Yost, the Department's Administrative Assistant (Legal) provided liaison between the Special Master and the Department and was helpful in every way that he could be. Mr. John Canney was generous in his time, particularly with respect to discussion of development of a pre-hire testing technique for incoming staff at M.C.I.

The Superintendent of Marion Correctional Institution, Mr. E. P. Perini, responded affirmatively to every request made by the Special Master. In addition to spending many hours of his own time explaining procedures and discussing problems, he obviously instructed his staff to provide a full measure of cooperation. Mr. W. J. Whealon, the Administrative Assistant to the Superintendent, provided liaison between the Special Master and the staff at Marion Correctional Institution, and his cooperation was outstanding in every respect. Over the course of the investigation, the Special Master asked for the submission of numerous documents and reports, frequently on a daily or weekly basis; all were provided through the efforts of the Superintendent and Mr. Whealon.

Staff with whom the Special Master and his Assistant had contact during visits to Marion were uniformly courteous, helpful, and friendly. This was true not only of those persons whose administrative responsibilities were directly related to the Court's order, and who were thus responsible for providing information to the Special Master, but also front line correctional officers who opened gates, conducted tours, gave directions and generally offered to be of help in any way they could be. While it cannot have been a pleasant experience to be under the pressure of an in-depth investigation of virtually every facet of the institution, administration and staff members were unfailingly courteous and helpful.

Members of the Inmate Liaison Committee labored as well to produce the information contained in this report. Meetings were long and sometimes difficult. Com-

[*] Professor of Law, The University of Toledo.

mittee members were charged with *representing* the more than 1300 inmates incarcerated at M.C.I., and they did their job well. This required concern on their part for the problems of other inmates and suppression of their own self interest to that larger concern. This was asking a lot from these men, and they performed admirably. Most important, members of the Committee were willing to acknowledge positive as well as negative aspects of the institution's efforts to comply with the Court's order. That in turn produced reliable information for inclusion in this report.

The University of Toledo College of Law provided assistance in many forms. In addition to the provision of a special office for the conduct of the investigation and the writing of this report, secretarial services as well as other forms of financial support were given. Two secretaries labored mightily to produce the final copy of this report in one week's time. Finally, it is literally true that the Special Master's Assistant, Kenneth Cookson, who is a second year law student, participated in this venture on the basis of full partnership. His contributions, both to the investigation itself and the preparation of this report, have been invaluable.

The report which follows begins with an analysis of 13 mandatory paragraphs and ends with discussion of the two prohibitory paragraphs at the beginning of the Court's order. This organization was utilized because many of the specific areas dealt with by the mandatory paragraphs relate more or less directly to the overall problem of racial discrimination, harassment, intimidation, and insult.

Each mandatory paragraph is treated separately. After a short statement of the content of the paragraph, there is a brief description of the method of investigation employed by the Special Master. Where necessary, a statement of current practices at Marion Correctional Institution is included. This, in turn, is followed by a discussion of evidence relating to compliance.

Because Administrative Regulations adopted by the Department of Rehabilitation and Correction deal with many of the practices and procedures to which the Court's order addresses itself, these have been mentioned in connection with each paragraph of the order. Copies are included as appendices. Finally, each section of the report concludes with the findings of the Special Master with respect to each paragraph of the Court's order.

One cautionary note is in order with respect to the inclusion of the discussion of Departmental Administrative Regulations within the body of this report. Although some instances of noncompliance with provisions of the Court's order constitute as well violations of certain Administrative Regulations, the mere existence of these Regulations should not be taken as indicating that noncompliance in such instances is limited to the Superintendent or staff of Marion Correctional Institution. To the contrary, in those cases in which the institution is found to be in a state of noncompliance with the Court's order and with the relevant Administrative Regulation, there is no evidence that officials of the Department of Rehabilitation and Correction have taken action to compel compliance on the part of the Superintendent or his staff. In the case of the Administrative Regulations dealing with censorship of incoming printed materials and tapes, the Regulations themselves, as applied to Marion Correctional Institution, constitute noncompliance with mandatory Paragraph 4 of the Court's order.

What follows is a report on the state of compliance and noncompliance by the institution with the order issued by the court on September 12, 1972. Although much of what has been learned to date will be of assistance in developing plans of compliance for implementation, this report is almost totally devoid of such references. Upon the Court's adoption of the findings of the Special Master contained herein, compliance plans can be developed quickly with respect to some areas of noncompliance and only with expenditure of great time and effort as to others. Those matters, however, are not the subject of this report.

## MANDATORY PARAGRAPHS

### PARAGRAPH 1

Paragraph 1 restrains the defendant from "obstructing, censoring, reading, copying, or delaying" first class legal mail. Inspection in the presence of the inmate/addressee for the limited purpose of detecting contraband is permitted. For the purpose of this investigation, the term "legal mail" is taken to include mail addressed to or received from any court of law, attorney-at-law, public service law office, law school legal clinic, and any office or official of the federal, state, or local government.

### TREATMENT OF LEGAL MAIL

All first class mail is received in the "outside" mail room located on the second floor of the administrative wing of the institution. The mail room staff consists of one officer and two clerks. All pieces other than legal mail are opened by machine and inspected for contraband. These items are then sorted and packaged for delivery to the "inside" mail room, which is located on the first floor inside the crash gate which separates the administrative wing from the rest of the institution. From that point the mail is collected by correction officers for delivery to cell blocks and dormitories by means of a mail call.

Legal mail, on the other hand, is separated in the outside mail room, and is delivered to the inside mail room without being opened. Passes are issued to inmates who call for their legal mail. Upon presentation of a pass, the legal item is opened in the presence of the inmate, inspected for contraband, and delivered to him.

In order to monitor the effectiveness of the process just described, a method of investigation was developed to disclose the incidence of breakdown in the process currently employed by the institution.

### METHOD OF INVESTIGATION

Beginning December 2, 1975, the Marion Correctional Institution (hereinafter M.C.I.) maintained a daily log indicating the incidence of improper treatment of legal mail received by the mail office. Information relating to each incident (name and number of addressee, name of individual who opened the piece in error, and the nature of notification of the inmate/addressee) was included.

Beginning January 16, 1976, all legal mail was ordered to be stamped "SPECIAL HANDLING" at the time of its receipt in the mail office. On that same date, the mail room was instructed to make a photocopy of all legal mail envelopes opened erroneously. On January 20, 1976, all correctional officers were directed to sign any envelope containing legal mail and presented by an inmate/addressee after having been delivered in regular mail call and thus opened outside the inmate's presence. Finally, the members of the Inmate Liaison Committee were asked to collect all evidence of improper treatment of legal mail and to submit it to the Special Master.

### EVIDENCE RELATING TO COMPLIANCE

Evidence relating to compliance prior to December 1, 1975, is virtually nonexistent. On September 22, 1975, the Administrative Assistant to the Superintendent issued a written reprimand to a member of the staff concerning improper treatment of legal mail. The memorandum stated in part:

This will be a follow-up of our impromptu conversation regarding the above subject and of the requirements to adhere strictly to the guidelines presented by Judge Young's court. The order of September 12, 1972, is specified, in that; all legal and official mail sent to an inmate, is to be opened in his presence and screened only for possible contraband and pornographic material.

The legal mail log which begins on December 2, 1975, discloses five incidents of error in opening legal mail in the outside mail room. Of these, two involved envelopes which bore return addresses which did not identify the legal character of the letters.

A third, received on February 14, 1976, bore a return address from the State of Ohio, Industrial Commission of Ohio. The fourth example was a letter sent by the Special Master to an inmate at Chillicothe Correctional Institution. This letter was opened at Chillicothe and forwarded to the addressee, who in the meantime had been transferred to Marion. On February 19, 1976, a letter bearing a return address of the American Civil Liberties Union, Cleveland, Ohio, left the outside mail room unopened. By the time it reached the inmate/addressee in the course of a regular mail call, it had been opened by someone whose identity has not been discovered. The most likely possibility is that it was opened by a person in the inside mail room and added to the regular mail call delivery.

Thus the record maintained by staff in the outside mail room discloses only one example of improper handling of incoming first class legal mail by that office. It indicates in addition a clear but unexplained infraction in the case of the letter from the American Civil Liberties Union.

Evidence submitted by representatives of the Inmate Liaison Committee, however, presents a different story. Eight examples of clear-cut violations by the staff of the outside mail room were placed in the hands of the Special Master. Return addresses of the following senders were clearly indicated:

```
Special Master . . . . . . . . . . . . . . 2 letters
Office of Personnel, Washington, D. C. . . . 1 letter
Legal Aid Society of Cincinnati . . . . . 2 letters
University of Akron School of Law
 Appellate Review Office . . . . . . . . 2 letters
Max Kravitz, Attorney at Law . . . . . . . 1 letter
```

Each of these envelopes bears clear evidence of having been opened in the outside mail room and/or having been delivered at a regular mail call. It should be noted that none of these incidents appears on the legal mail log submitted by the staff of the outside mail room.

Two examples of *delay* of incoming first class legal mail came to light in the course of this investigation. Two letters written by the Special Master to members of the Inmate Liaison Committee were post-marked in Toledo on February 3, 1976. These letters were delivered to inmates in the honor dormitory at MCI on February 10. Eighteen identical letters, addressed to inmates within the stockade itself and announcing a meeting of the Inmate Liaison Committee on February 7, were received by the inmates sometime between February 4 and 6. Because of this delay, the two honor dormitory residents were not aware of the impending meeting until passes were issued to them on February 7.

Administrative Regulation 814 permits the opening and reading of incoming and outgoing mail under special circumstances. Prior permission must be obtained from the Director of the Department of Rehabilitation and Correction. See Appendix A, page 268 *infra*. Paragraph 7 of this regulation, authorizing censorship, does not exempt legal mail. The Administrator of the Bureau of Program Services of the Department of Rehabilitation and Correction, in an interview with the Special Master on January 23, 1976, stated her understanding to be that Paragraph 7 of Administration Regulation 814 does *not* apply to legal mail. The position of the Superintendent of M.C.I., on the other hand, is that while Administrative Regulation 814 authorizes the inspection of all incoming mail, including legal mail, "as a matter of policy all legal mail is opened in the Inmate's presence." *Sheely v. Perini*, Case No. C75–244, currently pending before this court. (Answer of the Defendant, paragraph 7) In order to test this announced position, the Special Master caused a letter, clearly designated as legal mail, to be addressed to an inmate in Marion whose mail was under surveillance pursuant to Administrative Regulation 814. The letter was handled in all respects as legal mail and was opened and inspected for contraband in the presence of the inmate/addressee.

One additional incident brought to the attention of the Special Master was the opening of a stamped and sealed manila envelope, addressed to the Chairman of the Adult Parole Authority. The envelope was opened in an inmate's cell in the course of a

shakedown by a correctional officer. Because the envelope was inspected only for contraband in the presence of the affected inmate, and because the very purpose of a shakedown is the discovery of contraband, this conduct does not appear to be a violation of the court's order. (Following this incident the postage was removed from the envelope and a new envelope was given to the inmate.)

Apart from the specific incidents relating to legal mail discussed above, inmate allegations of interference with incoming and outgoing first class mail are widespread and have resulted in the filing of another suit in this court. *Sheely v. Perini*, Case No. C75–244. Complaints relate to reading, delaying, and returning of mail to sender in spite of the addressee's presence in the institution. Loss and theft of both incoming and outgoing first class mail are alleged, and instances of theft or loss of incoming packages have been verified. Complaints of delayed mail by inmates residing in the honor dormitory are particularly numerous and repetitive. While non-legal mail is not specifically within the scope of the order under consideration, the problems relating to legal mail are likely to continue until a thorough reorganization of all handling of incoming mail occurs. Furthermore, there is virtually no method of testing the effectiveness of outgoing mail procedures as they relate to legal mail without consideration of the larger problem of all outgoing mail.

### RELEVANT ADMINISTRATIVE REGULATIONS

Paragraphs 2 and 8 of the Administrative Regulation 814, Appendix A, p. 268 *infra*, conform to the requirements of paragraph 1 of the Court's order. Thus the violations of the order detailed above constitute as well violations of an Administrative Regulation issued by the Department of Rehabilitation and Correction.

### FINDING REGARDING COMPLIANCE

■ It is the finding of the Special Master that the institution has made a good faith effort to comply with the provisions of Paragraph 1 of the Court's order. No evidence of intentional violation has been discovered. On the other hand, the violations discussed above do constitute noncompliance with the order and additional procedures must be adopted to ensure full compliance. While occasional errors are bound to occur in any system, the incidence of error disclosed by this investigation appears at least in part to result from inadequate supervision of mail room personnel.

### PARAGRAPH 2

Paragraph 2 relates to the protection of "jailhouse lawyering" which was dealt with by the United States Supreme Court in *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The order in *Taylor v. Perini* contains three distinct elements:

(1) Protection of inmates from sanctions, threats of sanctions or harassment in their efforts to assist one another in their legal affairs

(2) A requirement that inmates wishing to work together be given a reasonable place to do so

(3) Permission to the institution to limit such activity to non-working hours

### METHOD OF INVESTIGATION

In order to test compliance with this paragraph, the Special Master and his Assistant interviewed the two inmates who currently serve as Inmate Legal Advisors, inspected the law library and its work area maintained by the institution, and compared what they heard and saw to the situation observed at Southern Ohio Correctional Facility (hereinafter S.O.C.F.) in Lucasville, Ohio. In addition, the Special Master interviewed one inmate in Marion whose jailhouse lawyering activities resulted in significant reprisals and reviewed carefully both the written and the taped record in that case. Finally, the question of the extent of cooperative inmate legal assistance permitted by the institution was discussed at some length with the Inmate Liaison Committee.

## EVIDENCE RELATING TO COMPLIANCE

Two inmates at Marion Correctional Institution have been assigned to serve as Inmate Legal Advisors for a total population of 1321 as of January 31, 1976. Five inmates are assigned to this position for approximately 1980 inmates at S.O.C.F. Thus the ratio of 1:660 at Marion compares to a ratio of 1:396 at S.O.C.F. Given the obviously high degree of involvement in the legal process by inmates in a correctional institution, the S.O.C.F. program would appear to be understaffed. The figures at Marion indicate that the formal program of inmate legal assistance is far from adequate to serve all of the reasonable needs of the inmates. This fact becomes striking in view of the widespread phenomenon of underemployment of inmates which results from having almost two inmates for every one full-time job to be filled. (See discussion in connection with paragraph 8, p. 251 *infra*.)

The physical area of the law library, which comprises an alcove in the general library, is small, measuring 17′ by 13′. The usable work area is virtually filled by a desk, filing cabinet, and two large tables upon which typewriters are placed. This area is used for "client" interviews, counseling, research, and typing. In addition to the two Inmate Legal Advisors and the inmates they assist, all inmates wishing to conduct legal research for themselves or their fellows must utilize this limited space as law books may not be checked out of the library. The collection itself fails to meet the minimum requirements for a collection for prison law libraries published by the American Association of Law Libraries, and recommendations for significant upgrading have been made recently by an official of the Department of Rehabilitation and Correction. The three typewriters which are available in the law library are old and in a state of less than good repair. All are of the manual type. Because no photocopying machine is available to inmates (with or without charge), a single document may have to be typed as many as half a dozen times. If carbon paper is available, no more than an original and two or three copies can be prepared at one time.

General library hours, and thus law library hours, are restricted to 6:00 p. m. to 8:30 p. m., Monday through Friday, and 9:00 a. m. to 3:00 p. m. on Saturday. On several occasions during on site inspections, the library was closed during these normal hours. The institution has been without a full-time librarian since November 29, 1975, and no prospects for this position are in sight at the time of the submission of this report. The experienced and conscientious correctional officer currently in charge of the library is assigned as well to other duties in the area of custody. Thus, in spite of his good faith efforts to maintain a reasonable level of service in the Library, he cannot be expected to function as effectively as would a full-time trained librarian. Inmate Legal Assistants are not permitted to enter another inmate's lock for the purpose of counseling and may not invite "clients" to their own cells or dormitories. The Assistants are not permitted to visit inmates incarcerated in correctional cells for the purpose of conducting legal business. This may result in a period of as long as 15 days without legal assistance by an Inmate Legal Advisor.

One very significant case of harassment and sanctioning of an inmate jailhouse lawyer (not assigned as Inmate Legal Advisor) has been documented. The inmate involved has filed a lawsuit in this court relating to this matter. *Hill v. Perini,* C75–132. In February, 1975, the inmate was ticketed for a violation of Class II, Rule 19, which provides as follows:

> All misdemeanors specified in the Ohio Revised Code or U.S.Code such as mail violations.

The entire text of the ticket, written by the Associate Superintendent for Treatment Services, consists of the following:

> It was called to my attention that resident Hill 132–337 has been corresponding with various legal agencies using the title "Legal Advisor." This is not resident Hill's title and he is not even assigned to

the Law Library. Accompanying this report are copies of envelopes addressed to the resident.

Placed in evidence were several envelopes bearing return addresses indicating the legal character of the letters and addressed as follows:

Mr. William Hill
Legal Advisor
P. O. Box 57
Marion, Ohio 43302

A letter was written by the Superintendent of M.C.I. to one attorney involved on March 27, 1975, returning the letter addressed to Mr. Hill and requesting the lawyer to "strike out the title, legal advisor, and substitute # 132–337 in it's (sic) place." Superintendent Perini opened and read the attorney's letter before returning it. *Hill v. Perini*, Case No. C75–132 (Defendant's Answer, paragraph 9).

In the course of the hearing before the Rules Infraction Board, Mr. Hill asked the panel to inform him of the misdemeanor he was accused of committing. The answer was, "a mail violation." When Mr. Hill asked whether he was being accused of violating a state or federal law, he was told that he could "put it that way" if he wished. Mr. Hill was convicted by a unanimous panel and sentenced to serve five days in the correctional cell. He was subsequently incarcerated in a correctional cell for five days.

In July, 1975, Mr. Hill was ticketed again by the Associate Superintendent for Treatment Services. Again he was charged with a violation of Class II, Rule 19. The offense consisted of using the title "Legal Advisor" on a paper which an inmate for whom Hill was providing legal services took to the Associate Superintendent for notarizing. Hill was convicted by the Rules Infraction Board a second time and was sentenced to and served five days in the correctional cell. The panel informed Mr. Hill that he would be transferred to maximum security (S.O.C.F.) in the event of another violation. Like all convictions of Class II offenses, records of these offenses are included in Mr. Hill's master pocket which is

available to the Parole Board at the time of any hearing regarding Mr. Hill. In the course of observing hearings held in Marion by the Parole Board, both the Special Master and his Assistant noted the use by the panel of records of institutional violations.

One justification offered by the panel for Mr. Hill's conviction was avoidance of confusion to the courts and the public concerning the status of a person engaging in jailhouse lawyering. This, in turn, was based upon a memorandum dated January 15, 1974, from the then Administrative Assistant to the Director of the Department of Rehabilitation and Correction to all managing officers. See Appendix B, p. 270 *infra*. No conceivable reading of this memorandum provides support for Mr. Hill's conviction of a Class II, Rule 19 offense.

Finally, it should be noted that Mr. Hill made a formal request for classification as an Inmate Legal Advisor on two occasions. Both requests were rejected by the Reclassification Committee.

Some difficulty has been encountered with regard to preparation and submission of petitions for habeas corpus relating to incarceration in M.C.I. As a result of the posting of a memorandum sent by a legal assistant to the Department of Rehabilitation and Correction to all managing officers, Appendix C, p. 271 *infra*, the current Inmate Legal Advisors came to believe that all petitions for habeas corpus had to be submitted to the Superintendent of the institution, and apparently a number have been submitted. The effect of such submission, of course, is to acquaint the Superintendent with allegations which may involve his own or his staff's activities.

Law books, like other publications, are generally permitted only if received directly from a publisher. (See discussion of Paragraph 4, p. 209 *infra*.) Thus an inmate with his own collection of law books must obtain prior approval for their entry into the institution. Another example of harassment was revealed by an inmate who stated that he attempted to send money to a lawyer on behalf of a friend incarcerated

in M.C.I., and that he was refused permission to do so by the Associate Superintendent for Treatment Services.

Difficulties encountered by residents of the honor dormitory exceed those experienced by the stockade population in several respects. Honor dormitory residents' access to the law library in the stockade is announced to be limited to 9:00 p. m. to 11:30 p. m. on Tuesday and Thursday. Because the inmates may not leave the honor dormitory until the completion of the regular 9:00 p. m. count, these limited hours are somewhat shorter in reality. Because Inmate Legal Advisors are not on duty in the library during these hours, honor dormitory residents have no access whatsoever to the formal inmate legal assistance program. A virtually useless partial collection of reported cases constitutes the only "law library" available in the honor dormitory itself, and no facilities for typing of legal documents were observed during on site inspections of the honor dormitory.

■ A principal difficulty involved in the encouragement of jailhouse lawyering, structured or otherwise, is the possibility that "dealing" will result. Class II, Rule 9 forbids

Dealing, which shall include any transaction for which payment of any kind is made, promised, or expected.

Obviously, the possibility that Inmate Legal Advisors, or their informal counterparts, will charge for their services is a real one. The need for reliance upon a system of inmate legal assistance, which is countenanced by the Court's order and which fills to only a limited extent the need for competent legal service, outweighs the risk of dealing which is inherent in such a system.

### RELEVANT ADMINISTRATIVE REGULATIONS

Administrative Regulation 837, Appendix D, p. 272 *infra*, is entirely consistent with and indeed exceeds in some respects the requirements of Paragraph 2 of the order issued in *Taylor v. Perini*. Thus, any violation of Paragraph 2 of that order constitutes as well a violation of the spirit and the letter of the Regulations of the Department of Rehabilitation and Correction.

### FINDINGS REGARDING COMPLIANCE

■ The finding of the Special Master with regard to Paragraph 2 of the Court's order is that the violations discussed above constitute noncompliance with the order. In particular, the Special Master finds noncompliance in the following respects:

(1) Appointment of an unreasonably small number of Inmate Legal Advisors to serve the inmate population

(2) Provision of inadequate physical facilities and support in the law library including the absence of a full-time librarian

(3) Unreasonable restrictions upon access to legal advice

(4) Inadequate law library hours

(5) Unreasonable restrictions upon receipt of legal publications

(6) Deliberate harassment of jailhouse lawyers other than duly appointed Inmate Legal Advisors

(7) Imposition of any requirement that petitions for habeas corpus be submitted in advance to the Superintendent

(8) Interference with inmates' efforts to assist one another by sending money to a lawyer

(9) Denial of legal assistance to residents of the honor dormitory

### PARAGRAPH 3

Paragraph 3 requires the institution to provide certain specific forms of assistance to inmates in connection with legal proceedings in which they are involved. The categories of assistance, which must be provided without charge or on credit, include the following:

(1) Supplies in the form of paper, pencils and pens

(2) Notarial services and

(3) Postage

## METHOD OF INVESTIGATION

In order to test compliance with this paragraph, the Special Master and his Assistant interviewed the two Inmate Legal Advisors functioning at M.C.I. as well as staff employed in the two mail rooms of the institution. In addition, records of requisitions submitted for law library materials were obtained from the Associate Superintendent for Treatment Services. Inmate input was provided by the Inmate Liaison Committee.

## EVIDENCE RELATING TO COMPLIANCE

Supplies in the form of paper, carbon paper, envelopes, legal pads and typewriter ribbons are reported by inmates to be in somewhat limited supply. By all accounts pens are not made available in the law library, where all materials referred to in Paragraph 2 are kept. An inmate is not permitted to receive free supplies or to purchase any of these materials on credit in the commissary.

At the same time, it does appear that the institution maintains a reasonable stock of such supplies, at least for the support of its limited formal legal assistance program. Requisitions indicate that $47.94 worth of such supplies were furnished to the law library from December 8, 1975, through March 3, 1976, averaging $15.98 per month. According to the Associate Superintendent for Treatment Services, the average monthly expenditure for law library supplies in 1975 was $8.00.

Such supplies as are made available to the law library are kept locked in the desk used by the two Inmate Legal Advisors and are distributed by those men to other inmates requiring supplies. According to one inmate in the honor dormitory, "There are some supplies left out for our use." Legal supplies of a limited nature are available for sale in the commissary, although a legal kit required by Administrative Regulation 837 is not available.

With respect to provision of notarial services, a total of 71 legal documents were notarized without charge in the month which began on January 19 and ended on February 20, 1976. Three staff members provided the following services:

```
Associate Superintendent for
 Treatment Services . . . . . . . 20 documents

Social Services Supervisor . . . . 47 documents

Personnel Office Employee . . . . . 4 documents
```

Notarial service is provided to residents of the honor dormitory by one of these three individuals on a regular basis. A widespread complaint by residents of the stockade relates to delays and "runarounds" which occur in an effort to obtain notary services. This should be compared to the system employed at S.O.C.F. where a "notary call" is held five mornings a week. Inmates desiring notary service are called on pass by Inmate Legal Advisors and a Notary Public is made available at a desk in the law library to perform notary services.

Finally, it does appear that first class postage for legal mail is made available on credit on a regular basis in the inside mail room. There is no evidence that any inmate has been refused regular first class postage for legal mail. This is in addition to the one letter per week at state expense which is provided in compliance with Administrative Regulation 814(a)(4). It does appear, however, that certified postage is not made available to an inmate for any purpose unless funds in his account are sufficient to pay for the postage. Furthermore, according to an undated memorandum distributed by the mail supervisor, certified postage was not available *for purchase* from December 11, 1975, through January 2, 1976, because of the pressures of the Christmas mail rush.

## RELEVANT ADMINISTRATIVE REGULATIONS

There are no Administrative Regulations directly relevant to this Paragraph of the Court's order. As indicated above, Administrative Regulation 837 requires that a "legal kit" be available for purchase in the commissary and Administrative Regulation 814(a)(4) requires that one letter per week

at state·expense be provided for each inmate. The institution complies with the latter, but not with the former.

## FINDINGS REGARDING COMPLIANCE

■ It is the finding of the Special Master that the institution is in compliance with the provisions of Paragraph 3 of the Court's order, with the exception of the failure to provide certified postage for legal mail, without charge or on credit, twelve months of the year. In view of the widespread distrust by inmates of the internal mail system at Marion Correctional Institution, at least partially justified by evidence of the inefficiency of the system, the requirement that certified mail be provided, at least on credit, seems a reasonable one.

While finding that the institution is in basic compliance with that portion of the Court's order requiring the provision of notarial services, the Special Master recommends that the system employed at S.O. C.F. be adopted in order to reduce complaints regarding difficulties encountered in obtaining such services within the stockade at M.C.I.

## PARAGRAPH 4

Paragraph 4 relates to censorship and exclusion of printed matter, and prohibits such censorship and exclusion of materials received from any source unless the publications are obscene or such as to constitute a clear and present danger to the security or safety of the institution. Such material may be censored or prohibited only on the basis of specific criteria, and then only as a result of a process designed to insure a fair and balanced hearing panel, notice to the affected inmate, a speedy determination of acceptability, the right to appeal, and the maintenance of records of censorship and exclusion for at least one year. The order prohibits the inclusion of any reference to such proceeding in any inmate's file.

■ At the outset, the limits of the phrase "printed matter" must be established. In addition to newspapers, magazines, pamphlets, and books—specifically

mentioned in this paragraph—inmates receive photographs and tape recordings. Photographs fall within the scope of a dictionary definition of the word "print", which includes "a photographic copy made on a sensitized surface." Webster's New International Dictionary (3d ed.) Tape recordings, which may be recorded commercially (eg. music) or by friends and relatives of an inmate, are not within the plain meaning of the term "printed matter." At the same time, magnetic tape recordings prepared by a relative or friend of an inmate are highly analogous to personal letters not subject to censorship by the terms of Administrative Regulation 814(1) except with prior written permission of the Director of the Department of Rehabilitation and Correction. This analogy is rejected by the terms of Administrative Regulation 826 which provides that all incoming and outgoing pre-recorded tapes are "subject to audible review by the staff of the institution." This regulation provides that such tapes are subject to Administrative Regulation 814(b) which proscribes censorship or exclusion of books, newspapers, magazines and other publications unless the obscene or inflammatory nature of the publication is established. The Special Master has thus treated incoming tape recordings by whomever recorded as a specie of "printed matter" within the scope of Paragraph 4 of the Court's order.

## METHOD OF INVESTIGATION

In order to test compliance with Paragraph 4, a number of interviews were held with the Associate Superintendent for Treatment Services, the individual designated by the Superintendent to deal with incoming materials subject to censorship or exclusion. A record of all incidents of exclusion since January, 1975, was obtained. On January 21, 1976, the Special Master requested that such records be submitted weekly, together with all excluded material other than that sent to Columbus for review by the Publications Screening Committee of the Department of Rehabilitation and Correction. This material was re-

viewed by the Special Master and his Assistant. Several conferences were held with mail room personnel in Marion individually and as a group to attempt to insure that all allegedly censorable material would reach the Associate Superintendent for Treatment. The views and a statement of practices of the Department of Rehabilitation and Correction itself were obtained in the course of interviews with staff in Columbus. Finally, knowledge of inmate experiences with the system employed at M.C.I. was obtained from the Inmate Liaison Committee.

### CURRENT PRACTICES AT M.C.I.

Censorable material may enter the institution in one of several ways. First class mail is received in the outside mail room. In the course of inspection for contraband, obscene or inflammatory material (usually in the form of photographs or advertisements) may be discovered. Second and third class mail—magazines and newspapers—are received in the inside mail room. Inspection may disclose objectionable material.

The staff of both mail rooms consult a list of "not to be permitted" publications as well as another "to be permitted" list issued by the Publications Screening Committee of the Department of Rehabilitation and Correction. See Appendix E, p. 273 infra. If the item in question appears on the "to be permitted" list, it is delivered to the inmate/addressee. All other questionable material is reported to be sent from the mail room to the Associate Superintendent for Treatment Services, without notice to the affected inmate. One exception may be material which is listed as "not to be permitted" by the Publications Screening Committee. At one time the Special Master was informed by the Associate Superintendent for Treatment Services and by inside mail room personnel that all questionable material, listed or not, was sent to the Associate Superintendent; at a later point in time, the manager of the inside mail room stated that materials on the "not to be permitted list" were excluded by the staff of the inside mail room without reference to the Associate Superintendent. In such case, inmates were said to be called to the inside mail room to indicate what disposition they wished to have made of the offensive material.

In view of the extremely small amount of second and third class material referred to the Special Master by the Associate Superintendent for Treatment Services, and because one copy of the "Gay Community News" which is routinely censored was retrieved by the Special Master from a wastebasket in the inside mail room in spite of the fact that the newspaper was addressed to an inmate residing at M.C.I., there is basis for believing that not all questionable material has been referred to the Associate Superintendent for his consideration. It is the belief of the Special Master that some such material is disposed of by personnel in the inside mail room.

Obscene or inflammatory material may enter the institution through inmates' visitors. In this case, it is discovered through routine searches conducted upon visitors and their possessions or through a very thorough (strip) search of the inmate upon his return from his visit. The practice at M.C.I., in accordance with Administrative Regulation 814(b)(1), is to insist that all books, magazines and newspapers be sent directly from the publisher. Unless prior permission has been obtained from the Associate Superintendent for Treatment Services, such materials are not permitted. A visitor found with such materials is told that they cannot be given to the inmate; an inmate found with such materials after a visit is subject to discipline. All material obscene or otherwise, is excluded.

When offending material reaches the Associate Superintendent for Treatment Services, he evaluates it. If he determines it to be permissible, he forwards it to the inmate/addressee; if he finds it to be objectionable, he calls in the affected inmate. The inmate is asked to sign a form in which he may (1) concur with the Associate Superintendent and request that the material be destroyed, (2) concur with the Associate Su-

perintendent and request that the material be mailed out of the institution at the inmate's expense, or (3) disagree with the Associate Superintendent and request that the material be submitted to the Publications Screening Committee in Columbus. In the last case mentioned, the inmate is informed (by text on the form) that he may make a "written comment or appeal" to the Publications Screening Committee within three days.

If material reaches the Publications Screening Committee, it will evaluate it. Material found to be permissible is required by Administrative Regulation 814(b) to be returned to the inmate; matter found to be objectionable is required by that Administrative Regulation to be returned to the sender or held as evidence for criminal prosecution. Notice and a statement of reasons for exclusion is sent to the Inmate by the Publications Screening Committee.

## EVIDENCE RELATING TO COMPLIANCE

Receipt of printed material "from any source" is not permitted at Marion Correctional Institution. Magazines, books and newspapers mailed into the institution by friends and relatives of inmates without prior permission of the Associate Superintendent for Treatment Services will not be delivered by the mail room staff; likewise, such materials may not be received by inmates from visitors without prior permission. The justification advanced for this policy, which accords with that announced in Administrative Regulation 814(b), is the difficulty of detecting contraband in the folds, spines, and covers of such publications. A cursory reading of the approved package items listed in Administrative Regulation 827, however, indicates that many items (eg. cigarettes, pipe tobacco, tube shampoo, baseball gloves, radios, televisions and stationery) may enter the institution without prior permission although they may require a careful and painstaking search for contraband. See Appendix F, p. 279 *infra*. No reliable evidence was discovered concerning the frequency or success of re-

quests for prior approval. The provisions of Administrative Regulation 814(b) notwithstanding, it is interesting to note that a memorandum of October 25, 1972, from the then Director of the Department of Rehabilitation and Correction instructed all managing officers to admit all printed material "from any source" citing *Taylor v. Perini.*

Several clear examples of the operation of this policy at M.C.I. were found. One inmate received three packages by mail, postdated May 2, 1975. These packages contained back issues of magazines and one old newspaper. These materials were held by the Associate Superintendent for Treatment Services until February 23, 1976, when the Associate Superintendent agreed to release the material to the affected inmate at the request of the Special Master. The mother and father of another inmate were told that they were not allowed to give their son copies of "Playboy", "Penthouse", or "Oui" and that they were not to bring them again. A third inmate put the matter to the Inmate Liaison Officer as follows:

Sorry to bother you again but I had some friends come to visit today; they brought me a few books from their private library but were told I was permitted to receive only books mailed directly from the publisher.

Article # 4 on page # 3 of the recently posted Notice of the U. S. District Court in Toledo, Ohio, in essence says we inmates may receive all reading materials, unless found to be obscene or a security risk, "from any source."

Please straighten this out for us.

Thank you Sir.

Respectfully submitted,

/s/ ___

The written response from the Inmate Liaison Officer made no reference to the Court's order, then in effect for more than three years:

Administrative Regulation 814(b), Section 1, states: "An inmate may receive a reasonable number of books, newspaper, magazines, and other publication directly from a publisher or distributor. Materi-

als may be received from other sources, such as the Inmate family or friends with prior approval for (sic) the administration. All materials are subject to inspection for contraband." Therefore, prior to receiving any books from a private source you would need prior approval from the administration. In the case prior approval would have to be received from Mr. Butchko, Associate Superintendent of Treatment. Should you have any questions regarding this matter you should direct them to Mr. P. J. Butchko.

Much material excluded to date at M.C.I. has been prohibited on the basis of its allegedly obscene nature. Paragraph 4 of the Court's order requires the application of "applicable constitutional criteria as established by the United States Supreme Court." The Special Master, accustomed as he is to the relative certainty provided by the language of the Uniform Commercial Code and the Bankruptcy Act, approaches the task of distilling workable criteria from the language of the Supreme Court's opinions in *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), and *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), *inter alia*, with some trepidation.

The Supreme Court in *Miller, supra*, announced the following basic guidelines:

(a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, (citations omitted); (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. 413 U.S. 15 at 24, 93 S.Ct. 2607 at 2615, 37 L.Ed.2d 419 at 431.

*Miller* changed two important aspects of the law announced by earlier cases. First, contemporary community standards which were thought under *Roth* and *Memoirs* to be national standards were narrowed to local standards. (*Miller* itself utilized a statewide community for its local community.) Second, the "utterly without redeeming social value" test of *Memoirs* was rejected and replaced by that of without "serious literary, artistic, political, or scientific value." Although *Miller* may be read as increasing permissible state control of obscenity, there is a strong theme running throughout the majority opinion that only "hard-core" pornography is meant to be banned.

Having said this, the Special Master must acknowledge that in making his investigation and in reaching his conclusions with respect to the nature of material excluded by officials at Marion Correctional Institution, he has kept in mind the language of Mr. Justice Stewart's memorable concurring opinion in *Jacobellis v. Ohio*, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1963):

I have reached the conclusion, which I think is confirmed at least by negative implication in the Court's decisions since *Roth* and *Alberts* [*Alberts v. California*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498], that under the First and Fourteenth Amendments criminal laws in this area are constitutionally limited to hard-core pornography. I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligently doing so. *But I know it when I see it,* and the motion picture involved in this case is not that. 378 U.S. at 197, 84 S.Ct. at 1683, 12 L.Ed.2d at 803. (emphasis added)

A few examples of censorship which has occurred will suffice. Numerous copies of the "Gay Community News" which styles itself "the gay weekly for the northeast" have been refused entrance to the institution. Headlines on the first page of the December 6, 1975, issue include: LEGAL MOVES EXHAUSTED—JUDGE WON'T FREE GRUSSE, TURGEON: THE VARA BARS: ENDLESS SAGA; PHILLY CENTER NEARS REALITY; ANTI–GAY BILL PASSES 44–2. The entire issue contains no photographs or drawings which are

sexually oriented beyond two drawings of males clad in brief underwear or otherwise covered from the waist down which appear in two advertisements. In addition, all photographs of male nudes in non-suggestive poses have been excluded routinely. Also refused entrance was an advertisement for color films which were "award winning finalists in the Third International Porn Film Festival." This four-page advertisement contains no pictures whatsoever. The description of "Cherry-Pickers", the film awarded "the highest possible prize" is as follows:

What do young, rich, virile, well hung men who have experienced every thrill of the flesh do to amuse themselves, worldly, sophisticated jet-setters that they are? They band together in a secret sex club, dedicated to introducing juicy, wet-lipped, radiantly beautiful young virgins to the many and varied joys of bed, and love making in all its aspects. Who are they? An oil rich Arab sheik, a Japanese shipping millionaire, the son of the President of an African Republic and a Swedish producer of porno movies.

What are they after? All those delightful young and beautiful virgins out there, just waiting for the right man or men to wake up their bodies with caresses they have had hot dreams about. Men who will touch them in the dark and moist secret places of their gorgeous yearning young flesh.

The Cherry-Pickers band together to find the most beautiful young virgins in the world and introduce them to hot, heavy, passionate, lustful sex. And you are there, you watch, you participate in these red hot sex sessions as these super-lovers, who really know how to turn on, arouse, stimulate and satisfy any woman, do their best to make these girls into their more than willing sex slaves.

You watch Gamal as he penetrates white-skinned, blonde Eaika, and begins a steamy love session that seems to go on forever, thanks to his age-old Arabian secrets of conserving male strength. You gasp in wonder at the massive male equipment of virile young Jubu-Jubu as he makes a tender young girl from California eat him up. And you envy Taruko-San as he reduces large-breasted, flowy-thighed Renee to a quivering mass of tender young flesh begging for more. This and more that we cannot tell you about is packed into this amazing 200' Super 8mm film. When you see it you will know why it was awarded the Supreme Best Film prize!

The advertisement concludes with an order form, listing the price of each film as $8.00, a copy of the "Cherry-Pickers" being included free with any order. In view of the unavailability of movie projectors at the command of inmates in the institution, the advertisement is unlikely to result in orders from inmates.

Publications listed on the "not to be permitted" list prepared by the Publications Screening Committee (See Appendix E, at p. 277 *infra.*) are equally beyond the scope of the Supreme Court's limitations upon censorship. Such publications as "Sex to Sexty" (non-explicit, sexually oriented cartoons), "The Advocate" (a homosexual newspaper containing photographs of male nudes, suggestive advertisements and "personals" but no explicit sexual activity) and "Swingers World" (heterosexual magazine with photographs of simulated sexual activity and "personals" with nude photographs) are illegally restricted. On the other hand the March, 1975, issue of "Hustler", which is admitted to institutions (see "to be permitted list" number 57), contains a picture of a dog apparently attempting intercourse with a woman and a photograph of a penis covered with excrement and blood, in juxtaposition with the rectum of a female. Advertisements for sexual paraphernalia which appear in "Hustler" are virtually identical to those appearing in publications on the Department's proscribed list.

Thus materials are being excluded, both by the Associate Superintendent of Treatment Services at M.C.I. and by the Publications Screening Committee in Columbus, which fail to meet the standards established by the United States Supreme Court in *Miller.*

In addition to censorship of books, magazines, and newspapers, all incoming tape recordings are listened to before delivery to the inmate/addressee. The Special Master questions that such recordings prepared by friends or relatives of the inmate could ever meet the Supreme Court's standard of obscenity. Because the identical words, if written in a letter, would be beyond the reach of the institution, it would appear that private comments recorded on magnetic tape should be similarly immune from censorship (other than routine visual inspection for contraband). Whether or not commercially recorded tapes may ever constitute obscenity may well be debatable. No case dealing with the question was found by the Special Master. At most, such a possibility would require only brief surveillance for the purpose of verification that the tape is indeed commercial in nature and inoffensive.

Also routinely excluded are nude photographs of wives and girl friends of the inmate. Such photographs, although considerably less revealing in many instances than photographs of models in "Playboy", "Penthouse", and "Hustler", are regarded by the institution and by the Publications Screening Committee as being obscene. The rationale for this distinction escapes the understanding of the Special Master.

There is no evidence of significant proportions of censorship of printed material allegedly constituting a clear and present danger to the security or safety of the institution. Likewise there is no evidence of efforts to screen out extreme political material, other than those examples which appear on the "not to be permitted" list of the Publications Screening Committee, e. g. "Inez Garcia Defense Committee" and "American Journal of Revenge."

Marion Correctional Institution has not attempted to develop specific criteria of non-acceptability, as required by paragraph 4(a) of the Court's order. The Publications Screening Committee's list of materials "not to be permitted" and the subjective judgment of mail room personnel and the Associate Superintendent for Treatment Services are the bases for decisions to admit or deny incoming materials. General criteria have been published by the Department of Rehabilitation and Correction in the form of Administrative Regulation 814(b)(3):

Publications may be excluded from an institution for one or both of the following reasons:

A. The publication is "obscene" under United States Supreme Court standards, that is, the dominant theme of the publication when considered in its entirety, is patently offensive to prevailing community standards relating to the description or representation of sexual matters, and the publication is utterly void of redeeming social value.

B. The publication is "inflammatory", that is, the presence of the publication in the institution would constitute a clear and present danger of inciting criminal activity, such as rioting or escape. No publication shall be held to be inflammatory solely on the basis of its appeal to a particular ethnic, racial, or religious audience.

It should be noted that the Department's definition of obscenity incorporates the then prevalent standard—utterly void of redeeming social value—which was altered by the Supreme Court in *Miller.* In a memorandum of October 25, 1972, the then Director of the Department of Rehabilitation and Correction instructed all Managing Officers to admit all printed material except that found to be either obscene or such as pose a "clear and present danger to the security of the prison." The definitions of these categories were stated to be as follows:

I MATERIAL WHICH IS CENSORABLE, AND MAY BE EXCLUDED FROM OHIO PENAL INSTITUTIONS includes the following:

A. *Obscenity.* To be obscene, printed matter must appeal solely to prurient (i. e., lewd) interest, must be contrary to accepted community standards, and

must be utterly without redeeming social value. If part of the material is pornographic, but part of it has redeeming social value, it must be admitted.

B. *Matter which constitutes a clear and present danger to the safety of the institution.* This includes "instruction in picking locks, digging tunnels or making weapons," or any matter posing a physical danger to security. Weapon catalogues, and articles on the operation or conversion of firearms, will not be admitted.

C. *Matter which poses a clear and present danger to the purpose of rehabilitation.* This includes publications which encourage criminal proclivities or enhance criminal skills, such as instruction in weaponry, or the illegitimate use, acquisition of abuse of drugs. However, articles educating the public to the problems of drug abuse are admissible.

Moving to the question of the procedures employed by Marion Correctional Institution, these do not include the use of a decision making panel of three or more persons. The responsibility for screening all publications is vested solely in the Associate Superintendent for Treatment Services.

The first notice which an inmate receives regarding the prohibition of any printed material is that provided by the meeting which he has with the Associate Superintendent for Treatment Services. Of sixteen censored items bearing a postmark and submitted to the Special Master for review, six (slightly more than 35%) were postmarked more than seven days before the inmate received any notification of the identification of the material, the interim prohibition, or the reason for the prohibition.

| POSTMARK DATE | CITY OF ORIGIN | DATE OF NOTICE |
|---|---|---|
| 1/27/76 | Los Angeles | 2/17/76 |
| 1/27/76 | Raritan, N.J. | 2/17/76 |
| 1/13/76 | Van Nuys, Calif. | 1/30/76 |
| 1/21/76 | Los Angeles | 1/29/76 |
| 1/19/76 | Jonesboro, Ga. | 1/29/76 |
| 6/19/75 | St. Paul, Minn. | 10/17/75 |

Because there is no *institutional* panel by which to be heard, the inmate never receives notice of any such right.

The decision to exclude is handed to the inmate in writing at the time of his meeting with the Associate Superintendent for Treatment Services. Space on the form is provided for a statement of reasons for exclusion. Of 28 copies of such notice which were submitted to the Special Master covering exclusions from January 1, 1976, through February 17, 1976, the reasons given for exclusion were the following:

"Not permitted" or "not permitted in institution" . 20 cases

"No nude photos" or "Nude Photo" . . . . . . . . . 7 cases

"Sanitary reasons" . . . . . . . . . . . . . . . . 1 case

An inmate who disagrees with the decision of the Associate Superintendent for Treatment Services may appeal that adverse decision to the Publications Screening Committee in Columbus. Administrative Regulation 814(b)(5)(B)(3) requires that the Publications Screening Committee make its recommendation to the Director of the Department of Rehabilitation and Correction within two weeks. One case monitored by the Special Master indicates that the two-week deadline is not met invariably:

1/22/76 "Swingers" magazine evaluated by the Associate Superintendent for Treatment Services, M.C.I.

1/23/76 Inmate/addressee requested appeal to the Publications Screening Committee

1/29/76 Letter from the Assistant to the Special Master to Department of Rehabilitation and Correction seeking information concerning disposition of this appeal.

2/ 3/76 Response from Coordinator/Convenor of the Publications Screening Committee stating that the item "is being circulated among members of the (committee)." The letter states, "Very shortly, after the members have individually considered the various materials being circulated, there will be a meeting of the entire Committee together. I will be pleased to report to you the action of the Committee."

As of the date of preparation of this report, no further word has been received from Columbus by the Special Master or his Assistant.

The Special Master requested a copy of all records of decisions prohibiting printed material. These records were provided by the Associate Superintendent for Treatment Services. The first record is dated January 27, 1975. These records indicate that a total of 36 incidents occurred from January 27, 1975, through December 31, 1975. Of these, five occurred in December, 1975, after the appointment of the Special Master. Twenty-eight such incidents were reported between January 6, 1976, and February 17, 1976. Such an unbelievable rate of increase in the institution's receipt of pornography since the appointment of the Special Master is evidence that proper records have not been maintained in the past.

Finally, random examination of files of inmates whose names appear in records submitted to the Special Master has not disclosed any evidence that records of decisions relating to censorship or exclusion of printed material are placed or referred to in any inmate's file.

### RELEVANT ADMINISTRATIVE REGULATIONS

Administrative Regulation 814(b), Appendix G, p. 285 *infra*, provides that publications may be excluded from an institution only if they are "obscene" or "inflammatory". This regulation together with the Director's memorandum referred to on pp. 212, 213 *supra*, attempt to define these terms in a general way. The Administrative Regulation establishes the Publications Screening Committee of four members, three of whose current members are not employees of the Department of Rehabilitation and Correction. The Regulation provides for initial screening by the institution mail office and for questionable material to be forwarded "to the Managing Officer or the person designated by him to review publications." Such person is required to make a decision "as soon as is administratively possible after receipt of the publication" and must prepare a written decision in every case of exclusion. Within three business days after receipt of the publication by the institution, the person making the decision must notify the inmate in writing and forward the publication to the Publications Screening Committee.

This Regulation fails to comply with the requirements of the Court's order that criteria for exclusion be *specific*, that a panel of *three or more persons* make any decision at the *institutional* level, that the inmate be afforded a hearing at the *institutional* level, and that printed matter be admitted *from any source*. It should be noted that the Administrative Regulation assumes that *all* excluded materials will be forwarded to the Publications Screening Committee within three days of their receipt by the Institution. Current practices at M.C.I. clearly violate this provision of the Regulation. Although Administrative Regulation 814(b) provides for the establishment and maintenance of the "to be permitted" and "not to be permitted" lists, there is no suggestion that the appearance of a publication on the proscribed list is intended to eliminate the necessity that the material be forwarded to the Publications Screening Committee.

Administrative Regulation 826, Appendix H, p. 287 *infra*, permits surveillance of incoming and outgoing recorded tapes and subjects them to the provisions of Administrative Regulation 814(b).

### FINDINGS REGARDING COMPLIANCE

The finding of the Special Master with regard to Paragraph 4 of the Court's order is that the institution is in a state of noncompliance with virtually all of the provisions of that paragraph and that the evidence suggests that no good faith effort has been made to comply with the requirements of the Court's order with respect to censorship or exclusion of printed materials. In particular, the Special Master finds noncompliance in the following respects:

(1) Failure on the part of mail room personnel to forward all intercepted material to the Associate Superintendent for Treatment Services

(2) Refusal to permit receipt of any printed matter from sources other

than the publisher or distributor without prior approval

(3) Failure to develop specific written criteria of non-acceptability

(4) Routine surveillance of incoming recorded tapes prepared by private individuals and others

(5) Exclusion of materials which are not obscene under the applicable constitutional criteria as established by the United States Supreme Court, including photographs of wives and girl friends which would not be obscene if published commercially

(6) Failure to employ a decision making panel at the institutional level as required by paragraph 4(b) of the Court's order

(7) Failure to give prompt notice of any kind to the inmate/addressee indicating the material withheld, the reason for the prohibition, and his right to a hearing at the institution

(8) Failure to provide a meaningful hearing at the institutional level

(9) Failure to provide the inmate/addressee with a written decision on admissibility within one week following the initial arrival of the material at the institution

(10) Failure to provide the inmate/addressee with a meaningful reason for any decision to exclude material

(11) Failure of the Publications Screening Committee to decide an appeal to it within two weeks of the time such appeal is lodged

(12) Failure to maintain complete records of all censorship activities at the institution for a period of one year or longer

The Special Master finds compliance with Paragraph 4 only in that references of proceedings relating to excluded material are not placed or referred to in any inmate's file.

## PARAGRAPH 5

Paragraph 5 of the Court's order requires the institution to purchase 117 books and magazine subscriptions comprising 91 titles, subject to the availability of library funds. These materials relate to Black experience, culture, history, and art.

## METHOD OF INVESTIGATION

Information relating to compliance with this paragraph was obtained from interviews with the Director of the Education Department of the institution whose jurisdiction includes the library. The Special Master made a visual inspection of all titles on the shelf as well as library check out cards indicating that inmates were in possession of certain of the required volumes. The Director of the Education Department made available a copy of his book order and the subsequent requisition issued for the purchase of books relevant to this paragraph of the Court's order.

## EVIDENCE RELATING TO COMPLIANCE

Data submitted by the Director of the Education Department and information gained through visual inspection of the institution library produced the following data:

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT 1/16/76 | NUMBER ORDERED BY M.C.I. | NUMBER ON STATE REQUISITION 2/4/76 |
|---|---|---|---|---|---|
| 1 | African Affairs | 1 | | 1 | 1[a] |
| 2 | Afro USA | 1 | | 1 | 1 |
| 3 | I Know Why Caged Birds Sing | 3 | 1 on shelf | 1 | 1 |
| 4 | Negro Slave Revolts | 1 | | 1 | 1 |

a Appears on separate State Requisition

## APPENDIX B—Continued

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT 1/16/76 | NUMBER ORDERED BY M.C.I. | NUMBER ON STATE REQUISITION 2/4/76 |
|---|---|---|---|---|---|
| 5 | Go Tell It on the Mountain | 1 | | | |
| 6 | Tell Me How Long the Train's ... | 1 | | 1 | 1 |
| 7 | Freedom Summer | 1 | | 1 | 1 |
| 8 | What Manner of Man? | 1 | 1 checked out | 1 | 1 |
| 9 | Black Scholar | 1 | | | |
| 10 | Black World | 1 | | | |
| 11 | American Negro Poetry | 1 | | | |
| 12 | Negro Leader in Time of Crisis | 1 | | 1 | |
| 13 | Life & Loves of Mr. Jive-Ass Nigger | 1 | | | |
| 14 | Manchild in the Promised Land | 1 | | | |
| 15 | Die Nigger Die | 1 | | 1 | 1 |
| 16 | Five Plays | 1 | | | |
| 17 | Black Power | 1 | | 1 | 1 |
| 18 | Malcom X: Man & His Times | 1 | | 1 | 1 |
| 19 | Dark Ghetto | 1 | | 1 | 1 |
| 20 | Soul on Ice | 1 | | 1 | 1 |
| 21 | Justice Denied | 1 | | 1 | 1 |
| 22 | Rivers of Blood, Nights of Darkness | 3 | | 1 | 1 |
| 23 | Black Theology | 1 | | 1 | 1 |
| 24 | Black Moses | 1 | | 1 | 1 |
| 25 | Crises of the Negro Intellectual | 1 | | 1 | 1 |
| 26 | The American Slave Trade | 3 | | 3 | 3 |
| 27 | If They Come in the Morning | 1 | | 1 | 1 |
| 28 | Black Reconstruction | 3 | 2 on shelf 1 checked out | | |
| 29 | Souls of Black Folk | 3 | | 3 | 3 |
| 30 | Invisible Man | 3 | | 1 | 1 |
| 31 | Black Nationalism | 3 | | 3 | 3 |

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT 1/16/76 | NUMBER ORDERED BY M.C.I. | NUMBER ON STATE REQUISITION 2/4/76 |
|---|---|---|---|---|---|
| 32 | Black Skin, White Mask | 1 | | 1 | 1 |
| 33 | Wretched of the Earth | 1 | 1 on shelf | 1 | 1 |
| 34 | Negro Slave Song | 1 | | 1 | 1[b] |
| 35 | Negro Slave & Protest Songs | 1 | | | |
| 36 | Conjure Man Dies | 1 | | 1 | 1 |
| 37 | Walls of Jerico | 1 | | 1 | 1 |
| 38 | Emancipation Proclamation | 1 | 1 on shelf | | |
| 39 | From Slavery to Freedom | 3 | 2 on shelf | | |
| 40 | Reconstruction | 1 | 1 on shelf | | |
| 41 | The Negro Family in the U.S. | 1 | 1 checked out | | |
| 42 | Freedom Ways | 1 | | | |
| 43 | Black Feeling, Black Talk | 1 | | 1 | 1 |
| 44 | Rebellion in Newark | 1 | | | |
| 45 | Blood in My Eye | 1 | | 1 | 1 |
| 46 | Autobiography of an Ex-colored Man | 1 | | 1 | 1 |
| 47 | Blues People | 1 | 1 on shelf | | |
| 48 | The Dutchman & the Slave | 1 | | 1 | 1 |
| 49 | Home | 1 | | 1 | 1 |
| 50 | The Journal of Negro History | 1 | | | |
| 51 | And Then We Heard Thunder | 1 | | 1 | 1 |
| 52 | Stride Toward Freedom | 1 | 1 on shelf | | |
| 53 | The Trumpet of Conscience | 1 | 1 checked out | | |
| 54 | Where Do We Go From Here | 1 | | | |
| 55 | Why Can't We Want | 1 | | 1 | 1 |
| 56 | King: A Critical Biography | 1 | | 1 | |
| 57 | Black Folk Tales | 1 | | 1 | 1 |

b Plus one additional volume added to the State Requisition by error

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT 1/16/76 | NUMBER ORDERED BY M.C.I. | NUMBER ON STATE REQUISITION 2/4/76 |
|---|---|---|---|---|---|
| 58 | Look Out Whitey; ... | 1 | | 1 | 1 |
| 59 | Black Muslims in America | 1 | 1 checked out | | |
| 60 | Autobiography of Malcom X | 3 | 1 checked out | 2[c] | 2[c] |
| 61 | Riots & Rebellion | 1 | 1 checked out | | |
| 62 | The Hit | 1 | | 1 | |
| 63 | Banjo | 1 | | 1 | 1 |
| 64 | Home to Harlem | 1 | | 1 | |
| 65 | My Daddy was a Number Runner | 3 | | 1 | 1 |
| 66 | Inside | 1 | | 1 | 1 |
| 67 | American Negro Revolution | 1 | | 1 | 1 |
| 68 | African Traditional Religions | 1 | | | |
| 69 | Diary of a Sit-in | 1 | 1 on shelf | | |
| 70 | Black Abolitionist | 1 | 1[d] on shelf | | |
| 71 | Mr. Lincoln & the Negroes | 1 | 1 on shelf | | |
| 72 | The Negro in the Civil War | 1 | 1 on shelf | | |
| 73 | Black America | 1 | | 1 | 1 |
| 74 | Seize the Time | 1 | | 1 | 1 |
| 75 | Crisis in Black & White | 1 | 1 checked out | | |
| 76 | Mississippi; The Closed Society | 1 | 1 checked out | | |
| 77 | Rhetoric of Black | 1 | | 1 | |
| 78 | The Peculiar Institution | 3 | 3 on shelf | | |
| 79 | The Story of Jazz | 1 | | | |
| 80 | Black Political Power in the United States | 1 | | 1 | 1 |
| 81 | Letters from Mississippi | 1 | | 1 | |
| 82 | Black Religion | 1 | | 1 | 1 |

c Plus one additional volume ordered by the institution in error and reflected in the State Requisition

d Plus one additional volume ordered by the institution in error

| No. | TITLE | NUMBER REQUIRED BY ORDER | ON SHELF OR CHECKED OUT 1/16/76 | NUMBER ORDERED BY M.C.I. | NUMBER ON STATE REQUISITION 2/4/76 |
|---|---|---|---|---|---|
| 83 | From Race Riot to Sit-in | 1 | | 1 | 1 |
| 84 | Freedom Now! | 1 | | 1 | 1 |
| 85 | The Man Who Cried I Am! | 1 | 1 on shelf | | |
| 86 | Strange Career of Jim Crow | 1 | | 1 | 1 |
| 87 | Native Son | 3 | 1 on shelf | | |
| 88 | Uncle Tom's Children | 3 | | 3 | 3 |
| 89 | The Choice, Issue of Black Survival in America | 1 | | 1 | 1 |
| 90 | Beyond Racism | 1 | | 1 | 1 |
| 91 | The New Abolitionists | 1 | — | 1 | 1 |
| | TOTAL | 117 | 28 | 67 | 61 |

These data establish that only 28 of the 117 required volumes are presently available in the library. Of the missing 89 volumes, 67 have been ordered by the institution, and 61 of these 67 are reflected in the state requisition. It thus appears that 22 volumes have not been ordered by the institution and that 28 cannot be established as having been ordered by the Department.

Although not altogether relevant to the question of compliance with Paragraph 5 of the Court's order, the Director of the Education Department requested that he be permitted to submit a list of titles of books relating to the Black experience which are presently held by the M.C.I. library although they are not required to be purchased by Paragraph 5 of the order. That list, which evidences the bona fide interest of the institution in purchasing materials which will be of interest to Black inmates, follows:

### Black Experience Materials Not Included on Court Order

Daniel J. Leab, From Sambo to Superspade

Philip Durham and Everett L. Jones, The Adventures of the Negro Cowboy

Richard Durham, The Greatest Muhammad Ali: My Own Story

Robert G. Weisbord, Genocide?: Birth Control and The Black American

Chester Himes, Black on Black

Robert W. July, Precolonial Africa

Elliott P. Skinner, People and Cultures of Africa

John Hope Franklin, The Negro in 20th Century America

John S. Mbiti, Introduction to African Religion

Langston Hughes, An African Treasury

Darwin T. Turner, Black American Literature Essays

Black Experience Materials Not Included on Court Order—Continued

Arthur P. Davis and Michael W. Peplow, The New Negro Renaissance

Richard Wright, The Outsider

James Baldwin, If Beale Street Could Talk

James Baldwin, Blues for Mister Charlie

Francis Joseph Kichak, The Serpent and The Dove

Booker T. Washington, Up From Slavery

Editors of Ebony, 1,000 Successful Blacks Vol. 1

Editors of Ebony, Famous Blacks Give Secrets of Success Vol. 2

Editors of Ebony, Career Guide Vol. 3

Editors of Ebony, The Ebony Handbook

Harry A. Ploski, Ph. D. & Ernest Kaiser, The Negro Almanac

Robert Ewell Greene, Black Defenders of America: 1775-1973

Editors of Ebony, Pictorial History: Black America Vol. 1, 2, 3

Editors of Ebony, Pictorial History: Black America 1973

Rhoda Hoff, America: Adventures in Eyewitness History

August Meier & Elliott Rudwick, Core: A Study in the Civil Rights Movement

Marc Howard Ross, Grass Roots in an African City

Gresham M. Sykes, Social Problems in America

Michael Dorman, We Shall Overcome

Sarah Patton Boyle, The Desegregated Heart

Major J. Jones, Christian Ethics for Black Theology

Janet Harris, The Long Freedom Road

Carl Becker, The Declaration of Independence

Immanuel Wallerstein, Africa: The Politics of Unity

Jim F. Heath, Decade of Disillusionment:

Peter Ritner, The Death of Africa

J. E. Baker, The Right To Participate:

Alan Reitman, The Pulse of Freedom

Margaret B. Young, Martin Luther King Jr.

Gerald Astor, And A Credit To His Race: Joe Louis

Peter J. Parish, The American Civil War

Wole Soyinka, Poems of Black Africa

Gladys-Marie Fry, Night Riders: In Black Folk History

George Lynn Cross, Blacks in White Colleges

Black Experience Materials Not Included on Court Order—Continued

Arthur Widder, Adventures in Black

Allen B. Ballard, The Education of Black Folk

Carl T. Rowan, South of Freedom

Nikki Giovanni, The Women and The Men

Peter Davies, The Truth About Kent State:

John Hope Franklin, The Emancipation Proclamation

Lance Jeffers, When I Know the Power of My Black Hand

Henry Blakely, Windy Place

David Delman, One Man's Murder

Leonard Levitt, An African Season

Jerry Rubin, Do It!

C. Duncan Rice, The Rise and Fall of Black Slavery

---

The state form requisitioning 61 volumes required by P. 5 refers to "Federal Grant I–6AA–6–73S" from which payment for these volumes will be drawn. The most recent report of the status of funds in that grant account indicates a "total available to expend" by Marion Correctional Institution of $21,000. Thus it appears that more than sufficient funds are available to effectuate compliance with the requirements of the Court's order.

## FINDING REGARDING COMPLIANCE

██ The data presented above established beyond doubt that the institution is in a state of noncompliance with this Paragraph of the Court's order. While the list of materials which are available though not required by the order demonstrates that the institution has made a good faith effort to provide materials of interest to black inmates and to improve the overall holdings of the library, the fact that only 28 volumes of a total of 117 required by the order are available presently to inmates almost three and one half years after the issuance of the consent order in *Taylor v. Perini* cannot be justified. The state purchase order indicates an average cost per volume of $5.22

for the more than 60 volumes ordered. If this figure represents a fair average cost per volume for the 117 volumes required by the Court's order, the total cost of compliance will be slightly more than $600.

## PARAGRAPH 6

This Paragraph prohibits the imposition of any disciplinary sanction or the making of any adverse disciplinary reference in an inmate's file in the absence of definite and specific written rules and regulations. These rules and regulations must be distributed and/or posted so as to provide fair notice to inmates of conduct which is prohibited and the permissible range of sanctions for each violation.

## METHOD OF INVESTIGATION

The investigation of the state of compliance with Paragraph 6 began with a careful reading of the Inmate Manual prepared by M.C.I. and distributed to all inmates upon their arrival in Marion. Similarly, a Correctional Employees Reference Manual distributed to all incoming staff was read. Interviews with staff and inmates, as well as discussion with members of the Inmate

Liaison Committee, were held. Commencing December 1, 1975, records of all Hearing Officer and Rules Infraction Board proceedings were compiled and submitted to the Special Master on a weekly basis. These records were analyzed by the Special Master and his Assistant. Because of the vague language of one offense, most tickets issued since December 1, 1975, for a violation of that provision were read in detail. In addition, selected inmate records were examined. Finally, the Special Master and his Assistant attended a disciplinary hearing held by a Hearing Officer and listened to a complete tape recording of two Rules Infraction Board hearings.

## PROCEDURES AT M.C.I.

Any staff member may issue a conduct report (ticket) for the violation of any rule of conduct. See Appendix I, p. 288 *infra*. Three classes of offenses are established by Administrative Regulation 804(a) and reproduced in the Inmate Manual prepared by M.C.I. The complete list of offenses, by class, in the Inmate Manual is as follows:

Class I offenses: (This type of offense is one that is a violation of Ohio law).*

1. Escape
2. Aiding or inducing inmates to escape
3. Involvement in a major disturbance or a riot
4. Conveying articles into an institution to aid an escape.
5. Conveying intoxicating liquors or drugs into an institution
6. Holding an officer as a hostage or wounding an officer
7. Offenses relating to persons, such as murder, attempted murder, and assaults, including sexual assaults.
8. All other felonies under Ohio Revised Code or laws of the United States

Class II offenses:

1. Disobedience of a direct order, which shall include aggravated insubordination
2. Refusal to carry out a work or other institutional assignment
3. Refusal of assignment or classification action
4. Creating a minor disturbance
5. Fighting with or without weapon
6. Theft of property
7. Possession or consumption of any intoxicant, such as liquors or drugs, unless with permission
8. Possession or manufacture of weapons or contraband, which shall include any article knowingly possessed for which permission has not been given.
9. Dealing, which shall include any transaction for which payment of any kind is made, promised, or expected
10. Forging documents
11. Consensual sex acts
12. Threats with or without a weapon or use of force
13. Gambling or possession of gambling articles
14. Any Class I offense
15. Malicious destruction, alteration, or misuse of property
16. Any act not specifically set forth herein, knowingly done which constitutes an obviously immediate and direct threat to the security of the institution, its staff, other inmates, or the inmate himself
17. Any act of an inmate aiding and abetting a Class II rule violation
18. Any repeated violation of Class III rules, where a determination is made that remedies for Class III rule violations serve no deterrant effect.

\* Only one Class I offense (escape) was reported from December 1, 1975 to February 20, 1976. No further references to Class I offenses will be found in this report.

Class II offenses—Continued

19. All misdemeanors specified in the Ohio Revised Code or U.S. Code such as mail violations
20. Business expenditures, either for profit, or not for profit, including usury, without specific permission in writing from the Managing Officer
21. Conspiracy to violate a rule of conduct

Class III offenses:

1. Disrespect to an officer or staff member, or an inmate.
2. Being out of place
3. Horseplaying
4. Smoking in a prohibited area
5. Unexcused tardiness or absence from a job or pass
6. Investigate** work performance
7. Excessive loud noise, such as a radio, T.V. or shouting
8. Seductive and obscene acts
9. Carelessness with tools and equipment
10. Dirty clothing, living quarters, or poor personal hygiene
11. Manufacturing items without permission
12. Giving false information or lying
13. Self mutilization (sic) including tatooing
14. Making unfounded complaints and charges against members of the staff.***
15. Aiding and abetting Class III rule violations
16. Violation of any other published institutional rules, regulations or procedures.

** "Investigate" is apparently a typographical error in the Inmate Manual. The statement of this rule in Administrative Regulation 804(a) is "_Inadequate_ work performance." (emphasis added.)

*** The version of this rule contained in Administrative Regulation 804(a) reads as follows: Making unfounded complaints and charges against members of the staff, _inmates and the institution with malicious intent_. (emphasis added.)

---

The ticket is written and signed by the complaining staff member, who then submits it to an Administrative Review Officer, generally the Shift Captain. The Administrative Review Officer may approve, withdraw, or change and approve the charge. This officer then signs the ticket and delivers a copy to the affected inmate whose signature is sought. If the violation charged constitutes an immediate and direct threat to the security of the institution, the staff, the inmate himself, other inmates, or institutional property, the inmate will be placed in a correctional cell in prehearing detention; otherwise no immediate disciplinary action is taken.

Whatever the charge, the inmate first appears before a Hearing Officer. This hearing is held promptly (within 24 hours unless the offense occurs on a weekend).

Class III offenses are disposed of at the Hearing Officer level. If the inmate is charged with violation of a Class II rule, the Hearing Officer may treat the Class II offense as a Class III offense and dispose of it or he may refer the case to the Rules Infraction Board. The sanctions available to the Hearing Officer are limited by Administrative Regulation 805 to the following:

(a) Discipline through loss of privileges or extra work assignment which shall be individualized as much as possible;

(b) Counseling;

(c) Referral to treatment, classification, or institutional services;

(d) Reprimands or warnings; or

(e) Referral to the Rules Infraction Board for further proceedings.

Note that under some circumstances the Hearing Officer may rewrite a Class III ticket as a violation of Class II–18 and refer the case to the Rules Infraction Board. In any case, the Hearing Officer will make a written finding. See Appendix J, p. 289 *infra.*

If the Hearing Officer determines that substantial evidence exists that a violation of a Class II rule has occurred, the inmate will appear before the Rules Infraction Board after a period of 24 hours in which to prepare his defense. This period may be waived in writing by the inmate.

The Rules Infraction Board is comprised of three staff members, two from custody and one from social services. The inmate may request the presence of witnesses, including the charging officer. See Appendix K, p. 291 *infra.* Evidence is taken and a decision is rendered and announced to the inmate. All proceedings are recorded electronically. In the event that the inmate is sentenced to serve time in a correctional cell, he walks a few feet from the hearing panel, changes clothes, and is admitted to a correctional cell. The inmate's personal belongings in his cellblock or dormitory are collected by a corrections officer and locked in a vault to await the inmate's release from the correctional cell.

Administrative Regulation 805 makes the following sanctions available to the Rules Infraction Board:

(a) Placing the inmate in disciplinary isolation for a period from 1 to 15 days, and/or

(b) Referring the inmate to the Reclassification Committee, with appropriate recommendations; and/or

(c) Recommending the transfer of the inmate to a different institution; and/or

(d) Recommending placement of the inmate in administrative isolation; and/or

(e) Such other action as may be appropriate, including remedies for Class III rule violations.

Option (d) is not available to the Rules Infraction Board at M.C.I. as there is no administrative isolation facility in the institution. Thus in a case in which (d) is appropriate, the Rules Infraction Board will recommend transfer of the inmate to a maximum security institution (S.O.C.F.). The Rules Infraction Board renders its decision in writing, (see Appendix L, p. 293 *infra*) and the inmate has a 24 hour period in which to appeal to the Superintendent. See Appendix M, p. 295 *infra.*

## EVIDENCE RELATING TO COMPLIANCE

Conduct which is prohibited is published in Administrative Regulation 804(a) and the Inmate Manual. See pp. 222–223 *supra.* In addition to the listing of Class I, Class II, and Class III offenses, the Inmate Manual contains a large number of rules and regulations governing inmate conduct. In addition an explanation of rules and regulations is made during the course of a one week orientation in which every new inmate participates. The printed schedule for the orientation program indicates that two hours are devoted to this purpose on the third day of the program. Examples of general rules listed in the Inmate Manual include the following:

Honor dormitory cafeteria rules (eg. wasting of food)

General honor dormitory rules (eg. "There is to be no card playing in the dormitory.")

Dormitory and cellblock regulations (eg. presence at "Count", use of radios and televisions, cell maintenance, smoking. 15 numbered rules are listed.)

General rules for the entire population (eg. wearing of uniform, hair style, registration of typewriters. 25 numbered rules are listed.)

Other general rules scattered throughout the Manual (eg. carrying of I.D. pictures, cooking on hot plates, smoking in the cafeteria)

Items approved for receipt in packages

Visiting rules, with a reference to the

Administrative Regulations and a suggestion that the latter be read.

A partial statement of items considered to be contraband. The Inmate Manual appears to be a reasonably complete although somewhat poorly organized statement of most though not all the rules and regulations applying to conduct by inmates.

In order to test the completeness of the statement of rules of conduct in the Inmate Manual, a study was made of 118 of the total (134) tickets charging violation of Class III, rule 16, "violation of any other published institutional rules, regulations or procedures." Since December 1, 1975, the following conduct has been "written up" under Class III–16:

| CONDUCT | No. OF TICKETS | INMATE MANUAL PAGE REFERENCE |
|---|---|---|
| Rinsing eating utensil with coffee | 8 | 30 |
| Hanging cover (including pictures) over window | 20 | 31 |
| Playing radio on speakers | 15 | 21 |
| Misuse of pass | 1 | |
| Eating on main cafeteria line with a diet pass | 4 | |
| No I.D. | 20 | 29, inside back cover |
| Placing can of soda outside cell screen | 6 | 26 |
| Heating food during prohibited hours | 9 | 25 |
| Tardiness in leaving for lunch | 2 | |
| Going through "chow line" twice | 1 | |
| Working on radio | 1 | 30 |
| Smoking in bed | 6 | 22 |
| Not showing up for work | 2 | Class III–5 |
| Soaking of state blues at night | 1 | |
| Not wearing shirt | 1 | |
| Eating food in cafe during working hours by cafeteria employee | 1 | |
| Eating at wrong time | 1 | |
| Reaching over cafeteria line to get food | 5 | |
| Turning night stand toward bed | 1 | |
| Possession of extra food in cafe | 1 | |
| Throwing food away | 2 | 30 |
| Using empty adjoining bed for storage | 1 | 22 |

| CONDUCT | No. OF TICKETS | INMATE MANUAL PAGE REFERENCE |
|---|---|---|
| In recreation area after suspension of recreation | 1 | none, this conduct constituted direct disobedience of a Hearing Officer's order |
| Burning matches | 2 | |
| Absence from job | 1 | Class III-5 |
| Blasting headphones | 2 | 21 |
| Mushfaking (using cardboard box for nightstand) | 2 | 26 (questionable) |
| Visiting in wrong area of honor dormitory yard | 1 | |

Thus since December 1, 1975, at least 22 inmates have been charged with violations of rules of which no fair notice is given in the Inmate Manual. It may well be that some of these violations resulted from failure to follow direct instructions by a correctional officer (e.g. tardiness in leaving for lunch) and others might be argued to fall fairly within the scope of general language in the Inmate Manual. For example, one rule in the Manual (p. 30) reads as follows: "Inmates must conduct themselves in an orderly fashion while in the cafe." This may provide notice that reaching over the cafeteria line to get food is prohibited.

Of 132 inmates convicted of a violation of Class III-16 since December 1, 1975, (excluding convictions of violation of two or more rules), only ten received any punishment other than a warning from the Hearing Officer. Additional punishment meted out consisted of extra work, loss of recreation privileges and, most often, the impounding of a radio or tape player for a limited time. In one case an inmate was told that his next Class III ticket would be handled as a Class II offense under Class II-18. Class II rules which may be impermissibly vague include Class II-4 (creating a minor disturbance), Class II-16 (any act not specifically set forth herein, knowingly done which constitutes an obviously immediate and direct threat to the security of the institution, its staff, other inmates, or the inmate himself), Class II-17 (any act of an inmate aiding and abetting a Class II rule violation), and Class II-21 (conspiracy to violate a rule of conduct). On the subject of Class II-21, one inmate apparently was convicted of a one-man conspiracy to violate a rule of conduct. Class III rules which are questionably broad include Class III-1 (disrespect to an officer, staff member or inmate), Class III-2 (being out of place), Class III-3 (horseplaying), Class III-12 (giving false information and lying), and Class III-15 (aiding and abetting a Class III rule violation). No data have been compiled with respect to these rules.

The following data provide a transition from the problem of promulgation of rules of conduct to that of publication of the permissible range of sanctions for any violation. In addition to the incidence of charging under each Class and Rule, these data indicate the full range of sanctions imposed for violations of each regulation.

| CLASS, OFFENSE & DESCRIPTION | ADJUDICAT- ING BODY | CONVIC- TIONS | ACQUIT- TALS | RANGE OF SANCTIONS |
|---|---|---|---|---|
| Class II, Rule 1<br>Disobedience of a direct order, which shall include aggravated insubordination | R.I.B.* | 76 | 2 | Transfer to S.O.C.F.; 3-15 days in C.C.;** Transfer to S.O.C.F. upon next serious offense; Job transfer; lock transfer; referred to psychological or social services |
| | H.O.*** | 43 | 0 | Extra work; suspend recreation privileges; job transfer; no punishment indicated |
| Class II, Rule 2<br>Refusal to carry out work or other institutional assignments | R.I.B. | 18 | 0 | Transfer to S.O.C.F.; 3-10 days in C.C.; transfer to S.O.C.F. upon next serious offense; job transfer; lock transfer |
| | H.O. | 8 | 0 | Extra work; warning; lock change; no punishment indicated |
| Class II, Rule 3<br>Refusal of assignment or classification action | R.I.B. | 10 | 0 | Transfer to S.O.C.F.; 1-15 days in C.C.; transfer to S.O.C.F. upon next serious offense; referred to psychological or social services |
| | H.O. | 0 | 0 | |
| Class II, Rule 4<br>Creating a minor disturbance | R.I.B. | 6 | 0 | Transfer to S.O.C.F.; 5-10 days in C.C.; transfer to S.O.C.F. upon next serious offense |
| | H.O. | 1 | 0 | No punishment indicated |
| Class II, Rule 5<br>Fighting with or without weapon | R.I.B. | 31 | 0 | Transfer to S.O.C.F.; 5-15 days in C.C.; transfer to S.O.C.F. upon next serious offense |
| | H.O. | 1 | 0 | No punishment indicated |
| Class II, Rule 6<br>Theft of property | R.I.B. | 4 | 0 | 5-10 days in C.C. |
| | H.O. | 5 | 0 | Extra work; no punishment indicated |

 \* Rules Infraction Board

 \*\* Correctional Cell

 \*\*\* Hearing Officer

| CLASS, OFFENSE & DESCRIPTION | ADJUDICAT- ING BODY | CONVIC- TIONS | ACQUIT- TALS | RANGE OF SANCTIONS |
|---|---|---|---|---|
| Class II, Rule 7<br>Possession or con-<br>sumption of an<br>intoxicant, such<br>as liquors or drugs, | R.I.B. | 9 | 0 | Transfer to S.O.C.F.;<br>5-10 days in C.C.; Lock<br>transfer; job transfer |
| unless with permis-<br>sion | H.O. | 0 | 0 | |
| Class II, Rule 8<br>Possession or manu-<br>facture of weapons<br>& contraband, which<br>shall include any<br>article knowingly<br>possessed for which<br>permission has not<br>been given | R.I.B. | 78 | 0 | Transfer to S.O.C.F.;<br>5-15 days in C.C.;<br>transfer to S.O.C.F.<br>upon next serious<br>offense; job transfer;<br>lock transfer; removal<br>of person from visitors'<br>list; confiscated cash<br>placed in Industrial &<br>Entertainment (I & E)<br>fund |
| | H.O. | 66 | 1 | Extra work; impound<br>radio or tape player;<br>send radio speakers from<br>institution |
| Class II, Rule 9<br>Dealing, which shall<br>include any trans-<br>action for which<br>payment of any kind<br>is made, promised or<br>expected | R.I.B. | 0 | 1 | |
| | H.O. | 0 | 0 | |
| Class II, Rule 10<br>Forging Documents | R.I.B. | 0 | 0 | |
| | H.O. | 0 | 0 | |
| Class II, Rule 11<br>Consensual sex acts | R.I.B. | 0 | 0 | |
| | H.O. | 0 | 0 | |
| Class II, Rule 12<br>Threats - with or<br>without a weapon or<br>use of force | R.I.B. | 15 | 0 | Transfer to S.O.C.F.;<br>10-15 days in C.C.;<br>transfer to S.O.C.F.<br>upon next serious<br>offense; job transfer;<br>lock transfer |
| | H.O. | 0 | 0 | |
| Class II, Rule 13<br>Gambling or posses-<br>sion of gambling<br>articles | R.I.B. | 0 | 0 | |
| | H.O. | 0 | 0 | |
| Class II, Rule 14<br>Any Class I offense | R.I.B. | 1 | 0 | Transfer to S.O.C.F.<br>(the charge was Class<br>I-1, escape) |
| | H.O. | 0 | 0 | |

| CLASS, OFFENSE & DESCRIPTION | ADJUDICAT- ING BODY | CONVIC- TIONS | ACQUIT- TALS | RANGE OF SANCTIONS |
|---|---|---|---|---|
| Class II, Rule 15<br>Malicious destruc- | R.I.B. | 6 | 1 | 5-15 days in C.C. |
| tion, alteration, or<br>misuse of property | H.O. | 4 | 0 | No punishment indicated |
| Class II, Rule 16<br>Any act not spe-<br>cifically set forth<br>herein knowingly<br>done which consti-<br>tutes an obviously | R.I.B. | 5 | 0 | Transfer to S.O.C.F.;<br>3-15 days in C.C.;<br>confiscated money placed<br>in I & E fund; lock<br>change |
| immediate & direct<br>threat to the<br>security of the<br>institution, its<br>staff, other inmates,<br>or the inmate him-<br>self | H.O. | 2 | 0 | Warning; impound radio<br>8-15 days |
| Class II, Rule 17<br>Any act of an in- | R.I.B. | 0 | 0 | |
| mate aiding or abet-<br>ting a Class II rule<br>violation | H.O. | 2 | 0 | Extra work; no other<br>punishment indicated |
| Class II, Rule 18<br>Any repeated viola-<br>tion of Class III | R.I.B. | 9 | 0 | 4-15 days in C.C.;<br>lock transfer |
| rule violations,<br>where a determina-<br>tion is made that<br>remedies for Class<br>III rule violations<br>serve no deterrent<br>effect | H.O. | 2 | 0 | Extra work; job<br>transfer |
| Class II, Rule 19<br>All misdemeanors<br>specified in the<br>Ohio Revised Code<br>or U.S. Code such | R.I.B. | 1 | 0 | 15 days in C.C.;<br>transfer to S.O.C.F.<br>upon next serious vio-<br>lation |
| as mail violations | H.O. | 0 | 0 | |
| Class II, Rule 20<br>Business expendi- | R.I.B. | 0 | 0 | |
| tures either for<br>profit or not for<br>profit, including<br>usury, without<br>specific permission<br>in writing from the<br>managing officer | H.O. | 0 | 0 | |
| Class II, Rule 21<br>Conspiracy to vio-<br>late a rule of | R.I.B. | 4 | 0 | 5-15 days in C.C.;<br>take person off visit-<br>ing list |
| conduct | H.O. | 0 | 0 | |

| CLASS, OFFENSE & DESCRIPTION | CONVIC- TIONS | ACQUIT- TALS | RANGE OF SANCTIONS |
|---|---|---|---|
| Class III,* Rule 1 Disrespect to an officer or staff member, or an in- mate | 25 | 0 | Warning; extra work; lock transfer; job transfer; No sanction imposed by Hearing Officer** |
| Class III, Rule 2 Being out of place | 243 | 4 | Warning; lock change extra work; next Class III offense to be handled as Class II, rule 18; loss of recreation; No sanction imposed by Hearing Offi- cer** |
| Class III, Rule 3 Horseplaying | 9 | 0 | Warning; Class III rewrit- ten as Class II, rule 18 and referred to R.I.B.; extra work |
| Class III, Rule 4 Smoking in prohibited areas | 16 | 0 | Warning; extra work; next Class III offense to be handled as Class II, rule 18 |
| Class III, Rule 5 Unexcused tardiness or absence from a job or pass | 62 | 2 | Warning; extra work; job change; next Class III offense to be handled as Class II, rule 18 |
| Class III, Rule 6 Investigate (sic Inadequate?) work performance | 8 | 0 | Warning; extra work; job transfer; no sanction im- posed by Hearing Officer** |
| Class III, Rule 7 Excessive loud noise, such as from radio, T.V., or shouting | 27 | 0 | Warning; extra work; im- pound radio 5 days; lock transfer; next "quiet dorm" violation will cause lock transfer; no sanction im- posed by Hearing Officer** |
| Class III, Rule 8 Seductive & obscene acts | 1 | 0 | Warning |
| Class III, Rule 9 Carelessness with tools & equipment | 1 | 0 | No sanction imposed by Hearing Officer** |
| Class III, Rule 10 Dirty clothing, living quarters, or poor per- sonal hygiene | 0 | 0 | |

\* All cases are disposed of by a Hearing Officer.

\*\* Violation may have been combined with that of a Class II offense leading to punishment by the Rules Infraction Board.

| CLASS, OFFENSE & DESCRIPTION | CONVIC- TIONS | ACQUIT- TALS | RANGE OF SANCTIONS |
|---|---|---|---|
| Class III, Rule 11 Manufacturing items without permission | 0 | 0 | |
| Class III, Rule 12 Giving false information or lying | 31 | 1 | Warning; extra work; lock transfer; loss of recreation; No sanction imposed by Hearing Officer** |
| Class III, Rule 13 Self mutilation, including tattooing | 0 | 0 | |
| Class III, Rule 14 Making unfounded complaints & charges against members of the staff | 1 | 0 | Warning |
| Class III, Rule 15 Aiding & abetting Class III rules violations | 5 | 0 | Warning; impound radio or tape player 5-10 days |
| Class III, Rule 16 Violation of any other published institutional rules, regulations or procedures | 132 | 2 | Warning; next Class III violation to be handled as Class II, rule 18; impound radio or tape player; loss of recreation; no sanction imposed by Hearing Officer** |

** Violation may have been combined with that of a Class II offense leading to punishment by the Rules Infraction Board.

The only sanctions referred to specifically in the Inmate Manual (beyond references to the effect that a rule violation "will result in a disciplinary report") are those contained on page 49, relating to a violation of a rule relating to visits:

Any inmate who attempts to convey, conceal, or have in his possession or under his control, any of the above mentioned articles (referring to contraband), or devises to scheme, plan or design to enter into a conspiracy to obtain the same shall, upon being found guilty by the Rules Infraction Board, be subject to one or more of the following:

Loss of visiting privileges

Recommended return to Lucasville

Disciplinary detention

Loss of honor status

Loss of living quarters

Recommendation by the Superintendent for the inmate and/or the visitor to be prosecuted under existing state laws.

As indicated above, Administrative Regulation 805 contains a list of sanctions available to a Hearing Officer and to the Rules Infraction Board. See pp. 223–224 *supra*.

Mention should be made of several specific sanctions which are employed in the institution. A job change may be recommended by the Hearing Officer or by the Rules Infraction Board. In this case, a recommendation is made to the Reclassification Committee if the inmate resides in the stockade or to the Honor Dormitory Reclas-

sification Committee if the inmate resides in the honor dormitory. Because Paragraph 8 (c) of the Court's order in *Taylor v. Perini* prohibits job assignment, transfer and removal for rule infractions "except insofar as such infractions are job related and manifest inability on the part of the violator to function in the job in question," the use of this sanction requires special scrutiny. See pp. 249–250 *infra*. Changes in housing assignments (known as lock changes) may also be job related, since employees in certain jobs lock in special areas, (e. g. cafeteria employees lock in 1 cell block, 1 and 1A dormitories because of their peculiar work hours.) Transfer from a cell block to a dormitory is a very severe sanction from the point of view of the inmate, since he is deprived of all privacy and a fair degree of physical protection by such a move.

Apart from honor dormitory residents who are permitted to carry as much as five dollars, inmates are not permitted to have any money within the institution. (Accounts are maintained against which inmates may draw funds.) The carrying of money is regarded as a violation of Class II–8, possession of contraband. In connection with discussion of visiting rules, the Inmate Manual (page 48) lists money as a specie of contraband. If convicted of such a violation, the inmate is deprived routinely of the money found on his person or in his living quarters. This money is forwarded to the Superintendent who deposits it in the Industrial and Entertainment Fund which is used to provide such amenities as movies for the inmate population. (The same is true of cash *hidden* in incoming letters and packages.) Two cumulative deposits from these sources made on December 12, 1975, and January 6, 1976, totalled $213.10. Amounts confiscated from individuals ranged from $1.00 to $72.00. There is evidence that some inmates, at least, are not aware of the possibility that confiscation will occur. The only reference to *confiscation* of contraband contained in the Inmate Manual appears on page 39:

The institution reserves the right to declare any item suspicious or contrary to the *above list* as contraband. Any contraband item will either be shipped back to the sender, at the expense of the inmate, or confiscated and later donated to charitable organizations in this area. (emphasis added)

This statement follows a list of items "not allowed to (be received) on a visit or in the mail." Money is *not* included on the list. In the case of money secreted within a letter or a package, of course, the penalty is being assessed against a person other than the inmate, usually his family.

Other sanctions which are imposed include removal from honor status and removal from semi-honor status. An inmate with honor status lives in the honor dormitory where regulations are somewhat less restrictive and movement more free; an inmate with semi-honor status lives in the stockade but has access to areas off-limits to other inmates. Honor or semi-honor status is an important element taken into account by the Parole Board. Actual removal from honor status or semi-honor status is within the jurisdiction of the Honor Placement Committee, to which recommendations may be made by the Rules Infraction Board. No reference is made in the Inmate Manual to possible loss of honor status other than the statement (p. 8) that honor status is granted or denied on the basis of the "record of conduct in the institution," and the statement on p. 49 of the Manual with respect to violation of a visiting rule. Loss of honor status or semi-honor status results in an automatic job transfer for the affected inmate, and thus again is related directly to Paragraph 8(c) of the Court's order. In any event, the sanction is an extremely severe one which requires careful supervision.

Even more severe is the sanction utilized by the Rules Infraction Board in recommending the transfer of an inmate to a maximum security facility (S.O.C.F.). Such procedure is authorized by Administrative

Regulation 805. Procedures for effecting transfers (both disciplinary and administrative) are outlined in Administrative Regulation 816. A disciplinary transfer is defined as

> those transfers which result from a recommendation by the Rules Infraction Board to the Managing Officer, after a hearing, as defined and outlined in Administrative Regulations 805 and 805(a).

An administrative transfer, on the other hand, is appropriate

> whenever it is determined that the presence of the resident in the transferring institution constitutes an immediate and probable danger to the security of the institution, to residents, staff, institutional property, *or the resident himself.* . . . (Emphasis added)

From July, 1975, through December, 1975, 38 inmates were subjects of disciplinary transfer from M.C.I. to S.O.C.F. Of these, a number were cases involving the phenomenon known as "freeze-up." This term refers to an inmate who presents himself to a staff member, claiming that his life or physical safety is in danger. As a result, he refuses to re-enter the population and seeks protective custody. It should be noted that M.C.I. has no facility for protective custody other than the possibility of temporary incarceration in a correctional or hospital cell. When an inmate at Marion freezes up, he "signs himself in" to a correctional cell. He is written up for a violation of Class II–2 or Class II–3. If he maintains his refusal to re-enter the population, he is tried and convicted. The "punishment" decreed is a recommendation for disciplinary transfer to maximum security, where protective custody facilities are available if necessary. The recommendation for transfer in freeze-up cases is routinely approved by the Superintendent and by the appropriate authority at the Department of Rehabilitation and Correction. The result is that the inmate gets what he asked for—separa-

tion from the population at M.C.I.—but at considerable cost. He is transferred to a maximum security institution and his permanent record is amended to show a disciplinary transfer. Such an entry is highly relevant to the possibility for parole.

One inmate currently residing at S.O.C.F. described the process at Marion. He became terrified as a result of threats by other inmates and sought help about what to do. He was told by a corrections officer that he would have to be "written up for something" in order to be transferred. At another time he was told by his job supervisor that he would have to "turn himself in" in order to obtain protection. He claimed that he never realized that a process existed whereby he could obtain an "administrative" transfer and he did not realize that his transfer would be "disciplinary" in nature and would appear on his record as such. He thought that the ticket was a "formality."

██ Two important conclusions emerge. First, "freezing up" is a violation of a rule of conduct, not fairly noticed by the description of Class II–2 or Class II–3. Second, the routine infliction of a disciplinary transfer under circumstances calling for administrative transfer constitutes an inappropriate sanction without fair notice and without full understanding by the affected inmate.

██ ·Finally, the removal of a person from the approved visitor list is an extreme sanction affecting both the inmate and a member of the public. On one occasion the Rules Infraction Board removed an inmate's wife from his visiting list for violation of Class II–21, "conspiracy to violate a rule of conduct." The Inmate Manual, p. 47, implies that such a removal may occur without reference to a formal Rules Infraction Board hearing:

> Note: if conduct between the visitor and the inmate is objectionable the visitor

upon orders of the Superintendent may be barred from further visits.

This constitutes an example of a statement of offense too vague to justify a sanction so severe.

Written notice of what conduct is prohibited and the sanctions which may be imposed for violations reaches the inmate in several ways. He possesses a copy of the Inmate Manual during the entire course of his incarceration at M.C.I. Copies of the Administrative Regulations are required to be kept in the officer's desk in every lock in the institution. A random investigation indicated that the regulations were available, but not necessarily in up-to-date or fully organized form. They may be utilized by an inmate only at the officer's desk. Notices may be posted on bulletin boards in each lock. Experience has shown that notices so posted and their replacements are likely to be torn down quickly.

All convictions (Class II and Class III) are filed in the master pocket of the affected inmate. A summary of Class II offenses is made on a cover sheet maintained in the inmate's file, and these offenses are considered by Parole Authority officials at the time of any hearing. Although Class III convictions are in the file, they apparently are not relied upon by these officials. Thus any non-compliance with respect to promulgation of written regulations and sanctions constitutes as well a violation of that portion of the Court's order relating to "adverse disciplinary record references."

### RELEVANT ADMINISTRATIVE REGULATIONS

Administrative Regulation 804, Appendix N, p. 296 *infra* requires that disciplinary rules and their consequences "be printed and furnished" to the inmates together with any necessary explanations. This provision comports with the provisions of Paragraph 6 of the Court's order. Administra-

tive Regulation 804(a), discussed above, defines the three classes of offenses and lists all offenses under each class. See pp. 222–223 *supra*. Administrative Regulation 816, Appendix *O* p. 297 *infra*, defines and outlines procedures for both administrative and disciplinary transfers. Administrative Regulation 805, Appendix P, p. 300 *infra*, outlines the appropriate administrative procedure for imposition of disciplinary sanctions, and Hearing Officer and Rules Infraction Board procedures at M.C.I. appear to conform basically with the provisions of that Regulation. Administrative Regulation 805(a), Appendix Q, p. 303 *infra*, sets out in some detail the procedures to be followed by the Rules Infraction Board and Administrative Regulation 807, Appendix R, p. 305 *infra*, authorizes the institution's current practices with respect to pre-hearing detention. Finally, Administrative Policy F–014, Appendix Z, p. 321 *infra*, authorizes confiscation of money found in the possession of an inmate, but requires that "any monies received through the mail for an inmate" be returned promptly to the sender. This Administrative Policy became effective on March 1, 1976. Prior to this time, officials of the Department of Rehabilitation and Correction were aware of and approved the policy of confiscation enforced by officials at M.C.I.

### FINDINGS REGARDING COMPLIANCE

The evidence discussed above supports a finding that the current Inmate Manual constitutes a good faith but inadequate effort to inform inmates of conduct which will result in disciplinary action. This manual is in need of updating, reorganization, and rewriting for sake of clarity. It is clear that one published Class III rule (Class III–16) permits punishment for some conduct which is brought to the attention of the inmate not at all or insufficiently. Other prescribed Class II and III offenses as well as less formal rules may be similarly overdrawn, and further investigation will be required with respect to them. The range of sanctions for various offenses is

inadequately promulgated to the inmate population. Reliance upon incomplete and poorly filed copies of the Administrative Regulations maintained in locks is less than fair notice, and the Inmate Manual is incomplete in this respect. The Special Master finds that posting on a bulletin board does not constitute fair notice of any disciplinary rule or sanction in view of the transitory effect of such postings. The matter of sanctions in the form of recommendation for job change will be dealt with in this report in connection with compliance with Paragraph 8 of the Court's order. Particular specificity and distribution are required (over and beyond present practices) with respect to sanctions involving the following:

(1) Change of lock assignment;
(2) Loss of honor and semi-honor status;
(3) Removal of an individual from an inmate's list of approved visitors

The Special Master finds that current institutional practices with respect to confiscation of money as contraband, recently formally approved by the Department of Rehabilitation and Correction, constitutes a sanction which is not brought home to the inmate population in a manner which gives fair notice.

The Special Master finds that current practices at M.C.I. with respect to freeze-ups constitute a violation of the provisions of Paragraph 6 of the Court's order as well as the Department's own Administrative Regulation 816. While the unavailability of protective isolation facilities at M.C.I. may require transfer to another institution, that transfer should not be routinely a disciplinary one. Cases legitimately falling within the scope of the Department's definition of administrative transfer should be so handled; inmates making spurious claims of endangerment must be made aware in advance that such conduct constitutes a violation of a rule of conduct and will be dealt with by recommending a disciplinary transfer.

## PARAGRAPH 7

This paragraph imposes limitations upon the length of solitary confinement, punitive segregation, or correctional cell incarceration, and establishes certain minimum conditions to be met in connection therewith.

## METHOD OF INVESTIGATION

The investigation of practices related to this paragraph consisted of on-site visits on numerous occasions to the correctional cell areas within the institution, interviews with staff, including the institution's physician, and discussions with the members of the Inmate Liaison Committee as well as inmates then incarcerated in correctional cells. In addition, the correctional cell area at S.O.C.F. was visited and former M.C.I. inmates residing at S.O.C.F. were interviewed. A number of reports were requested and received from the staff in Marion, including weekly correctional cell reports as well as those of occupancy of wards 8 and 9 in the hospital area, correctional cell visitor logs, and the correctional cell exercise log. Records of the Department of Rehabilitation and Correction concerning disciplinary transfers from M.C.I. to S.O.C.F. were reviewed, as was this Court's order in *Price v. Perini,* C73–458.

## EVIDENCE RELATING TO COMPLIANCE

There being no protective or administrative isolation facilities at M.C.I., the facilities for solitary confinement or punitive segregation consist of correctional cells. Twenty-four such cells are located in one area in the institution; two additional cells, wards 8 and 9, are located in the institution hospital and are used for disciplinary as well as psychiatric purposes. On rare occasions, some other hospital ward (of single or multiple capacity) is used to hold a prisoner who is being held in pre-hearing detention or who is awaiting transfer to a maximum security institution.

*Length of term.* Inspection of records of sentences imposed by the Rules Infraction Board indicates that sentences handed down by that body never exceed 15 days of correctional cell time. This limitation corresponds to the maximum term permitted by the Administrative Regulation 805 as well as the order of the Court in *Taylor v. Perini.* Only one case of incarceration for a term of more than 30 days within any six months period is reflected by those records. On January 19, 1976, it appears that one inmate was sentenced to serve 15 days in the correctional cell in spite of the fact that he had served 25 days during the past six months.

The Associate Superintendent for Custody acknowledges that other violations of one or both of these limitations have occurred and continue to occur upon rare occasion. These violations involve situations in which inmates are awaiting transfer to a maximum security institution. A hypothetical example of such a violation might be the following. Inmate X becomes involved in a fight on Friday night. He is placed in pre-hearing detention in a correctional cell that evening. At a Rules Infraction Board hearing on Monday, he is convicted and recommended for transfer to maximum security. He remains in the correctional cell. An appeal to the Superintendent is filed on Tuesday and denied on Wednesday. On that afternoon written permission is sought from Columbus for the disciplinary transfer. That request may reach Columbus on Thursday. By this time, Inmate X has spent six days in the correctional cell. (A "day" of correctional cell time consists of sleeping overnight in the cell.) Unless the Department's written approval reaches M.C.I. within nine days, the 15 day limitation will have been exceeded. Even if the Department's approval is received before the expiration of the 15 day period, arrangements to physically transport the inmate to S.O.C.F. may cause additional delay. Until the inmate is transferred, it is the position of the Associate Superintendent of Custody that the security interests of the institution require continued incarceration in a correctional cell.

The reality of this hypothetical situation was established by interviews with several inmates currently incarcerated at S.O.C.F. after such transfers from Marion. One stated that he had spent 18 days in disciplinary incarceration at M.C.I. before being transferred to S.O.C.F. He stated, however, that the last three days were spent in a hospital ward with another inmate awaiting transfer. During that time he was locked up, but was allowed to smoke and enjoy other privileges not available in a correctional cell. Another inmate stated that he had been incarcerated in a correctional cell for a total of 17 days prior to being transferred. These allegations tend to confirm the statement of the Associate Superintendent for Custody that violations do occur on occasion.

On January 19, 1976, the Special Master began to receive records indicating prior correctional cell time served within six months of the commencement of a current correctional cell term. These data will make future monitoring quite feasible. Daily records of the name and number of each inmate in a correctional cell, as well as in a hospital correctional cell, will facilitate further such monitoring.

*Normal institution meals.* Meals served in the correctional cells contain no extra salt, pepper, or sugar (except sugared cereal in the morning), and no desserts. Milk appears to be served less frequently in the correctional cells than in the cafeteria. Correctional cell trays are delivered earlier than regular meals and according to inmates are rarely hot. The basic diet, however, appears to be that of the main cafeteria. Special meals for inmates with diet problems are not available; nor, according to inmate cafeteria workers, the institution physician, and a correctional officer, are they available in other than name in the

main cafeteria. Thus unless a normal meal for an inmate with special diet requirements is taken to mean the regular prison diet, a normal diet is not available to such a person while incarcerated in a correctional cell.

*Adequate clothing, bedding and toilet facilities.* Upon entering a correctional cell, an inmate discards whatever clothing he is wearing and dons a pair of coveralls. He may keep his socks and shoes, and sometimes his underwear. One inmate was observed wearing a pair of coveralls split from the crotch to the knee in such a way that he had to hold the folds of his pants together in order to avoid being exposed. Bedding consists of two sheets, a pillow case, and a blanket. Exceptions which have been reported by inmates appear to be the result of oversight. Sheets and pillow cases are exchanged every three days. All cells contain regular toilets and sinks, with the exception of six (wards 8 and 9 in the hospital and four cells in the correctional cell area). Water pressure is very low. The six cells without regular toilets have what are referred to as "oriental flush" facilities, a hole in the floor. Flushing is not within the control of the incarcerated inmate. These six cells contain no sink and no source of running water. Two of these cells are used as vaults; there is no evidence that they are ever occupied by inmates. The other four are occupied by inmates on occasion, particularly when other cells are filled. This is a not uncommon occurrence. It should be noted that all cells in the correctional cell area at S.O.C.F., a maximum security institution, contain regular toilets.

The term "toilet facilities" is assumed to include normal toilet articles such as soap, toothbrush, and toothpaste. These items are described as "sanitary facilities" and are specifically mandated by Administrative Regulation 805. The practice at M.C.I. with respect to these items is uneven.

Upon conviction by the Rules Infraction Board, (which holds its hearings in the correctional cell area) a man is admitted immediately to a cell. His personal belongings in his lock are gathered up and placed in the institution vault until his release. Inmate testimony is virtually unanimous that in many if not most instances, no personal articles are retrieved by the corrections officer for the inmate's use in the correctional cell. It is clear that the inmate cannot get these items for himself, and friends are not allowed to bring them to him. This has led to the practice, commented upon by staff, of an inmate's appearing before the Rules Infraction Board with toothbrush, toothpaste, soap, and a washcloth in hand. That such a practice should be necessary is entirely inconsistent with the assumption of innocence which ought to be accorded to the inmate at the time of his hearing.

*Normal medical care.* The order in *Taylor v. Perini* has been modified in effect by this Court's order in *Price v. Perini*, issued on January 14, 1976. The latter requires that "regular visits . . . be made by the medical staff without the necessity of a request." As far as the institution physician knows, such visits are not being made at this time. Beyond this, inmate complaints about medical care in the correctional cell area are numerous. From 8:00 a. m. until 4:00 p. m. one correctional officer is on duty in the correctional cell area. From 4:00 p. m. until 8:00 a. m., the single officer on duty in the correctional cell area is also responsible for a cellblock across the hall, out of sight and hearing of the correctional cells. During this period of dual responsibility, the officer stations himself in the cellblock for which he is responsible and makes rounds through the correctional cell area on occasion. Even when an officer is physically present in the area, the extremely high noise level (the converse of the situation observed at S.O.C.F.) makes it virtually impossible for him to hear a request for assistance. The problem is particularly acute for inmates incarcerated in the lower tier of cells which are virtually soundproof because of their solid glass fronts. The

visitors log indicates that hospital personnel enter the correctional cell area sometimes never, and sometimes several times, in the course of a day.

Finally, the question of the meaning of "normal" medical care must be posed. According to the institution physician, regular medical care in the institution is in need of significant upgrading, both in terms of staff (number and quality) and equipment. One of his earnest requests is a rudimentary medical library which would cost, in his opinion, somewhere between $100 and $200. The doctor spends approximately 10 hours per week in the institution. While a physician's assistant, paramedic, or registered nurse is on duty in the reception area of the hospital at all times, there are no medical personnel to observe patients in the hospital bed area or to maintain proper medical records. Thus what is "normal" in the institution would be regarded as abnormal and inadequate in the non-prison world. Whatever the general institution standard, it would appear that inmates incarcerated in the correctional cell area have less care and attention than other inmates.

The two correctional cells in the hospital area are used for inmates who are injured, ill, or awaiting transfer to S.O.C.F. Apparently the medical attention afforded these inmates is equivalent to that available to any other inmate/patient in the prison hospital.

*At least one book of the inmate's selection.* A small collection of books is kept in the correctional cell area. Inmates are permitted to have a book of their choice from that selection, and exchanges are permitted upon request. The inmate does not have access to the prison library and the selection available in the correctional cell area is relatively unchanging. Many of the books are very worn. The inmate is not permitted to bring his own or a library book into the correctional cell.

*Availability of textbooks.* The practice with respect to textbooks for inmates en-

rolled in educational programs is somewhat akin to that described above with respect to toilet articles. If the inmate has the foresight to bring the book(s) with him to his Rules Infraction Board hearing, he may be permitted to keep them. Otherwise, it is highly unlikely that they will be retrieved from his lock for him by the corrections officer assigned to remove his personal possessions to the institution vault. Some inmates have stated that they were permitted to have their books; others have stated that their books were denied.

*Normal mail privileges.* First class mail is delivered daily to the correctional cells. Sometimes the mail is routed directly from the mail room to the correctional cell; other times the mail will be routed to the inmate's lock. In the latter case, delay may result; the possibility that the mail will be lost by remaining on the lock officer's desk is significant. All pieces of mail other than first class items are held in the mail room until the prisoner's release. Most inmates questioned indicated that their legal mail arrived in the correctional cell and was opened and inspected for contraband in their presence. Several stated, however, that they merely received notices of receipt of legal mail and were required to wait until their release from the correctional cell before getting their legal mail. As in other areas, the practice appears to be somewhat erratic.

*Access by clergymen, social services personnel, and attorneys.* The visitors log indicates that social services personnel have access to the correctional cell area. Both institution chaplains stated that they are permitted in the area whenever they wish to go. There is no evidence that attorneys have made such visits, but staff have stated that an attorney's admission would pose no difficulties. Inmate Legal Assistants are not permitted to visit inmates in the correctional cell area for the purpose of providing legal services.

*Adequate light.* Three distinct areas in the correctional cell wing must be considered with regard to this portion of the

Court's order. The upper tier is composed of 12 cells with single grill (barred) fronts. The lower north tier is composed of six cells with double doors, one grilled and one solid. These cells are provided with solid metal screens which can be raised over glass windows. Two of these cells are used as vaults, and two others contain no regular toilet facilities and are thus used only when other cells are filled. The lower south tier is composed of six cells with single solid doors containing small glass windows. The remainder of the front of each cell is covered by a thick solid glass window. None of the cells in any of these areas contains an inside light fixture. Natural daylight enters the area through two large skylights running the length of the rows of cells on the upper tier. Light coming through these skylights is directed at the front of the upper tier cells and down onto the lower tier cells. Fluorescent light fixtures are placed along the walls facing all cells. These lights remain burning 24 hours a day.

The combination of natural and artificial light in the upper tier cells is clearly adequate for reading in the daytime hours. Less light is available during daytime hours, however, in both the north and south lower tier cells. Footcandle measurements ranged from 5 to 25 in these cells during daylight hours. According to the standards proposed by the Illuminating Engineering Society Lighting Handbook, (5th ed. 1972), the minimum recommended for reading books, magazines and newspapers in a residence is 30 footcandles. The same is recommended for reading similar materials in a school dormitory.

If the movable screens available on cells in the lower north tier are pulled up, the cell is cast into total darkness. There is no evidence that these screens are ever used. The artificial light provided during the night does not appear to be such as to interfere with normal sleeping.

*Opportunity for exercise.* Correctional officers in the correctional cell area have stated that all inmates are given an opportunity to exercise and shower every three days. The exercise log submitted to the Special Master indicates that exercise is offered. Log entries are signed by both the inmate and the correctional cell officer. In some cases, the log indicates an exercise period of one hour; in others no time period is indicated. According to inmates, the period may be as short as 30 minutes. Some claim to have had no exercise other than an opportunity to take a shower. Exercise is taken in two short halls running along the cells.

## RELEVANT ADMINISTRATIVE REGULATIONS

As indicated above, Administrative Regulation 805, Appendix P, p. 300 *infra*, limits any single term in a correctional cell to 15 days. That regulation mandates as well that inmates in disciplinary isolation be afforded cell privileges which correspond to the provisions in Paragraph 7 of the Court's order.

## FINDINGS REGARDING COMPLIANCE

The Special Master makes the following findings with respect to compliance with the provisions of Paragraph 7:

(1) There has been a good faith effort to comply with the time limits placed upon incarcerations. Nonetheless, violations which have occurred constitute noncompliance with this portion of the paragraph.

(2) With respect to inmates on a regular diet, the institution is in compliance with sub-paragraph (b) requiring "normal institution meals." With respect to meals served to inmates on prescribed special diets, the institution is in a state of noncompliance.

(3) The institution is in compliance with those portions of sub-paragraph (c) requiring adequate clothing and bedding, but in a state of noncompliance with respect to that portion of the sub-paragraph requiring adequate toilet facilities. Noncompliance consists of failure to provide toilets and

sinks in six cells and in failing to permit normal toilet articles unless the inmate arrived with them at the time of his Rules Infraction Board hearing.

(4) The institution is in noncompliance with the requirements of the Court's order in *Price v. Perini* that medical rounds be made without request by an inmate. The institution is in further noncompliance with sub-paragraph (d) requiring normal medical care by failing to provide full-time attendance in the correctional cell area by a corrections officer in order to cope with a medical emergency. Finally, the institution is in noncompliance by making use of a number of virtually soundproof cells, failing to control the noise level in the area, and failing otherwise to provide a system to alert a correctional officer in the event of medical emergency. What standards should be applied to the term "normal" medical care are regarded as being outside the scope of the Court's order in *Taylor v. Perini*.

(5) The institution is in noncompliance with sub-paragraph (e) and efforts must be made to increase the number and variety of books available in the correctional cell area.

(6) The institution is in noncompliance with sub-paragraph (f) requiring that textbooks be available to inmates enrolled in an educational course, because of the failure to develop a system whereby such books can be retrieved on a regular basis for the inmate from his personal possessions.

(7) Subject to the need to enforce an effective policy for delivering legal mail to the correctional cell area upon receipt, the institution is in compliance with sub-paragraph (g) requiring normal mail privileges. This finding assumes that receipt of second and third class mail does not fall within the scope of "normal" mail privileges.

(8) The institution is in compliance with sub-paragraph (h) requiring access to correctional cells by clergymen, social services personnel and attorneys.

(9) The institution fails to comply altogether with the requirements of sub-paragraph (i) requiring adequate light for reading in the daytime in the lower tier cells. In view of the narrow margin of noncompliance, however, the Special Master recommends against requiring full compliance.

(10) Subject to the requirement of developing and maintaining more detailed exercise logs, the institution is in compliance with sub-paragraph (j) requiring that exercise be provided.

## PARAGRAPH 8

This paragraph requires the development of "objective and reviewable written procedures" relating to assignment, promotion, transfer and removal of inmates to and from job assignments. The objective of the paragraph is to bring about nondiscriminatory job assignments. The Court's order states a number of terms and conditions which must inhere in any system adopted.

## METHOD OF INVESTIGATION

Data concerning race were developed with regard to the total population of the institution. These were compared to information obtained from a number of job supervisors relating to the racial characteristics of their employees broken down by job category. Job supervisors as well as staff whose responsibilities include the administering of discipline for rule infractions were interviewed. Inmate perspective was obtained through discussions with the Inmate Liaison Committee. Data submitted by the Classification Committee, the Reclassification Committee, the Honor Reclassification Committee and the Honor Placement Committee were employed to establish the

system of job assignment currently used at M.C.I.

## CURRENT PRACTICES AT M.C.I.

Upon admission to Marion Correctional Institution, an inmate appears before the Classification Committee, chaired by the Associate Superintendent for Treatment Services. This Committee first establishes the future date upon which the inmate will be considered for honor status. The minimum period of incarceration in the stockade is 90 days. At the time of this hearing, the Classification Committee assigns the inmate to his first job.

In the event that the inmate seeks a job change (after a minimum of 90 days on the job), he may request a hearing before the Reclassification Committee, also chaired by the Associate Superintendent for Treatment Services. A hearing before the Reclassification Committee can result as well from a disciplinary recommendation from the Rules Infraction Board, a Hearing Officer or a job supervisor. In the course of such a hearing a decision concerning reclassification is made.

The function of the Honor Placement Committee, also chaired by the Associate Superintendent for Treatment Services, is to grant or deny honor status. The decisions of this committee are reviewed routinely by the Superintendent. In the event that honor status is granted, the committee makes a job assignment for the new honor inmate. Stockade and honor dormitory jobs are not interchangeable. Inmates residing in the stockade work in the main institution; honor dormitory inmates work in the honor dormitory itself, in an institutional support facility such as the power house, or on the institution's farm.

An inmate's honor status may be revoked upon the recommendation of the Rules Infraction Board, and an additional function of the Honor Placement Committee is to render decisions on such recommendations. These decisions too are reviewed by the Superintendent on a regular basis.

Finally, the Honor Reclassification Committee, chaired by the Administrative Assistant to the Superintendent, performs for honor dormitory inmates the function performed by the Reclassification Committee within the stockade. That is, an inmate seeking a job change (within the honor dormitory job categories) must have the approval of the Honor Reclassification Committee. The same is true of recommendations for job removal by supervisors, the Rules Infraction Board, or a Hearing Officer.

## EVIDENCE RELATING TO COMPLIANCE

As stated above, the purpose of Paragraph 8 is to promote nondiscriminatory job assignment, promotion, transfer and removal. Before turning to questions relating to the functioning of the committees described above, one should see the end result created by the present system of assignment. The principal function of such a system should be to avoid the discriminatory end result which required the Court to include Paragraph 9 in the order in *Taylor v. Perini*.

Because inmates do not move freely between stockade jobs and honor dormitory jobs, and because placement in the honor dormitory requires consideration of a number of factors other than job needs, data from these two segments of the institution must be considered separately.

*The stockade.* As of January 31, 1976, there were 1134 inmates housed in the stockade at M.C.I. Of these 641 were black and 493 were white. The percentage by race was 56.5% black and 43.5% white. The following data were submitted by job supervisors within the stockade at the request of the Special Master. All job supervisors had not responded by the date of the writing of this report. The data account for 867 inmates. As of January 30, 1976, 41 were full-time college students in the Newgate program. Therefore 226 inmates are not accounted for by job supervisor reports submitted.

| SHOP | JOB CATEGORY | #BLACK | #WHITE | %BLACK | %WHITE |
|------|--------------|--------|--------|--------|--------|
| AUTOMOBILE BODY SCHOOL* | Student | 8 | 7 | 53 | 47 |
| | Clerk | 2 | 1 | 67 | 33 |
| | Utility | 3 | 1 | 75 | 25 |
| | TOTAL | 13 | 9 | 59 | 41 |
| | | | | | |
| AUTOMOTIVE MECHANICS SCHOOL* | Student | 6 | 7 | 46 | 54 |
| | Porter | 1 | 4 | 20 | 80 |
| | Clerk | 0 | 1 | 0 | 100 |
| | TOTAL | 7 | 12 | 37 | 63 |
| | | | | | |
| CAFETERIA | Floor workers | 14 | 2 | 88 | 12 |
| | Floor tank men | 6 | 0 | 100 | 0 |
| | Service line | 11 | 5 | 69 | 31 |
| | Menu Board | 0 | 2 | 0 | 100 |
| | Coffee maker | 2 | 0 | 100 | 0 |
| | Set-up | 2 | 0 | 100 | 0 |
| | Breadmen | 2 | 0 | 100 | 0 |
| | Diet kitchen | 2 | 2 | 50 | 50 |
| | Pot and grill | 5 | 1 | 83 | 17 |
| | Pan room | 6 | 2 | 75 | 25 |
| | Dish room | 11 | 3 | 79 | 21 |
| | Garbage dock | 4 | 0 | 100 | 0 |
| | Creamery | 0 | 4 | 0 | 100 |
| | Cooks | 12 | 11 | 52 | 48 |
| | Porters | 6 | 3 | 67 | 33 |
| | Sugar | 0 | 1 | 0 | 100 |
| | Maintenance | 0 | 1 | 0 | 100 |
| | Refrigeration | 0 | 2 | 0 | 100 |
| | Extra help | 9 | 4 | 69 | 31 |
| | Office clerks | 1 | 4 | 20 | 80 |
| | Office porter | 1 | 0 | 100 | 0 |
| | Clothing room | 1 | 0 | 100 | 0 |
| | Ice cream | 0 | 1 | 0 | 100 |
| | Set up tables | 0 | 1 | 0 | 100 |
| | Store room | 0 | 2 | 0 | 100 |
| | Officer's cafe | 3 | 2 | 60 | 40 |
| | Vegetable room | 2 | 3 | 40 | 60 |
| | Bake shop | 0 | 5 | 0 | 100 |
| | Porter | 3 | 0 | 100 | 0 |
| | Butcher shop | 1 | 7 | 12.5 | 87.5 |
| | Silverware and cups | 1 | 0 | 100 | 0 |
| | Night cleaners | 3 | 1 | 75 | 25 |
| | Men in court, correctional cells & hospital | 6 | 3 | – | – |
| | TOTAL | 114 | 72 | 61 | 39 |
| | | | | | |
| CARPENTER SHOP | Carpenter | 1 | 3 | 25 | 75 |
| | Carpenter helper | 3 | 3 | 50 | 50 |
| | Porter | 2 | 1 | 67 | 33 |
| | Clerk | 0 | 1 | 0 | 100 |
| | Chair repairman | 0 | 1 | 0 | 100 |
| | TOTAL | 6 | 9 | 40 | 60 |
| | | | | | |
| COMMISSARY | Clerk | 5 | 6 | 45 | 55 |
| | Porter | 0 | 1 | 0 | 100 |
| | Radio & T.V. Repair | 0 | 2 | 0 | 100 |
| | TOTAL | 5 | 9 | 36 | 64 |

* Federally financed vocational school programs.

| SHOP | JOB CATEGORY | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|
| CUSTODIAL SCHOOL | Day hall porters | 10 | 3 | 77 | 23 |
| | Semi-honor offices | 9 | 3 | 75 | 25 |
| | Shop hall porters | 5 | 5 | 50 | 50 |
| | Office porters | 8 | 6 | 57 | 43 |
| | Night hall porters | 8 | 3 | 73 | 27 |
| | TOTAL | 40 | 20 | 67 | 33 |
| DENTAL CLINIC | Clinic | 0 | 2 | 0 | 100 |
| | Dental laboratory | 0 | 2 | 0 | 100 |
| | TOTAL | 0 | 4 | 0 | 100 |
| DEPUTY'S OFFICE | Clerk and runner | 4 | 4 | 50 | 50 |
| EDUCATION OFFICE | Clerk | 2 | 5 | 29 | 71 |
| | Porter | 7 | 0 | 100 | 0 |
| | TOTAL | 9 | 5 | 64 | 36 |
| ELECTRIC SHOP | Electrician's helper | 1 | 5 | 17 | 83 |
| | Electrician | 0 | 1 | 0 | 100 |
| | Clerk | 1 | 0 | 100 | 0 |
| | Motor repairman | 0 | 1 | 0 | 100 |
| | Semi-honor status motor repairman | 1 | 1 | 50 | 50 |
| | TOTAL | 3 | 8 | 27 | 73 |
| FURNITURE FACTORY | Clerk | 0 | 2 | 0 | 100 |
| | Clean-up inspector | 0 | 1 | 0 | 100 |
| | Porters | 6 | 1 | 86 | 14 |
| | Machine operators | 14 | 14 | 50 | 50 |
| | Machine helpers | 3 | 7 | 30 | 70 |
| | Utility helpers | 10 | 1 | 91 | 9 |
| | Final assemblers | 4 | 6 | 40 | 60 |
| | Sub-assemblers | 6 | 10 | 37 | 63 |
| | TOTAL | 43 | 42 | 51 | 49 |
| GARMENT SHOP | Lineman | 0 | 1 | 0 | 100 |
| | Mechanic | 0 | 1 | 0 | 100 |
| | Clerk | 0 | 1 | 0 | 100 |
| | Cutter | 0 | 1 | 0 | 100 |
| | TOTAL | 0 | 4 | 0 | 100 |
| HOSPITAL | Clerks | 2 | 5 | 29 | 71 |
| | Medical Aides | 3 | 12 | 18 | 71 |
| | Runner | 1 | 0 | 100 | 0 |
| | Lab man | 0 | 1 | 0 | 100 |
| | X-ray technician | 0 | 1 | 0 | 100 |
| | Laundry man | 1 | 0 | 100 | 0 |
| | Porters | 10 | 4 | 71 | 29 |
| | Clerk training for X-ray | 0 | 1 | 0 | 100 |
| | TOTAL | 17 | 24 | 41.5 | 58.5 |
| IDENTIFICATION | Photographer | 1 | 1 | 50 | 50 |
| | Runner | 2 | 0 | 100 | 0 |
| | Darkroom | 0 | 3 | 0 | 100 |
| | Porter | 1 | 0 | 100 | 0 |
| | TOTAL | 4 | 4 | 50 | 50 |
| INSTITUTION STOREROOM | Clerk | 1 | 2 | 33 | 67 |
| | Stockroom | 0 | 1 | 0 | 100 |
| | Porter | 1 | 0 | 100 | 0 |
| | Dockworker | 5 | 6 | 45 | 55 |
| | TOTAL | 7 | 9 | 44 | 56 |

| SHOP | JOB CATEGORY. | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|
| LAUNDRY | Shirt press | 6 | 0 | 100 | 0 |
| | Porters | 2 | 0 | 100 | 0 |
| | Extractors | 1 | 3 | 25 | 75 |
| | Driers | 0 | 1 | 0 | 100 |
| | Pullers | 2 | 0 | 100 | 0 |
| | Runners | 1 | 1 | 50 | 50 |
| | Pants Press | 4 | 0 | 100 | 0 |
| | Maintenance | 0 | 2 | 0 | 100 |
| | Clean sheet counter | 1 | 0 | 100 | 0 |
| | Clothing room | 0 | 2 | 0 | 100 |
| | H.D.(?) | 1 | 0 | 100 | 0 |
| | Sheetcounters | 0 | 3 | 0 | 100 |
| | Clerks | 0 | 2 | 0 | 100 |
| | Officers laundry | 0 | 1 | 0 | 100 |
| | Sheet shake down & mangle | 28 | 17 | 62 | 38 |
| | Clerk runner | 1 | 0 | 100 | 0 |
| | Tub puller | 1 | 0 | 100 | 0 |
| | Presser | 9 | 1 | 90 | 10 |
| | Washer | 3 | 1 | 75 | 25 |
| | TOTAL | 60 | 34 | 64 | 36 |
| LIBRARY | Clerks | 2 | 5 | 29 | 71 |
| MAINTENANCE | Clerk | 0 | 1 | 0 | 100 |
| | Plasterer | 0 | 1 | 0 | 100 |
| | Cafeteria repair | 0 | 1 | 0 | 100 |
| | Laundry repair | 0 | 1 | 0 | 100 |
| | Furnace repair | 0 | 1 | 0 | 100 |
| | Heating repair | 0 | 2 | 0 | 100 |
| | Refrigerator repair | 0 | 2 | 0 | 100 |
| | General repair | 2 | 5 | 13 | 87 |
| | TOTAL | 2 | 14 | 13 | 87 |
| MASONRY SCHOOL* | Clerk | 1 | 0 | 100 | 0 |
| | Utility | 6 | 2 | 75 | 25 |
| | Student | 12 | 4 | 75 | 25 |
| | TOTAL | 19 | 6 | 76 | 24 |
| PAINT SHOP | Clerk | 0 | 1 | 0 | 100 |
| | Porter | 0 | 1 | 0 | 100 |
| | Glazer | 0 | 2 | 0 | 100 |
| | Sign painter | 0 | 2 | 0 | 100 |
| | Painter | 5 | 5 | 50 | 50 |
| | TOTAL | 5 | 11 | 31 | 69 |
| PLUMBING SHOP | Clerk | 1 | 0 | 100 | 0 |
| | Lift station | 0 | 1 | 0 | 100 |
| | Welder | 0 | 2 | 0 | 100 |
| | 24 hour plumber | 1 | 0 | 100 | 0 |
| | Plumber | 4 | 5 | 44 | 56 |
| | TOTAL | 6 | 8 | 43 | 57 |
| QUARTERMASTER | Clerk | 1 | 1 | 50 | 50 |
| | Outside tailor | 0 | 1 | 0 | 100 |
| | Honor dorm, hospital & cafe clothes | 1 | 0 | 100 | 0 |
| | Counter clerks | 4 | 1 | 80 | 20 |
| | Tailors | 2 | 1 | 6 7 | 33 |
| | Repair | 2 | 0 | 100 | 0 |
| | Shoe repair | 1 | 0 | 100 | 0 |
| | Presser | 1 | 0 | 100 | 0 |
| | Porters | 4 | 0 | 100 | 0 |
| | TOTAL | 16 | 4 | 80 | 20 |

\* Federally financed vocational school programs.

| SHOP | JOB CATEGORY | | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|---|
| RADIO AND TV SCHOOL | Students | | 6 | 11 | 35 | 65 |
| | Clerk | | 1 | 0 | 100 | 0 |
| | Porter | | 1 | 0 | 100 | 0 |
| | Utility | | 2 | 1 | 67 | 33 |
| | | TOTAL | 10 | 12 | 45 | 55 |
| RESIDENTIAL WIRING SCHOOL* | Student | | 11 | 3 | 79 | 21 |
| | Clerk | | 1 | 0 | 100 | 0 |
| | Tool room clerk | | 0 | 1 | 0 | 100 |
| | Porter | | 0 | 1 | 0 | 100 |
| | | TOTAL | 12 | 5 | 71 | 29 |
| SAFETY | Inspector | | 1 | 1 | 50 | 50 |
| SHEET METAL | Wash tanks | | 5 | 0 | 100 | 0 |
| | Shears | | 0 | 9 | 0 | 100 |
| | Tool room mechanic | | 0 | 2 | 0 | 100 |
| | Spray painter | | 9 | 0 | 100 | 0 |
| | Porters | | 1 | 3 | 25 | 75 |
| | Punch press | | 2 | 2 | 50 | 50 |
| | Break press | | 1 | 2 | 33 | 67 |
| | Cabinet assembly | | 8 | 0 | 100 | 0 |
| | Utility | | 2 | 3 | 40 | 60 |
| | Grinder | | 2 | 1 | 67 | 33 |
| | Welders | | 1 | 4 | 20 | 80 |
| | Cut off saw | | 1 | 1 | 50 | 50 |
| | Chain assembly | | 2 | 3 | 40 | 60 |
| | Clerk | | 1 | 1 | 50 | 50 |
| | | TOTAL | 35 | 31 | 53 | 47 |
| SOCIAL SERVICES | Clerks | | 5 | 5 | 50 | 50 |
| TOOL ROOM | Porter | | 5 | 1 | 83 | 17 |
| | Clerk | | 0 | 1 | 0 | 100 |
| | Counterman | | 1 | 0 | 100 | 0 |
| | Locksmith | | 0 | 1 | 0 | 100 |
| | Repairman | | 0 | 4 | 0 | 100 |
| | | TOTAL | 6 | 7 | 46 | 54 |
| TRASHRUN | Trash crew | | 8 | 4 | 67 | 33 |
| TREATMENT | Clerk | | 0 | 1 | 0 | 100 |
| WELDING* | Student | | 14 | 5 | 74 | 26 |
| | Clerk | | 0 | 2 | 0 | 100 |
| | Tool room | | 0 | 2 | 0 | 100 |
| | Repairman | | 0 | 1 | 0 | 100 |
| | Porter | | 0 | 1 | 0 | 100 |
| | | TOTAL | 14 | 11 | 56 | 44 |
| ALL JOBS | | | 473 | 394 | | |

\* Federally financed vocational school programs.

---

Leaving aside those employment units (including porters and office workers in all units) specifically covered by Paragraph 9 of the order, it appears that several new trouble spots have developed. The garment shop is 100% white. Percentages of whites in the maintenance shop (87%), the paint shop (69%), and the automotive mechanics school (63%) far exceed the percentage of whites in the stockade. On the other hand, the percentages of blacks in the quartermaster department (80%), the masonry school (76%), and the residential wiring school (71%) are disproportionately high. Even in an employment unit which is reasonably balanced overall, disparities exist with respect to particular jobs. For example all (5) wash tank workers and all (9)

spray painters in the sheet metal shop are black; all (9) shears operators are white.

*The honor dormitory.* As of January 31, 1976, there were 187 inmates housed in the honor dormitory. Of these 119 were black and 68 were white. Thus the percentage by race was 64% black and 36% white. The following data, accounting for 128 inmates, were submitted by job supervisors in the honor dormitory.

| SHOP | JOB CATEGORY | | #BLACK | #WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|---|
| CLARK'S GARDEN GANG | Gang worker | | 11 | 3 | 79 | 21 |
| | Waterboy | | 1 | 0 | 100 | 0 |
| | | TOTAL | 12 | 3 | 80 | 20 |
| COY'S TRACTOR GANG | Tractor & truck driver | | 2 | 8 | 20 | 80 |
| DAIRY BARN | Labor | | 10 | 0 | 100 | 0 |
| | Chore man | | 1 | 3 | 25 | 75 |
| | Milker | | 8 | 2 | 80 | 20 |
| | Night man | | 1 | 0 | 100 | 0 |
| | Milker washer | | 1 | 0 | 100 | 0 |
| | Truck drivers | | 0 | 2 | 0 | 100 |
| | Feeders | | 2 | 0 | 100 | 0 |
| | Clerk | | 1 | 0 | 100 | 0 |
| | Calf barn | | 0 | 2 | 0 | 100 |
| | | TOTAL | 24 | 9 | 73 | 27 |
| M.C.I. GARAGE | Licensed drivers | | 4 | 2 | 67 | 33 |
| | Unlicensed drivers | | 3 | 0 | 100 | 0 |
| | Fire department | | 1 | 1 | 50 | 50 |
| | Washrack | | 1 | 0 | 100 | 0 |
| | Toolroom | | 0 | 1 | 0 | 100 |
| | Mechanic | | 1 | 0 | 100 | 0 |
| | Clerk-dispatcher | | 2 | 0 | 100 | 0 |
| | | TOTAL | 12 | 4 | 75 | 25 |
| HOG LOT | Tractor driver | | 0 | 1 | 0 | 100 |
| | "Where & if needed" | | 1 | 8 | 11 | 89 |
| | | TOTAL | 1 | 9 | 10 | 90 |
| NEWLAND'S FARM GANG | Gang workers | | 4 | 4 | 50 | 50 |
| | Gang waterboy | | 1 | 0 | 100 | 0 |
| | | TOTAL | 5 | 4 | 56 | 44 |
| POWER PLANT | Clerk | | 0 | 1 | 0 | 100 |
| | Utility | | 1 | 0 | 100 | 0 |
| | Fireman helper | | 1 | 2 | 33 | 67 |
| | Chemist | | 0 | 1 | 0 | 100 |
| | Coal crew | | 2 | 2 | 50 | 50 |
| | Ash crew | | 4 | 0 | 100 | 0 |
| | Porter | | 4 | 0 | 100 | 0 |
| | | TOTAL | 12 | 6 | 67 | 33 |
| WAGNER'S GARDEN GANG | Gang Worker | | 5 | 5 | 50 | 50 |
| | Waterboy | | 1 | 0 | 100 | 0 |
| | | TOTAL | 6 | 5 | 55 | 45 |
| WITZEL'S FARM GANG | Grainery feed mixer | | 2 | 0 | 100 | 0 |
| | Dump man | | 1 | 0 | 100 | 0 |
| | Carpenter truck driver | | 0 | 1 | 0 | 100 |
| | Yardman | | 0 | 1 | 0 | 100 |
| | Farm clerk | | 0 | 1 | 0 | 100 |
| | | TOTAL | 3 | 3 | 50 | 50 |
| ALL JOBS | | | 77 | 51 | | |

These data likewise establish the discriminatory effect of job assignment procedures currently in use at M.C.I. 80% of the tractor and truck drivers on Coy's tractor gang are white, as are 89% of the "where and if needed" employees in the hog lot. On the other hand, 100% of the ash crew and porters in the power plant are black, as are 100% of "labor" employees in the dairy barn.

Thus, assuming that all "problem" employment units existing in September, 1972, were included in Paragraph 9 of the Court's order, job discrimination appears to have increased at M.C.I. since the filing of the consent order in *Taylor v. Perini.*

This state of affairs may arise to some extent from the fact that there are no written criteria for job assignment, transfer and removal which are utilized by any of the institution committees charged with job assignments. One job supervisor volunteered a statement of written criteria for selection of garage employees; these are worthy of inclusion because they indicate that the task envisioned by Paragraph 8(a) can be done and done best by the supervisors themselves.

## M.C.I. Garage

| Priority | General Job Classification |
|---|---|
| 1 | One to two years to first Parole Board date. |
| 2 | At least 8th grade education, ability read, write and understand simple written orders. |
| 3 | Eligibility for Restricted Drivers License. |
| 4 | Normal physical health. No back injuries, leg or arm amputations, normal eyesight with or without glasses. |
| 5 | Stable social adaptability. |
| 6 | Steady working habits |

### Special Skills

| Dispatcher | Ability to type, keep business records, accounting of cost of operation. |
|---|---|
| Assistant Dispatcher & Gas Pump Operator | Same as Dispatcher above and ability to perform as utility man, for example: porters duties and gas pump operation. |
| Automotive Mechanic | Engine tuning and major engine overhaul, general lubrication and maintenance of vehicles. Some welding experience desired. |
| Tool Room Man | Account for and issue tools and automotive maintenance equipment, take tool inventory, general vehicle lubrication and housecleaning chores. |

Fire Department

Fire Chief: Special training in fire fighting, care and maintenance of fire fighting equipment. Ability to instruct in fire fighting technique. Ability to operate pumpers as licensed driver. Prefer some first aid training.

Fireman: Ability to operate pumper and foam machine, connect hoses and attach all fire fighting apparatus. Maintenance of fire fighting equipment. Prefer some first aid training.

| | |
|---|---|
| Tractor Operator | Ability to operate small tractor, tractor rotary mowers, small blade, operators maintenance of tractor. |
| Licensed Drivers | Ability to operate State cars and trucks up to 2 1/2 ton capacity and perform general maintenance of automotive vehicles. Fix flat tires, be able to read invoices, road maps and signs. |
| Unlicensed Drivers | Ability to drive and/or willingness to learn how to operate cars and trucks up to 2 1/2 ton capacity. Ability to read road signs, invoices and road maps. |

One important exception to the general dearth of job criteria exists with respect to the vocational education program. School shops involved in this program include masonry, welding, residential wiring, automobile body repair, and automobile mechanics. Criteria for the selection of *students* (as opposed to workers such as clerks and porters) are established by guidelines issued by the Office of Manpower Development since these programs are funded by Federal monies distributed through the State of Ohio. These guidelines require the Director of Education at M.C.I. to interview and review inmates to ascertain:

1. valid interest for the particular occupation
2. resident's ability to complete the course and to become employed in the occupation
3. parole board hearing date within three months after the completion of the program.

With respect to the third criterion, the inmate must be within 12 months of his parole hearing at the time of his interview.

Inmates selected initially by the Director of Education are screened by a representative of the Adult Parole Authority, in the course of which screening the A.P.A. representative will "indicate to the institutional Director of Education the percentage factor of probable parole on that hearing date." Following this procedure, the Director of Education rates all selected inmates on the basis of aptitude, interest, ability, and motivation. Final selection is made by the Ohio Bureau of Employment Services. This decision is based upon tests administered by the Ohio Bureau of Employment Services, an interview held by a representative of that agency with the inmate, and the ratings provided by the Adult Parole Board and the Director of Education.

Because the purpose of the vocational schools is to *train* individual inmates shortly before their release from the institution, the use of traditional "job" criteria would be inappropriate. While the criteria specified by the Office of Manpower Development appear to be rational and within the spirit of Paragraph 8(a) of the Court's order, it is the responsibility of the Director of Education to attempt, within the limits of the criteria imposed upon him, to develop a list of "selected residents" which is non-discriminatory for review by the Ohio Bureau of Employment Services.

Few tests are employed in connection with job assignment. After an inmate is assigned to the stockade cafeteria, he will be given a short written test by the supervisor in the event that the inmate is being considered for a cook's job. The supervisor of the radio and television shop administers a simple mathematical test to his employees after they are assigned by the appropriate committee. A successful driver test is required by the supervisor of the garage for some of his employees. All tests administered appear to be job related. No tests are given prior to the decision of the assigning committee; thus such tests as are administered do not constitute criteria for job assignments by those committees.

Although the Hearing Officer and the Rules Infraction Board may recommend a job transfer as a sanction for infraction of a disciplinary rule, the incidence of such recommendations is not great. The following data describe all recommendations for job change by either a Hearing Officer or the Rules Infraction Board since December 2, 1975:

| OFFENSE(S) | | NO. OF TRANSFERS RECOMMENDED |
|---|---|---|
| III-1 | disrespect to an officer or staff member, or an inmate | 1 |
| III-2 III-5 | being out of place (combined with unexcused tardiness or absence from a job or pass) | 1 |
| III-5 III-6 | unexcused tardiness or absence from a job or pass (combined with inadequate work performance) | 1 |
| II-1 | disobedience of a direct order, which shall include insubordination | 1 |
| II-1 III-16 | disobedience of a direct order, which shall include insurbordination (combined with violation of any other published institutional rules, regulations, or procedures) | 1 |
| II-1 II-2 | disobedience of a direct order, which shall include aggravated insubordination (combined with refusal to carry out a work or other institutional assignment) | 1 |
| II-2 | refusal to carry out a work or other institutional assignment | 2 |
| II-7 | possession or consumption of any intoxicant, such as liquors or drugs unless with permission | 1 |
| II-8 | possession or manufacture of weapons or contraband, which shall include any article knowingly possessed for which permission has not been given | 2 |
| II-12 | threats with or without a weapon or use of force | 2 |
| | TOTAL | 13 |

Less formal mechanisms than the issuance of a conduct report exist for making a disciplinary job transfer. A job supervisor may request reclassification of an employee/inmate directly from the Reclassification Committee or the Honor Reclassification Committee. Data disclosing the incidence and disposition of such requests began to be provided to the Special Master on February 12, 1976. On the basis of this very incomplete information, it is nonetheless clear that such requests are made and, on occasion, honored. For example, the supervisor of the power house recommended

reassignment of an employee/inmate claiming that "he can't and won't do the work." The Honor Dormitory Reclassification Committee approved the request on February 25, 1976, and assigned the inmate to Ewing's hog lot. The Reclassification Committee (stockade) honored requests for reassignment from six job supervisors at its meeting of February 19, 1976. Where indicated, reasons appear generally to be job related. (e. g. "requested off job, won't work"; "Taking books out of library"—library employee; "Does not carry out assignments".)

Even less formal is the transfer effected by a job supervisor within his own shop. A machinist may be reassigned by his supervisor to a porter's job within the same shop, for example. No data are available to determine the frequency of such occurrences.

Three written complaints were received by the Special Master from inmates complaining of non-job related disciplinary transfers. One of these is alleged to have resulted from repeated appeals on the inmate's part to the Inmate Liaison Officer complaining about racial discrimination. Another alleged that he had been transferred (within his shop) for being late returning from a visit to a bathroom. The third lost his job in the hospital as a result of being found in the minor surgery room in spite of a rule prohibiting his presence there.

The limited data available at this time tend to indicate that the phenomenon of job transfer by the various committees for disciplinary purposes is rather limited. Many of the transfers described above are (or are arguably) job related. Data which have just begun to arrive in the office of the Special Master will permit continuing and closer monitoring in the future.

Intra-shop transfers, on the other hand, are insufficiently documented at this time. The principal reason for this is that such transfers, effected solely by the job supervisor, are not routinely "reviewable" by any other person.

There is at the present time a well-defined procedure for making the initial job assignment which an inmate received. Once the inmate receives a job, however, procedures for transfer are less definite. He may seek reclassification from the Reclassification Committee or the Honor Reclassification Committee; his reclassification may be recommended by a Hearing Officer or the Rules Infraction Board; his reassignment may be requested by his supervisor. Apparently, a combination of the inmate's request for reassignment, a request by the supervisor of the job sought by the inmate, and the permission of the supervisor of the inmate at the time of his request for reassignment is the usual pattern of events which results in reclassification. There is no regular or on-going review of job assignments, and neither reclassification committee ever makes a transfer on its own initiative. Hypothetically, if all goes well on the job, the inmate stays out of disciplinary trouble, and he never seeks a job change, he will remain on the same job during the entire period of his incarceration at M.C.I.

As pointed out above, responsibility for assignment and reassignment is now vested in four separate committees, three of whom are chaired by the Associate Superintendent for Treatment. Until recently, he served as chairman of all four committees. Separation of responsibility for the honor dormitory and the stockade is appropriate in view of the noninterchangeability of jobs in those two units of the institution. The only difference in membership on the Honor Placement Committee and the Honor Reclassification Committee is the identity of the representative from the Social Services Department; membership on the Classification Committee and the Reclassification Committee is the same except that two additional members serve on the former. These are the Director of the Education Department and the Supervisor of the Ohio Penal Industries Shops. Apart from intra-shop transfers discussed above, responsibility for assignment and reassignment is centralized in these committees.

All concerned acknowledge that deference is given to the wishes of job supervisors in making original job assignments as well as in transferring inmates from one job to another. Justifications offered include the need to find the right man for the right job and experience which a particular supervisor may have had with a particular inmate during an earlier period of his present incarceration or during his prior incarceration. Data provided by all four committees corroborates this practice.

One important source of information for supervisors seeking to find a qualified inmate for a job may be input from other inmates already assigned to the job unit. While such influence cannot be documented, members of the Inmate Liaison Committee have stated that such reliance upon other inmates is common. Inmate input, of course, can also result in a supervisor's veto of a particular inmate seeking to join a particular shop. Hard evidence to substantiate this practice is virtually impossible to obtain. The demonstrated degree of supervisor interest in the identity of inmates assigned to a shop and the implausibility of other explanations to account for such interest indicate that inmate recommendations probably play an important role in the system.

Finally, an inmate may obtain a transfer by means of his own initiative. He may and frequently does approach the supervisor of the shop he wishes to enter to convince the latter to request his transfer. An approach to fellow inmates already employed in the shop for help in persuading the supervisor is also made on occasion. Absent such activity on the part of an inmate, he is unlikely to obtain a transfer from a job which he wishes to leave.

An underlying cause of many of the difficulties encountered in the area of job assignment and reassignment is the phenomenon of underemployment which exists in the institution at this time. Estimates by job supervisors and other staff of the institution are that somewhere between 700 and 800 full-time jobs exist in the institution. These include institution support and maintenance jobs, shops, vocational schools, and the full-time college program (Project Newgate). The more than 1300 inmates are featherbedded to provide everyone with some kind of work. Interestingly, the response at Southern Ohio Correctional Facility has been a different (though not better) one. Somewhat more than 1900 inmates are allocated in the following manner in that institution: 900 work at full-time jobs, 400 participate in full-time educational programs during the day, and 600 are completely idle. The remedial, grade school and high school programs at M.C.I. function only in the evening hours. An inmate participating in one of these programs is assigned to a job during the day.

## RELEVANT ADMINISTRATIVE REGULATIONS

The Administrative Regulations which deal with the matters covered by Paragraph 8 of the Court's order are consistent with the provisions of the order. Administrative Regulation 822 (See Appendix S, p. 306 *infra.*) prohibits racial discrimination with regard to "institutional program assignments", and requires "fair, consistent, and objective classification of all inmates" with respect to job assignments. Administrative Regulation 836(1), Appendix T, p. 307 *infra*, contains an almost verbatim expression of the language in Paragraph 8(c) of the Court's order relating to job transfers related to discipline for rule infractions. Although Administrative Regulation 836 does not require the development of job related substantive criteria for assignment, it does state a number of factors to be taken into account in making assignments. Current practices at M.C.I. violate Paragraph 5 of this Administrative Regulation which requires that decisions of the Classification Committee be recorded "with the reasons for the decision clearly stated." Provision is made in sub-paragraph 6 of the Administrative Regulation for use of the grievance procedure by an inmate who is dissatisfied with the committee. Finally, sub-para-

graph 7 reflects precisely the provisions of Paragraph 8(d)(2) and (3) of the order issued in *Taylor v. Perini*.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the institution's current procedures for assignment, promotion, transfer, and removal of inmates to and from job assignments have produced a pattern of racial discrimination in certain employment units both within the stockade and in the honor dormitory. In addition, the Special Master finds that the institution is in a state of non-compliance in the following respects:

(1) There are no written job criteria of any kind employed by the committees charged with job assignment, transfer, and removal.

(2) There are no written reviewable procedures for intra-shop job transfers by a job supervisor, and centralized responsibility for such transfers does not exist.

(3) There are no defined procedures for making job assignments and transfers as a result of regular or on-going review of inmate job assignments, with the result that such assignments and transfers are dependent to a very large extent upon the self-initiative of inmates.

(4) Deference is given by the responsible institutional committees to the wishes of job supervisors and indirectly to wishes of fellow inmates.

The Special Master finds the institution to be in a state of compliance in the following respects:

(1) Such tests as are utilized in connection with job assignment *by job supervisors* are job related.

(2) Centralized authority for job assignments, transfers, and removals (apart from intra-shop transfers effected by job supervisors) is vested properly in the four institutional committees charged with responsibility for classification and reclassification.

Limited data which exist indicate that disciplinary job transfers effected by the Reclassification and Honor Reclassification committees comply with Paragraph 8(c). Because of incomplete data, however, no finding can be made at this time respecting intra-shop transfers effected by job supervisors.

## PARAGRAPH 9

Paragraph 9 requires the preparation and submission of a plan for rectifying the effects of past discrimination in job assignments with respect to a number of specific employment units, as well as with respect to all office and porter jobs within the institution. The institution has submitted no plan. This portion of the report will examine the current patterns of discrimination which exist in the employment units and job categories listed in this paragraph of the Court's order.

## METHOD OF INVESTIGATION

Data from all job supervisors in those specific employment units listed in the order were sought and obtained. Information regarding inmate porter jobs is incomplete, as all supervisors had not reported at the time of the preparation of this report. Data obtained from job supervisors were compared to those shown on the Monthly Population Report in order to determine whether gross disparity of reporting existed, and the data were comparable.

## EVIDENCE RELATING TO COMPLIANCE

The reports which have been received with respect to office jobs show a total of 103 such positions *within the stockade itself*. Of these, 43 are filled by black inmates and 60 are filled by white inmates. Thus the percentage by race may be compared to the racial balance of all inmates in the stockade as follows:

| % White Population | % Black Population |
|---|---|
| 43.5% | 56.5% |
| % White Office Workers | % Black Office Workers |
| 58.0% | 42.0% |

Incomplete reports from job supervisors with respect to porter jobs show a total of 131 such jobs *in the stockade*. Of these 90 are filled by black inmates and 41 are filled by white inmates. The percentage by race compares to the racial balance of all inmates in the stockade as follows:

| % White Population | % Black Population |
|---|---|
| 43.5% | 56.5% |

| % White Porters | % Black Porters |
|---|---|
| 31.0% | 69.0% |

Data relating to the other employment units specifically dealt with in Paragraph 9 of the Court's order are reported on the following pages, *supra:*

plumbing shop, p. 244, electric shop, p. 243, carpenter shop, p. 242, commissary, p. 242, hospital, p. 243, dental clinic, p. 243, cafeteria (stockade), p. 242, laundry, p. 244, trash run, p. 245, and the custodial school, p. 243.

These data reflect the following:

| EMPLOYMENT UNIT | # BLACK | # WHITE | % BLACK | % WHITE |
|---|---|---|---|---|
| Plumbing Shop | 6 | 8 | 43 | 57 |
| Electric Shop | 3 | 8 | 27 | 73 |
| Carpenter Shop | 6 | 9 | 40 | 60 |
| Commissary | 5 | 9 | 36 | 64 |
| Hospital | 17 | 24 | 41.5 | 58.5 |
| Dental Clinic | 0 | 4 | 0 | 100 |
| Cafeteria (stockade) | 114 | 72 | 61 | 39 |
| Laundry | 60 | 34 | 64 | 36 |
| Trash run | 8 | 4 | 67 | 33 |
| Custodial Sthool | 40 | 20 | 67 | 33 |

Again these percentages should be compared to the overall racial breakdown in the inmate population: 56.5% black and 43.5% white. In the first six employment units listed, the number of black inmates employed is disproportionately low; in·the last four, it is disproportionately high. While no systematic effort was made by the Special Master to obtain opinion from inmates as to the relative desirability of these jobs, it is clear that the first six require generally higher skills than do the last four. Furthermore, informal comments from staff and inmates, as well as observations gained in the course of numerous on site inspections tend to indicate that the first six (particularly commissary, hospital, and dental clinic) are generally more desirable while the last four (particularly cafeteria, trash run and custodial school) are less desirable.

## RELEVANT ADMINISTRATIVE REGULATIONS

Administrative Regulation 822, Appendix S, p. 306 *infra*, is directly on point to the problem addressed by Paragraph 9 of the Court's order. The most relevant language of that Administrative Regulation reads as follows:

There shall be fair, consistent, and objective classification by committee of all inmates with respect to all aspects of institutional life. So far as possible, institutional programs should reflect the ethnic distribution of the inmate population.

This language of the Department of Rehabilitation and Correction itself provides a fair standard by which to measure the institution's compliance with Paragraph 9.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the institution is in a state of noncompliance with Paragraph 9 of the Court's order in that:

(1) No plan for rectification of the effects of past discrimination in job assignments with respect to the employment units and job categories specified in the paragraph has ever been submitted to the Court, and

(2) A discriminatory pattern continues to exist in the employment units and job categories specified in the paragraph.

## PARAGRAPH 10

Paragraph 10 mandates the preparation of an affirmative action plan for submission to the Court. The overall purpose of the plan is to create and maintain "a working

atmosphere free of racial harassment, intimidation or insult." The plan is a program of action directed both at staff and at the inmate population. Elements required to be included are promulgation and enforcement of staff rules, a redefinition of all staff job descriptions, an orientation program for present and incoming staff, pre-hire psychological testing of staff, a program for in-service training of all staff, a program of orientation for present and incoming inmates, and the designation of one or more staff as Equal Opportunity Co-ordinator.

## METHOD OF INVESTIGATION

Interviews were conducted with the Personnel Officer of the institution concerning staff hiring procedures, staff disciplinary rules including procedures for enforcement thereof, and in-service staff training programs. The institution's Training Officer responsible for the orientation and training of incoming correctional officers was consulted as well. Discussions with staff of the Department of Rehabilitation and Correction in Columbus provided information concerning pre-hire psychological testing of staff. A copy of the schedule for the incoming inmates' orientation session was obtained and discussed with the Director of Social Services. The two individuals who have been designated "Equal Opportunity Co-ordinator" were interviewed at length several times. Limited input concerning the existence and scope of the orientation program for new inmates was obtained from the Inmate Liaison Committee.

## EVIDENCE RELATING TO COMPLIANCE

No written affirmative action program has been prepared by M.C.I. for submission to the Court. While an Affirmative Action Plan for Fiscal Year 1976 for the entire Department of Rehabilitation and Correction has been approved by the State Equal Employment Opportunity Office, the thrust of this plan is toward equal opportunity hiring throughout the system. Many of the specific matters contained in Paragraph 10 of the Court's report (e. g. pre-hire psychological testing, inmate orientation) are altogether absent from the Department's plan. The only matter treated with any detail whatsoever is that of in-service training of staff members.

The remainder of this section of the report will deal with the extent to which the objectives of this paragraph of the Court's order have been realized in the absence of a written affirmative action program.

At the outset, it should be understood that the problem of racial discrimination and harassment at M.C.I. is exacerbated by the presence of a very small number of non-white staff. As of January 3, 1976, some 369 persons were employed at M.C.I.; as of January 7, 1976, the total of non-white employees was 15. Of these, nine were corrections officers, one a recreation specialist, one an accountant, one a food service manager, one a teacher, and another a social worker. This state of affairs results to a large extent from the small minority labor force in the geographical area from which M.C.I. draws its employees (4.9%). Although the Department's Affirmative Action Plan is aimed at increasing the incidence of minority employment at M.C.I., as well as other correctional institutions within Ohio, the geographical location of the institution virtually assures that the staff will remain overwhelmingly white in the future.

Written rules applicable to correctional officers are contained in the Correctional Employees Reference Manual distributed to all incoming correctional officers. While these rules relate in some instances to conduct toward inmates (e. g. unnecessary mental and physical violence, recognition of the worth and dignity of every individual, and an injunction from "riding an inmate on the basis of a personal grudge"), no specific reference to the problems of racial

discrimination, harassment, intimidation and insult could be found.

There are no written rules prohibiting such conduct and no written sanctions for their violation apart from those provided in Administrative Regulation 822. See discussion, p. 257, *infra*. An inmate's only recourse in the face of racial discrimination, harassment, or insult is the filing of a grievance with the Inmate Liaison Office. According to records maintained by that office, the number of such grievances (of a formal nature) is very small. There is little in the record to suggest that satisfactory resolutions of such grievances occur on a regular basis, and inmates regard the entire process as a sham. The Personnel Officer of the institution was unable to point to a single case within his memory of discipline of a correctional officer or other staff member resulting from an allegation of racial discrimination, harassment, or insult.

The files of the Special Master, on the other hand, contain a number of complaints relating to these matters. The general attitude of the inmate population is that there is little they can do about such problems within the institutional framework which exists. As a result they sometimes attempt to deal with their problems by means of self help in the form of harassment of the offending guard. This approach, while undesirable, appears to be a not altogether unsuccessful one. Allegations of racial harassment, etc., frequently boil down to the word of one inmate or a group of inmates against that of the correctional officer involved. In such a case the system assumes that the officer is telling the truth. What is necessary, then, is evidence of a pattern of conduct disclosing propensities for racism. While the inmates are not in a position to provide this in many instances, the Inmate Liaison Officer should be.

Staff job descriptions have been prepared for all positions at M.C.I.; these are currently in the process of being updated on revised forms. Neither form contains any general statement (in print) relating to equal opportunity responsibility. In an effort to comply with the spirit of Paragraph 10(b) of the Court's order, all descriptions have been or are being rewritten to include the following language:

> This position shall be responsible for compliance with all rules, regulations and procedures of the United States Equal Employment Opportunity Commission and the Ohio. Civil Rights Commission as they relate to the performance of an employee.

A training program for all incoming correctional officers is administered by the institution's Training Officer. This individual has other duties as well, including the Chairmanship of the Rules Infraction Board. In a period of approximately one week, the program attempts to expose the incoming employee to virtually all facets of the institution and the responsibilities of a corrections officer. The printed training module schedule prepared by the Training Officer includes instruction on "EEO practices" and "Working with inmates—Black awareness". New officers participating in the program have corroborated that such instruction is given. The Special Master did not have an opportunity to participate in any of these training sessions because of other demands upon the limited time he was able to spend in Marion.

One of the examinations administered in the course of the training program relates to officer/inmate behavior. The examination tests understanding of some of the historical, psychological and personality factors influencing this relationship. There is no specific emphasis upon problems relating to race.

During January, 1976, the Special Master did attend an in-service training program for M.C.I. employees presented by the Affirmative Action staff of the Department of Rehabilitation and Correction. The thrust of the program was the philosophy of equal

employment opportunity in hiring and promotion. The program did not deal with inmate/staff relations in any way.

No pre-hire psychological examination of any kind has been administered to any candidate for a staff position at M.C.I. The Minnesota Multiphasic Personality Inventory (MMPI) has been administered *on a post-hire basis* to 94 employees. These tests were sent to Columbus for scoring and evaluation by staff of the Department of Rehabilitation and Correction. Scoring has been completed and at least some results have been evaluated.

Two in-service staff training sessions have been held since September, 1972, which relate to development of human relations skills in staff. The first of these was presented by DARC and Associates between March 26 and April 4, 1973. An outline of the program is found in Appendix U, p. 309 *infra.* The program was rated an overall success by an official of M.C.I.

The second program was presented by the Area Manpower Institute for Development of Staff on July 17, 1973. This program was described as "an experimental sensitivity type session attended by both staff and residents." Twenty-nine employees and fifteen residents participated. The program was less than an unqualified success, particularly with regard to the impact upon the security staff in attendance.

According to a memorandum of February 24, 1976, from the Affirmative Action Coordinator of the Department of Rehabilitation and Correction to the Personnel Officer of M.C.I., there are no plans at this time at the departmental level for future EEO training. A number of individual M.C.I. employees (including the Superintendent) have attended special EEO training sessions over the past several years. Finally, 3 M.C.I. correctional officers have attended special in-service training sessions for correctional officers held at the Ohio Correction Academy. Much of the subject matter of these sessions relates to the nuts and bolts of the correctional officer's job. There is some instruction, however, in "discrimination and racial issues", the "responsibilities of correctional officers", and "human relations".

On the question of incoming inmate orientation, the schedule for the one week orientation program does indicate the participation of the Inmate Liaison Officer, who is one of the Equal Opportunity Co-ordinators serving the institution. One of his responsibilities in these sessions is to acquaint incoming inmates with principles of equal opportunity as they relate to M.C.I. Inmates who have been interviewed have stated that there is little if any treatment of the realities of racial discrimination in these meetings. The Inmate Manual which is distributed to incoming inmates in connection with the orientation program is silent on the matter of racial discrimination and inmate's responsibility to abide by the principle of equal opportunity.

Finally, on August 19, 1975, the Superintendent appointed two persons to serve as Equal Opportunity Co-ordinators. These are the Personnel Officer and the Inmate Liaison Officer. The first has responsibility primarily in the area of staff and the second in the area of the inmate population. Both of these individuals have primary job responsibilities apart from their duties as Equal Opportunity Co-ordinator, which duties were simply added to their other responsibilities at the time of their appointment. The record does not indicate that there has been any effort at overall implementation, coordination, evaluation or reporting on institutional efforts to effectuate the Court's order.

## RELEVANT ADMINISTRATIVE REGULATIONS

Administrative Regulation 803, Appendix V, p. 311 *infra,* includes "abusive language and racial slurs" within the definition of "inappropriate supervision" by an

employer. The Regulation also establishes the position of Inmate Liaison Officer to investigate inmate complaints of inappropriate supervision and sets forth the procedures to be utilized by inmates in making such complaints.

The last paragraph of Administrative Regulation 822, Appendix S, p. 386 *infra,* is altogether supportive of Paragraph 10(1) of the Court's order requiring sanctions for racial discrimination, harassment, intimidation and insult by employees. This Regulation requires as well pre-service, in-service and staff development programs which include training in human relations. Administrative Regulation 834, Appendix W, p. 313 *infra.,* establishes an employee grievance procedure which can be used by an employee subjected to racial discrimination, harassment, intimidation, and insult.

## FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the institution is in noncompliance with the requirements of Paragraph 10 of the Court's order in that no overall affirmative action program has been developed by the institution or submitted to the Court. In the absence of such an overall program, the Special Master makes the following findings with reference to the subparagraphs of this portion of the Court's order:

(a) Although Administrative Regulations 822 and 803 constitute written rules prohibiting racial discrimination coupled with sanctions for violations, these prohibitions are not brought home to institutional staff in a sufficient manner.

(b) While the institution is making a good faith effort to include the required statement concerning equal opportunity responsibility in all revised job descriptions, the language currently employed is not sufficient to accomplish its intended purpose.

(c) Although efforts are being made to include instruction in the institution's commitment to the principles of equal opportunity during orientation sessions for incoming staff, additional emphasis on this subject is required.

(d) The institution and the Department of Rehabilitation and Correction are in noncompliance with the portion of the Court's order requiring pre-hire psychological testing of incoming staff members.

(e) The two in-service training sessions held since September, 1972, constitute a good faith effort to provide relevant training, but continued efforts in this respect are required.

(f) Sufficient indoctrination concerning the institution's commitment to principles of equal opportunity is not provided by the present inmate orientation program.

(g) The duties of Equal Opportunity Coordinator do not constitute the *primary* job responsibility of any member of the institution's staff. There has been no effort at overall implementation, coordination, evaluation or reporting on institutional efforts to effectuate the Court's order, and the objectives of subparagraph 10(g) have not been met in any respect.

The Special Master finds further that the objective of Paragraph 10—the creation of a working atmosphere free of racial discrimination, harassment, intimidation or insult—has not been achieved in the absence of an overall affirmative action program.

## PARAGRAPH 11

Paragraph 11 of the Court's order requires the institution to submit a plan for elimination of the effects of past racial discrimination in the assignment of beds to inmates. The language of this Paragraph is not restricted to the dormitories within the stockade and thus is taken by the Special Master to include cellblocks within the stockade as well as the dormitories in the honor dormitory.

## METHOD OF INVESTIGATION

Weekly reports, consisting of diagrams of all dormitories (stockade and honor dormitory) and cellblocks have been provided by the staff member charged with the responsibility for making bed assignments and approving requests for bed transfer. All other data and information concerning bed assignments requested by the Special Master have been provided as well.

## EVIDENCE RELATING TO COMPLIANCE

The matter of bed assignments within the institution has been the subject of five separate orders of the Court. The first of such orders was the consent order filed in *Taylor v. Perini* on September 12, 1972, which is the subject of this compliance report. In July, 1973, the Court issued an order requiring the beds in each stockade dormitory to be numbered in a particular way and requiring assignments to such beds to be filled on a random basis without reference to the race of the inmate being assigned. The assigning officer was permitted to employ a different procedure with respect to the eight beds in each dormitory equipped to accommodate television sets in the event that the inmate assigned in a random manner failed to own a television set. Even as to these beds, however, race was not to be a factor in making the assignment.

The Court next addressed this problem in September, 1973, when it issued an order requiring a report of the then existing racial composition of the bed pattern, to be followed by a random drawing of names and reassignment of all inmates to new beds. After the general reassignment, subsequent individual assignments were to be made on a random basis without reference to race. (Again a nondiscriminatory, nonrandom process was permitted with respect to beds equipped for television.) After a period of ten days following the mass reassignment, inmates were permitted to trade beds on a voluntary basis with the approval of the institution authorities. This order concluded with a requirement for reports which would disclose the effect, if any, of the random drawing upon the then existing bed pattern.

In February, 1974, the Court issued an order *sua sponte* requiring reports of policies which had been in effect previously and which were in effect at the time of the February order for the assignment and reassignment of beds.

Finally, in June, 1974, in connection with the Plaintiff's motion to show cause why the defendant and his attorney should not be held in contempt of court, the Court again ordered that "the defendant shall continue to require incoming inmates to select their initial bed assignment without any knowledge of the identities or races of the inmates already residing in the dormitories involved."

In the course of these various events, the officials at the institution gained the impression that a bed assignment or reassignment could not be made if the effect would be to place an inmate in a bed flanked on both sides by inmates of his race. No such requirement appears in any of the orders of the Court concerning this problem. Apparently, the impression of the prison officials may have been gained in an informal conference or proceeding relating to the problem of bed patterns. Whatever the circumstances giving rise to the impression, it has been a cause of significant difficulty, both from the standpoint of the institution and from the standpoint of the inmates. Because of crowded conditions in Marion, the staff member assigning beds to incoming inmates has few choices about where to place a man. The assumed requirement that the inmate must be flanked on at least one side by a person of the opposite race has compounded the problem for this officer. At the same time, the Court's order has been cited in good faith to inmates as a reason for denying a request for bed reas-

signment when such transfer would result in the inmate's being flanked by two persons of his race.

As of February 20, 1976, the racial configuration of each living unit in the institution was the following:

| LIVING UNIT | # WHITE | # BLACK | % WHITE | % BLACK |
|---|---|---|---|---|
| 1 dormitory (cafeteria workers) | 21 | 43 | 33% | 67% |
| 1-A dormitory (cafeteria workers) | 21 | 43 | 33% | 67% |
| 2 dormitory | 22 | 41 | 35% | 65% |
| 2-B dormitory (Newgate College program) | 15 | 30 | 33% | 67% |
| 3 dormitory | 19 | 44 | 30% | 70% |
| 3-C dormitory | 25 | 37 | 40% | 60% |
| 4 dormitory | 12 | 52 | 19% | 81% |
| 4-D dormitory | 27 | 36 | 43% | 57% |
| 5 dormitory (Papillon drug & alcohol prog.) | 25 | 25 | 50% | 50% |
| 5-E dormitory (Papillon) | 26 | 24 | 52% | 48% |
| 6 dormitory | 15 | 48 | 24% | 76% |
| 6-F dormitory (quiet dorm) | 39 | 24 | 62% | 38% |
| 1 cellblock | 33 | 34 | 49% | 51% |
| 2 cellblock | 34 | 33 | 51% | 49% |
| 3 cellblock | 33 | 34 | 49% | 51% |
| 4 cellblock | 34 | 33 | 51% | 49% |
| 5 cellblock | 33 | 34 | 49% | 51% |
| 6 cellblock (allotted cellblock) | 50 | 17 | 75% | 25% |
| Honor Dormitory North | 50 | 47 | 52% | 48% |
| Honor Dormitory East | 21 | 74 | 22% | 78% |

These figures should be compared with the overall population figures discussed earlier (Stockade 43.5% white and 56.5% black; Honor Dormitory 36% white and 64% black.)

The "quiet dormitory" (6–F) is provided for inmates, typically somewhat older, who want quieter conditions than those existing in other dormitories. Rules against noise are strictly enforced. The "allotted" cellblock (6) is so named because various staff members have the privilege to fill those beds with their inmates of their choice. These cells are accounted for as follows:

```
7 Step and Newspaper . . . . . . . . . . . . 2
Administration . . . . . . . . . . . . . . . 1
Arts & Crafts and Officers clothes . . . . . 2
Assoc. Sup't. for Custody . . . . . . . . . 7
Assoc. Sup't. for Treatment . . . . . . . . 8
Captain's Office . . . . . . . . . . . . . . 2
Education Department . . . . . . . . . . . . 4
Infirmary . . . . . . . . . . . . . . . . .12
Identification Department . . . . . . . . . 1
Mail office . . . . . . . . . . . . . . . . 4
Maintenance Department . . . . . . . . . . . 7
Personnel Department (inmate) . . . . . . . 5
Psychological Department . . . . . . . . . . 2
Parole & Social Services . . . . . . . . . . 6
#6 cellblock help . . . . . . . . . . . . . 5
 Total . . . .68
```

Cellblocks are vastly preferable to dormitories for several reasons. In the first place, the inmate obtains a degree of privacy in his cell and he has some latitude in personalizing it. Most important, his person and his property are less subject to violence. The rule against an inmate's entering another inmate's cell under any circumstances is enforced strictly.

Apart from the question of the racial balance of a given dormitory or cellblock, racial patterns within a particular unit fall within the scope of this paragraph of the Court's order. In particular, the bed pattern of the dormitories has been a matter of concern to the Court in the past.

The phenomenon of an all white or an all black row of beds in a dormitory has disappeared, probably as a result of the Court's order, in all dormitories but one. In 2–B dormitory (Newgate College Program), inmates are permitted to choose their own beds. The result is two all black rows and two somewhat integrated rows. In 6 dormitory there is one row containing 14 blacks and 1 white.

The data provided on the racial balance of all cellblocks and dormitories discloses that the number of blacks in dormitories is disproportionately high and that the number of whites in cellblocks is disproportionately high. Only in the two Papillon dormitories and the desirable "quiet dorm" do whites exceed their overall institutional population percentage. Conversely whites exceed their overall institutional population percentage in all cellblocks. The racial imbalance in the "allotted" cellblock (6) is even more remarkable.

Keeping in mind the overall racial ratio in the honor dormitory (36% white and 64% black), the imbalance in both dormitories in the Honor Dormitory is clear. As in the case of the Newgate Dormitory in the stockade, the bed pattern in the honor dormitory is segregated as a result of inmates being permitted to choose their own beds.

## RELEVANT ADMINISTRATIVE REGULATIONS

Apart from the general policy disfavoring racial discrimination announced in Administrative Regulation 822, Appendix S, p. 306 *infra*, there are no Administrative Regulations dealing with the matter of bed assignments in particular.

## FINDINGS REGARDING COMPLIANCE

■ It is the finding of the Special Master that the institution is in noncompliance with Paragraph 11 of the Court's order in that no plan of compliance has ever been submitted to the Court. As a result, assignments to dormitories and cellblocks within the stockade have produced a disproportionate racial balance in every living unit therein, with the exceptions of the Newgate dormitory and the Papillon dormitories, where the disproportion is accounted for by other factors.

With respect to the bed pattern existing within particular dormitories within the stockade, it is the finding of the Special Master that the institution is in compliance with Paragraph 11 of the Court's order. To the extent that a discriminatory pattern exists within the Newgate College Program dormitory, it results from inmate choice. With respect to the honor dormitory, an inmate choice system is utilized, and the bed pattern is a segregated one.

## PARAGRAPH 12

This paragraph requires removal from the files of 67 named inmates all references to participation in litigation related to *Taylor v. Perini* and forbids communication of such information in any form to the Parole Board.

The list of 67 inmates appears to contain one duplication. James Brenson is listed twice, with two numbers. One of these is the number of another individual on the list, Walter Jackson. Thus the number of inmates protected by this paragraph is 66.

## METHOD OF INVESTIGATION

All master files of these individuals were examined with the exception of 11 which were sent to other institutions at the time of the transfer of those inmates from M.C.I. to Chillocothe Correctional Center, the Ohio Penitentiary, and S.O.C.F.

## EVIDENCE RELATING TO COMPLIANCE

Of the 55 files examined, 49 were devoid of any reference whatsoever to *Taylor v. Perini* and the inmate's participation therein. Six items were discovered in files, only one of which makes a direct reference to *Taylor v. Perini.*

The file of George Bennett, 128–317, who was paroled in 1975, contains a copy of a Writ of Habeas Corpus Ad Testificandum dated December 12, 1974, ordering Bennett's appearance in Toledo. The caption of the writ is *Taylor v. Perini.* That same file contains a memorandum to A. W. Cochran from E. P. Perini instructing that arrangements be made to transfer the inmate to Toledo for a court appearance in the United States District Court. No specific reference to *Taylor v. Perini* is contained in the memorandum, which is dated May 22, 1972.

That same memorandum is contained in the file of Samuel Bell, 128–209 as well as that of John Rogers, 124–803.

A memorandum from E. P. Perini to Judge Don Young was found in the file of Clifford Holt, 124–091. The memorandum is dated December 29, 1972 and indicates that certain findings of the Rules Infraction Board were enclosed. No specific reference to *Taylor v. Perini* is made. A similar letter from Superintendent Perini to Judge Young was found in the file of Walter Gamble, 124–495. Again, there is no specific reference to *Taylor v. Perini.* The memorandum indicates that a conduct ticket and a summary of minutes of "action in this case" were enclosed with it.

The file of Roy Finn, Jr., 131–595, contains a copy of a conduct ticket dated February 28, 1973, which contains the following reference: "3 days CC: from susp. time to do, 3 days CC: susp. on this charge. The Disp. Board will await approval from Judge Young."

In the course of inspecting these and other inmate files, it became clear that copies of all documents relating to litigation involving the institution itself are maintained in an inmate's file. This is also true of letters written by an inmate to the Department of Corrections, copies of which are returned to the institution together with any answer provided by an official of the Department. Thus it can be assumed that documents relating to *Taylor v. Perini* were placed in inmates' files routinely as they were received by the institution.

## FINDING REGARDING COMPLIANCE

■ With the exception of the references discussed above, the institution is in compliance with Paragraph 12 of the Court's order. Because all official correspondence regarding an inmate is placed routinely in his file, there is no reason to believe that the references found constituted any deliberate effort to convey information to the Parole Board. Many files are voluminous and this may explain the failure to expunge the materials which were discovered by the Special Master. A final finding of compliance should await inspection of the remaining 11 files which are not located at M.C.I. at this time.

## PARAGRAPH 13

Paragraph 13 of the Court's order requires that necessary steps be taken to inform all staff of the institution of the terms of the order.

## METHOD OF INVESTIGATION

Information relating to compliance with this paragraph was obtained by the Special

Master through the use of affidavits, a posting report, interviews with the staff and on-site inspections.

## EVIDENCE RELATING TO COMPLIANCE

Data on posting of the order were submitted to the Special Master by the Administrative Assistant to the Superintendent on a daily basis from December 15, 1975, to February 11, 1976, and on a weekly basis beginning February 20, 1976. These indicate that the Court's order of September 12, 1972, as well as the order appointing the Special Master, are posted on the bulletin board in each inmate living area. A copy is placed also in the correction officer's desk in each lock. In addition, an undated memorandum from the Inmate Liaison Officer to the Superintendent and the Administrative Assistant to the Superintendent advises that the order is posted in various areas throughout the institution (e. g. infirmary, visiting room, control room, employee personnel office, and officer's assembly room). Further an affidavit signed by the Administrative Assistant to the Superintendent states that he posted or caused to be posted in both the stockade and the honor dormitory the order of the Court appointing the Special Master.

The Special Master and his Assistant made inquiries of the staff during interviews as to whether they had obtained or had seen copies of the order. In all cases the staff acknowledged the existence of the order and the appointment of the Special Master though a number stated that they had not read the documents and did not have personal copies. Copies of the order were handed to job supervisors by the Special Master during an interview held February 6, 1976. Additional copies of the order were reproduced by the Special Master and delivered to the Superintendent to replace damaged or stolen copies as the need arose.

During the course of investigation, the Special Master and his Assistant also made numerous unannounced on-site inspections of bulletin boards throughout the institu-

tion. Copies of the order have been posted on bulletin boards accessible to staff throughout the institution.

## FINDING REGARDING COMPLIANCE

The evidence produced by the investigation indicates that the institution has made a good faith effort to inform all staff of the terms of the order and is in full compliance with Paragraph 13 of the Court's order. While occasionally a copy of the order disappeared from a bulletin board or desk, the data submitted indicate that substantial notice of the order has been given.

## PROHIBITORY PARAGRAPHS

The first prohibitory paragraph of the Court's order enjoins the defendants from engaging in any act or practice with the purpose or effect of discriminating against inmates on the basis of race, color, or national origin. Racial harassment, intimidation or insult of inmates is forbidden by the second prohibitory paragraph.

## METHOD OF INVESTIGATION

Records of all disciplinary proceedings from December, 1975 through February, 1976, were examined to determine whether a discriminatory pattern exists in ticketing and punishing inmates for violation of institutional rules. Several interviews were held with the Inmate Liaison Officer to determine the nature and number of grievances presented to his office. A meeting was held with all inmates of Hispanic background to determine what problems that group might be encountering. Finally, extensive discussions with members of the Inmate Liaison Committee produced significant information about racial discrimination, harassment, intimidation and insult, as well as the grievance procedures available to inmates.

## EVIDENCE RELATING TO COMPLIANCE

Much of the data developed in connection with the specific mandatory paragraphs of

this order and discussed above relates to racial discrimination (e. g. job assignments, rectification of past discriminatory patterns in selected employment units, and bed and lock assignments). Several other problem areas covered by mandatory paragraphs are closely related to the subject of racial discrimination. Chief among these is the matter of imposition of disciplinary sanctions, the subject of Paragraph 7 of the Court's order.

All disciplinary proceedings held between December 1, 1975 and February 22, 1976, were analyzed to produce the following data concerning the race of inmates ticketed for violation of an institutional rule and appearing before a Hearing Officer or the Rules Infraction Board.

R.I.B.

| CLASS & NO.* | #B | #W | TOTAL # | %B | %W |
|---|---|---|---|---|---|
| II- 1 | 55 | 23 | 78 | 70.5 | 29.5 |
| II- 2 | 11 | 7 | 18 | 61 | 39 |
| II- 3 | 3 | 7 | 10 | 30 | 70 |
| II- 4 | 5 | 1 | 6 | 83 | 17 |
| II- 5 | 24 | 7 | 31 | 77 | 23 |
| II- 6 | 4 | 0 | 4 | 100 | 0 |
| II- 7 | 4 | 5 | 9 | 44 | 56 |
| II- 8 | 41 | 38 | 79 | 52 | 48 |
| II- 9 | 0 | 1 | 1 | - | - |
| II-10 | 0 | 0 | 0 | - | - |
| II-11 | 0 | 0 | 0 | - | - |
| II-12 | 5 | 9 | 14 | 36 | 64 |
| II-13 | 0 | 0 | 0 | - | - |
| II-14 | 0 | 1 | 1 | - | - |
| II-15 | 5 | 2 | 7 | 71 | 29 |
| II-16 | 4 | 1 | 5 | 80 | 20 |
| II-17 | 0 | 0 | 0 | - | - |
| II-18 | 5 | 4 | 9 | 56 | 44 |
| II-19 | 1 | 0 | 1 | - | - |
| II-20 | 0 | 0 | 0 | - | - |
| II-21 | 4 | 0 | 4 | 100 | 0 |
| Total | 171 | 106 | 277 | 62 | 38 |

HEARING OFFICER

| | #B | #W | TOTAL # | %B | %W |
|---|---|---|---|---|---|
| II- 1 | 22 | 21 | 43 | 51 | 49 |
| II- 2 | 4 | 4 | 8 | 50 | 50 |
| II- 3 | 0 | 0 | 0 | - | - |
| II- 4 | 0 | 1 | 1 | - | - |
| II- 5 | 0 | 1 | 1 | - | - |
| II- 6 | 4 | 1 | 5 | 80 | 20 |
| II- 7 | 0 | 0 | 0 | - | - |
| II- 8 | 45 | 22 | 67 | 67 | 33 |
| II- 9 | 0 | 0 | 0 | - | - |
| II-10 | 0 | 0 | 0 | - | - |
| II-11 | 0 | 0 | 0 | - | - |
| II-12 | 0 | 0 | 0 | - | - |
| II-13 | 0 | 0 | 0 | - | - |
| II-14 | 0 | 0 | 0 | - | - |
| II-15 | 0 | 4 | 4 | 0 | 100 |
| II-16 | 0 | 2 | 2 | 0 | 100 |
| II-17 | 2 | 0 | 2 | 100 | 0 |
| II-18 | 2 | 0 | 2 | 100 | 0 |
| II-19 | 0 | 0 | 0 | - | - |
| II-20 | 0 | 0 | 0 | - | - |
| II-21 | 0 | 0 | 0 | - | - |
| Total | 79 | 56 | 135 | 58.5 | 41.5 |
| Total Class II | 250 | 162 | 412 | 61 | 39 |

* See pp. 222–223 *supra* for definition of offense.

| CLASS & NO. | #B | #W | TOTAL # | %B | %W |
|---|---|---|---|---|---|
| III- 1 | 17 | 8 | 25 | 68 | 32 |
| III- 2 | 143 | 103 | 246 | 58 | 42 |
| III- 3 | 7 | 2 | 9 | 78 | 22 |
| III- 4 | 9 | 7 | 16 | 56 | 44 |
| III- 5 | 43 | 20 | 63 | 68 | 32 |
| III- 6 | 5 | 3 | 8 | 62.5 | 37.5 |
| III- 7 | 19 | 8 | 27 | 70 | 30 |
| III- 8 | 1 | 0 | 1 | - | - |
| III- 9 | 1 | 0 | 1 | - | - |
| III-10 | 0 | 0 | 0 | - | - |
| III-11 | 0 | 0 | 0 | - | - |
| III-12 | 25 | 6 | 31 | 81 | 19 |
| III-13 | 0 | 0 | 0 | - | - |
| III-14 | 0 | 1 | 1 | - | - |
| III-15 | 4 | 1 | 5 | 80 | 20 |
| III-16 | 94 | 40 | 134 | 70 | 30 |
| Total | 368 | 199 | 567 | 65 | 35 |
| Total Class II and III | 618 | 361 | 979 | 63 | 37 |

These data include inmates living in the honor dormitory as well as the stockade. Therefore, they should be related to the racial ratio of the *total* institution, which was 42.5% white and 57.5% black on January 31, 1976. The data show a deviation of 4.5% with respect to Class II offenses heard by the Rules Infraction Board, a 1.0% deviation with respect to Class II offenses held as Class III offenses by a Hearing Officer, and a 3.5% deviation with respect to *all* Class II offenses. The deviation with respect to Class III offenses is 7.5% and that with respect to *all* offenses (Class II and Class III) is 5.5%. In every category, blacks have been ticketed disproportionately frequently. At the same time, the deviations from overall racial percentages in the population are not extreme and do not establish gross discrimination in the enforcement by staff of disciplinary rules.

As far as can be determined from these and other data submitted to the Special Master, punishment for offenses does not appear to be meted out in a discriminatory manner. That is, blacks and whites committing the same offenses appear generally to be treated alike.

One instance of discrimination based upon national origin relates to the Supervisor's denial of a request by inmates of Hispanic background to form a resident organization for the purpose of pursuing subjects (such as Spanish language training and Spanish history) of common interest to members of the group. There are 28 such inmates at M.C.I. Although Administrative Regulation 829, Appendix X, p. 316, *infra*, recognizes that such organizations can "have a positive influence on rehabilitation" and encourages them, the Superintendent denied the group's application citing as grounds that other programs were available, membership dues of $10 per year were too high, and that the requirement that at least 60% of the members be Spanish-American was objectionable. The Deputy Director of the Department of Rehabilitation and Correction affirmed the Superintendent's denial.

Apart from systematic discrimination which may result from unfair job classification, custody, disciplinary, or housing decisions, the problem of racial discrimination, harassment, intimidation and insult boils down to one of human relations between the staff and the inmates. Discrimination may appear in countless subtle (and not so subtle) ways. Examples of complaints range from direct discrimination by a few guards to manner of address, treatment during "shake-downs" for contraband, and non-recognition of special religious interests of inmates of one race. No statute could be drafted to prohibit the variety of invidious

behavior which is claimed by inmates to exist within the institution. The situation is exacerbated, of course, by the small number of minority staff employed in the institution.

Impressions gained from interviews with numerous staff members at every level have convinced the Special Master that most of the staff and administrators at M.C.I. are hard working and fair-minded men. Inmates have acknowledged on several occasions that Officer X or Officer Y, although "tough", is fair. Therefore this report should not be taken to allege rampant or pervasive racism on the part of the staff or the administration of the institution. At the same time, the very nature of the racial pattern of inmates and staff members makes it highly likely that some incidents do occur. Certainly the records of the Special Master and information gained from discussions with the Inmate Liaison Committee provide corroboration.

█ What is required in the institution is an independent and effective grievance process which will bring instances of racial discrimination to light and deal effectively with them. At the moment, no such system exists at M.C.I.

Records maintained by the Inmate Liaison Officer concerning formal grievances are incomplete. In the five months beginning July 3, 1975, and ending December 2, 1975, a total of 33 grievances were recorded. There is no indication that any of these related to racial discrimination, and many obviously did not. (e. g. lost glasses)

The Special Master requested that copies of all grievances filed with the Inmate Liaison Officer, together with information concerning the disposition thereof, be submitted on a regular basis. The only records submitted, covering the months of December through February, were the following:

| DATE & NATURE OF GRIEVANCE | DATE & NATURE OF DISPOSITION |
| --- | --- |
| 12/2/75 Delay in seeing physician and improper release of medical records to the inmate's wife by the superintendent | 12/15/75 No recommendation. "It appears that Subject was given fair and adequate treatment by the Infirmary staff. . . . Concerning the release of information there is nothing in the records to support Subject's claim." On appeal to Superintendent, appeal denied. |
| 12/8/75 Discrimination and harassment by correctional officer | 12/17/75 "Subject verbally requested that this grievance not be pursued any further. He stated that he just wanted it on record." No further investigation. |
| 12/9/75 Referral by job supervisor to the Reclassification Committee | 12/20/75 Grievance rejected because of failure to appeal. The notice of rejection to the inmate stated, "You should appeal your case in accordance with Administrative Regulation 891, Paragraph 9, Section 9.1, 9.2, 9.3, and 9.4. I recommend that you read this regulation and take the appropriate action." |
| 12/15/75 Harassment and profanity on the part of a correctional officer | No action to date. |
| 12/15/75 Failure to assign the inmate to the Newgate Program | 12/22/75 Grievance rejected because the inmate failed to discuss the matter with the Director of Social Services. "Mr. Morgan will interview you concerning this matter." |

| DATE & NATURE OF GRIEVANCE | DATE & NATURE OF DISPOSITION |
|---|---|
| 12/17/75 Assault by two correctional officers | 12/20/75 "It appears that all applicable regulations have been followed to resolve the above described situation. With the appointment of a Board of Inquiry all investigative effort has been terminated by this officer." The subsequent Board of Inquiry hearing resulted in exoneration of the two officers. |
| 12/16/75 Improper removal from job for non-job related disciplinary rule infraction | 2/13/76 Grievance rejected on its merits. "In your case it was determined that this (infraction) could affect job performance. . . ." (emphasis added) |
| 12/19/75 Improper opening of legal mail | 1/19/76 Investigation made and report requested from manager of mail room. "Until a response is made by the Mail Office, no further investigation will be conducted." The subsequent investigation proved the inmate's complaint to be well founded, and he received a written apology from the Superintendent on February 25, 1976. |
| 1/22/76 Racial harassment by correctional officer - kicking of inmate's footlocker | 1/22/76 Investigation made. Officer apologized to inmate. |
| 1/28/76 Unfair treatment and racial harassment by correctional officer | No action to date. |
| 1/28/76 Medical complaint by inmate in correctional cell | 1/29/76 Investigation made and infirmary administrator contacted. Inmate was seen by medical personnel. |
| 2/4/76 Improper opening of legal mail | 2/23/76 Admission of error. Action taken to prevent future errors of this kind. |
| 2/11/76 Removal from Papillon dormitory | 2/23/76 Grievance rejected on its merits. |
| 2/11/76 Inability to make change in visitors list | 3/5/76 Grievance rejected on the merits because of frequent changes in list by inmate. |
| 2/18/76 Copy of grievance not submitted to Special Master | 3/2/76 Grievance rejected. Inmate failed to follow proper course of action under Administrative Regulation 805(a). |

Inmates interviewed are unanimous in condemning the institutional grievance procedure. A few examples from the files will suffice:

. . . "I also made an effort to locate anyone in our lock that could tell me of satisfaction obtained in any such grievance (filed with the Inmate Liaison Officer). Out of 68 men I located one resident who had a matter of a minor nature cleared up . . ."

. . . "I stopped (the Inmate Liaison Officer) in the hall and attempted to explain my complaint and ask what the procedure was, etc. He told me in so many words he was not going to get involved and that was that!"

... "I left (the Inmate Liaison Officer's) office with the feeling that he is retained in his job position by the institution so that any potentially damaging information about the helter-skelter methods and the antiquated procedures that this management employs, will not be brought to light."

... "This inquiry (of the Inmate Liaison Officer) was made quite some time ago. To date, I have received no reply whatsoever."

... "Regarding grievances . . . I have personally filed (with the Inmate Liaison Officer), I have yet to receive one satisfactory result. To sum it up with an accurate description, his title should not be Liaison Officer, but rather 'Mr. Perini's Puppet'."

... "In the month of December, 1975, I filed an institution complaint . . . through . . . the Institution liaison officer. To present date I have yet to hear a thing about this complaint, and suspect I never will." (To date, the files of the Special Master confirm the inmate's suspicion.)

... "I want to bring it to light that (the Inmate Liaison Officer) doesn't do his job and I personally think he is scared of rocking the boat here at this institution as he avoids following thru with grievances from the inmates here at MCI."

---

These criticisms, which are directed against the person who serves as Inmate Liaison Officer, are fairly regarded as equally attributable to dissatisfaction with the present system employed at M.C.I. Current practice, in consonance with the Administrative Regulations cited below, limit the scope of effective action by the Inmate Liaison Officer to referral to the Superintendent or to an institutional Board of Inquiry. What is clear, however, is that the unanimous opinions of inmates interviewed as well as the records of the Inmate Liaison Office itself establish the inadequacy of current grievance procedures employed by M.C.I.

### RELEVANT ADMINISTRATIVE REGULATIONS

As pointed out above, Administrative Regulation 803 includes "such conduct as abusive language (and) racial slurs" within the definition of "inappropriate supervision." See Appendix V, p. 311, *infra*. This regulation also establishes the office of Inmate Liaison Officer and establishes procedures for the operation of that office. Administrative Regulation 822, Appendix S, p. 306, *infra*, prohibits racial discrimina-

tion generally and Administrative Regulation 845, Appendix Y, p. 318, *infra*, outlines the grievance procedures available to inmates through the Inmate Liaison Office.

### FINDINGS REGARDING COMPLIANCE

It is the finding of the Special Master that the institution is in noncompliance with Prohibitory Paragraphs 1 and 2 of the Court's order in that:

(1) There is some evidence of discrimination against inmates of Hispanic origin in the refusal to permit such inmates to form an institutional organization.

(2) There are isolated instances of racial discrimination, harassment, intimidation, and insult by staff members, and

(3) There is no effective grievance procedure maintained to process complaints relating to racial discrimination, harassment, intimidation, or insult.

end of Appendix B

### APPENDICES

See Appendices A through Z on following pages.

**268**

# APPENDIX A

STATE OF OHIO

## DEPARTMENT OF REHABILITATION & CORRECTION
Page 1 of 2

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

ADMINISTRATIVE REGULATION 814
SUBJECT: INCOMING MAIL

1. There shall be no censorship, copying or reading of 1st class letters addressed to an inmate, nor shall there be any limitation as to the number of 1st class letters that an inmate may receive nor the persons who may correspond with an inmate.

2. Inspection of incoming mail:
 A. All mail, other than correspondence from a court, an attorney, or a public official, shall be opened by the institution mail office and inspected for the presence of contraband and money. The written portion of the mail shall then be promptly delivered to the inmate.
 B. All 1st class mail addressed to an inmate from any court, attorney, or public official may be opened and inspected for contraband only in the presence of the inmate addressed.

3. The Managing Officer or his designee shall determine whether contraband contained in mail shall be returned to the sender, confiscated as evidence, or held for the benefit of the inmate.

4. All money sent to an inmate shall be by certified check, cashier's check or by money order and shall be credited to the inmate's account. Cash and personal checks will be returned to the sender.

5. To assure prompt and accurate delivery, all incoming mail should have the inmate's complete address, including name and number, due to the fact that many of the inmates have the same name, and have proper postage. An incorrect address, or improper postage, may result in the letter being returned to the sender.

6. Certified or special delivery letters shall be promptly delivered to the addressee after inspection. Telegrams, due to their emergency contents, may be reviewed prior to delivery.

7. Under special circumstances, the mail sent to or sent by an inmate may be opened and read, provided:
 A. The Managing Officer has reasonable belief that the written contents of a letter addressed to or sent by an inmate constitutes a clear and imminent danger to institutional security. In such case, he shall apply in writing to the Director for authority to read the mail. The request shall include all the following information:
 1. the name and address (if known) of the person from whom the letter is addressed.
 2. the name and number of the inmate addressed.

STATE OF OHIO

## DEPARTMENT OF REHABILITATION & CORRECTION
Page 2 of 2

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

 3. the reasons for believing that the letter constitutes a clear and imminent danger to institutional security.
 4. the time period for which permission to read is sought.

B. The Director shall review all applications for authority to read mail, and may order further investigation before granting or denying such request.

C. Every application for authority to read which is granted must be in writing and shall include the following:
 1. the name and address (if known) of the person writing.
 2. the name and number of the inmate addressed.
 3. the time period for which to read is granted, which shall be the absolute minimum that the Director feels the situation warrants.

D. If permission to read is granted, it will authorize only the Managing Officer or his designee to read the letter. If, after reading any such mail, the Managing Officer or his designee determines that it does not constitute a clear and imminent danger to institutional security, the letter shall be promptly forwarded to the inmate addressed, or sent on to the addressee. Otherwise, the letter shall be returned to the sender or held as evidence for criminal prosecution.

8. Mail and other material in the possession of an inmate may be inspected for contraband, but may not be read subject to Paragraph #7, unless special authority in writing is given by the Managing Officer. However, if a member of the staff reasonably believes that any such document is in danger of imminent destruction, the document may be seized and forwarded to the Managing Officer for review.

# APPENDIX B

### STATE OF OHIO

## DEPARTMENT OF REHABILITATION AND CORRECTION

1944 MORSE ROAD, COLUMBUS, OHIO 43229 (614) 469-6190

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

January 15, 1974

TO: ALL MANAGING OFFICERS

FROM: WILLIAM K. WEISENBERG, ADMINISTRATIVE ASSISTANT TO THE DIRECTOR

SUBJECT: CORRESPONDENCE FROM INMATE LEGAL ADVISORS

 I have received several letters from Prosecuting Attorneys and Judges inquiring about the term "Resident Legal Advisor" as it appears on correspondence coming from the legal service offices at the institutions. The inquiries are related to whether or not the persons signing the letters are Attorneys-at-Law or inmates.

 In order to clarify the status of these persons, I am requesting, effective immediately, that you instruct the residents working in the legal services offices to sign their correspondence in the following manner.

> Ex: John Doe, Serial No. 123-456
> Inmate Legal-Advisor

 It is my opinion that this procedure will avoid further letters from the Bar and the Judiciary.

 Thank you for your cooperation.

William K. Weisenberg
Administrative Assistant
to the Director

WKW:v _____

cc: Bennett J. Cooper, Director
 Dr. Joseph R. Palmer, Deputy Director

400-22

## APPENDIX C
### DEPARTMENT OF
### REHABILITATION AND CORRECTION

# INTRA-DEPARTMENTAL REFERENCE

November 28, 1975

TO: ALL MANAGING OFFICERS

FROM: STEPHEN T. YOST, ADMINISTRATIVE ASSISTANT - LEGAL

SUBJECT: HABEAS CORPUS PETITIONS.

I have been advised by the Attorney General's Office that in some instances inmate petitions for writs of habeas corpus are not served upon the Attorney General. Thus, the first notice received is a show cause order.

In order to minimize this difficulty each institution should place in the law library an instruction that notice of service in habeas corpus petitions should include service to the Institution Superintendent and to the Attorney General at the following address:

Attorney General of Ohio
Habeas Corpus Section
Room 1513, State Office Tower
30 East Broad Street
Columbus, Ohio 43215.

Additionally, whenever the institution receives a petition for writ of habeas corpus, it should be date stamped and a copy mailed to the above address and me, as with all other complaints filed in courts.

STY/s

DEC 3 1975

## APPENDIX D

DEPARTMENT OF REHABILITATION AND CORRECTION

SUBJECT:

Legal Services

ADMINISTRATIVE

REGULATION

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

EFFECTIVE DATE: April 15, 1974

AUTHORITY:

BENNETT J. COOPER, DIRECTOR

REGULATIONS AFFECTED STATUTORY REFERENC.

It is the policy of the Department of Rehabilitation & Correction to permit residents reasonable access to legal materials and a reasonable opportunity to prepare legal documents.

Residents in protective isolation, administrative isolation, and pre-hearing detention shall be afforded the same opportunities as those in general population, except that of using the law library premises. In the event a resident is not permitted access to the law library premises, books shall be provided to the resident on a reasonable basis at his cell or dormitory location.

Each institution shall establish a schedule of library hours when legal materials can be used. Where possible, evening and week-end hours shall be provided.

A resident shall be permitted to purchase law books unless there is a compelling reason why he should not be able to do so.

Residents shall be permitted to assist each other in the preparation of legal documents. However, it shall be a violation of institutional rules for a resident to charge a fee of any kind for such services.

Residents shall be permitted reasonable access to typewriters or to typists for the preparation of legal documents.

Residents shall be permitted to contact attorneys to secure legal representation. The payment of retained attorney fees is a matter between attorney and client.

Each institution shall make available to its residents a legal kit which shall be designated by the Department and sold through the commissary.

## APPENDIX E
### STATE OF OHIO

## DEPARTMENT OF REHABILITATION AND CORRECTION
1050 Freeway Drive, North, Suite 403
Columbus, Ohio 43229
(614) 466-6190

JAMES A. RHODES, Governor

GEORGE F. DENTON, Director

PUBLICATIONS TO BE PERMITTED
IN THE INSTITUTIONS

1. Ace Boon Coon (A play)
2. Advantage of Dope, The (A play)
3. Advocate, The
4. Akwesasne Notes, Mohawk Nation
5. Albizu Campos and the Ponce Massacre, by Juan Antonio Corretjer
6. All You Can Eat
7. Ann Arbor Sun
8. Anatomy of the Feminine Itch, The
9. Art of Sensual Massage, The, by Gordon Inkeles and Murray Todris
10. Atlas of Human Anatomy for the Artist
11. Bachelor's Best, Magbab Pub. Corp.
12. Berkeley Barb, The
13. Bi Plane, A Magazine
14. Black America and the World Revolution, by Claude M. Lightfoot
15. Black and White - One Class, One Fight, by Henry Winston
16. Black Belt Magazine, Los Angeles, California
17. Black Panther International News Service, The
18. Black River Press
19. Black Voice
20. break de chains
21. Call, The
22. Cavalcade
23. Cavalier
24. Challenge
25. China, The Struggle Within
26. Columbus Free Press
27. Communist Councilman from Harlem, International Pub. Co., N.Y., N.Y.
28. Comrade George, Red Prison Movement, Eric Mann
29. Cress Theory of Color - Confrontation and RACISM (White Supremacy) by
 Frances Gess Welsing
30. Crime of Martin Sostre, The, by Vincent Copeland, McGraw Hill Co.
31. Doctor Kinsey and the Studies of Sex Results
32. Do It, by Jerry Rubin, Simon and Schuster
33. Door, P.O. Box 2022, San Diego, California
34. Dragon Seed Newspaper, The
35. Duke
36. Easyriders
37. El Griro Del Norte, Inc., Box 466, Espanola, New Mexico
38. Eugene Augur, The
39. Exotic Life of the American Wife, The
40. Family Voice, The

**11-14-75**

41. Fifth Estate, The, Detroit, Michigan
42. Five Articles, by Mao Tse-Tung
43. Fling
44. Fortune News
45. Four Year's Score in Freedom's Fight, by Claude Lightfoot and Wm. L. Patterson
46. Free World Times, The
47. Frolic, Frolic Magazine
48. Forum, The International Journal of Human Relations, New York, N.Y.
49. Gent
50. Getting into Deep Throat, by Richard Smith
51. Getting It Together (A play)
52. Good Times, The Picadilly Book Company, New York, N.Y.
53. Great Speckled Bird, The
54. Guardian, The
55. Highest Stage of Capitalism War in the Mid-East, V. L. Lenin, Imperialism
56. How Socialism will come to the United States, The View of the Communist Party
57. Hustler
58. Indonesia, The Second Greatest Crime of the Century, Deidre, World View
 Publishers, New York
59. Inside News (Newspaper)
60. Insurgent Publications - Booklist
61. Insurgent Publications Newspaper, The
62. Intercontinental Press
63. Jailhouse Lawyer's Manual, The
64. Jaquar
65. Joy of Sex, The, Edited by Alex Comfort, M.B., Ph.D. - Crown Publishers
66. Judo Jiu-Jitsu, Self Defense, Universal Body Building, Inc.
67. Karate, Book I, Book II, Universal Body Building, Inc.
68. Karate Illustrated, Rainbow Publications
69. Karate, Official
70. Knight, Sirkay Pub. Co.
71. Kung Fu, Universal Body Building, Inc.
72. Latin America, An Empire Report
73. Lenin on the National and Colonial Questions
74. Manifesto of the Communist Party
75. Man to Man
76. Mao Tse-Tung on Guerilla Warfare
77. Mao Tse-Tung Quotations from and Statements By
78. Midnight Special, The, Prisoners News, National Lawyers Guild (N.Y.)
79. Mixed Literature from American Literature on Africa
80. Modern Man, The Adult Picture Magazine, Publisher's Develop. Corp.
81. Movin' on Up
82. Mr.
83. Muhammad Speaks
84. My Lustful Adventures, by Harry Temple
85. Najrelease
86. National Committee for the Defense of Joanne Chesimard and Clark Squire
87. National Leader
88. New Banner, The
89. Nudist Society
90. Nugget

11-14-75

91. Ohio Connections, Columbus, Ohio
92. Ohio Prisoners Speak Out, Prisoner Support Group, Yellow Springs, Ohio
93. On Ice, Illinois Congress of Ex-Offenders, (Chicago Connections), Chicago, IL
94. Organizing in the Prisons: Notes from Champaign County Jail, by John Lombardo, Prisoners Solidarity Committee, New York
95. Origin of the Family, Private Property, and the State, The, Frederick Engels
96. Outlaw, The
97. Pacific Research and World Empire Telegram
98. Passion's Acres, by Rodney Middleton
99. Penal Digest International, The
100. Penthouse
101. People's Record, The
102. Pierre Louys
103. Playboy
104. Playboy on Sex
105. Players, Players International Publications
106. Prison Letters of George Jackson, The
107. Prisoners Call Out: Freedom, Prisoners Solidarity Committee, N.Y.
108. Prisoners Free Press, Philadelphia, Pennsylvania
109. Quotations from Mao Tse-Tung, Statements by Comrade Mao Tse-Tung, published by Foreign Languages, Press, Peking
110. Raven Special
111. Realist, The
112. Restless Night of Mademoiselle
113. Right On
114. Rising Up Angry, Chicago, Illinois
115. Rockwell, Lincoln - Tape recordings of Speeches
116. Rouge, Rotop, Inc.
117. Savate Boxing and Wrestling, Universal Body Building, Inc.
118. Selected Reading from the Works of Mao Tse-Tung
119. Sex Book, A Modern Pictorial Encyclopedia
120. Sex is a Laughing Matter, from Playboy
121. Show Business Laid Bare, by Earl Wilson
122. Sir
123. Socialist Revolution (Bimonthly Publication), Agenda Publishing Company, San Francisco, California
124. Stud
125. Swinger's Dairy, by Iris Brent
126. Take Over
127. The Thunderbolt, The White Man's Viewpoint, published by The Thunderbolt, Inc., Dr. Edward R. Fields, Editor and Publisher, 591 Cherokee Street, Marietta, Georgia 30061
128. Topper, Captain ·Publications, Inc.
129. Topper, Rotop, Inc.
130. Tri-Continental, North American Edition
131. Verlaine, Paul Verlaine
132. Vertes, Marcel Vertes
133. Vietnam Veterans' against the War, Winter Soldier Organization
134. Viva (Marysville Only)
135. Western Nudes
136. White Power - The Newspaper of White Revolution

11-14-75

137. Wobblies, by Patrick Renshaw, A Doubleday Anchor Book, Doubleday and Company, Inc., Garden City, New York
138. Work Force - Vocational for Social Change
139. Worker's Voice
140. Worker's World, The
141. Yellow Room, The, by LeCompte DuBouleau

NOV 2 4 1975
MARION CORRECTIONAL INSTITUTION
SUPT. OFFICE

GEORGE F. DENTON, Director

11-14-75

**STATE OF OHIO**

## DEPARTMENT OF REHABILITATION AND CORRECTION

1050 Freeway Drive, North, Suite 403
Columbus, Ohio 43229
(614) 466-6190

JAMES A. RHODES, Governor

GEORGE F. DENTON, Director

PUBLICATIONS <u>NOT</u> TO BE
PERMITTED IN THE INSTITUTIONS

1. Advocate, The (Los Angeles, California 90004)
2. All Pleasure (Newspaper)
3. American Journal of Revenge, The - Straight to Hell (New York, N.Y. 10019)
4. Aquarius, The Dawn of (A Swinging Publication)
5. Barbaron's Black Book for Swingers
6. Best of the San Francisco Ball
7. Black Dragon Fighting Society
8. Body Politic, The
9. Cadre P.E.
10. Castle of the Whip, by A. Degranamour
11. Catalogs of Sexual Objects, Paraphanalia, Films, Movies, Photographs, Magazines, Books
12. Champion of Love, The, by Victor D-Andorra
13. Contact - Monthly Magazine
14. Dick
15. Digest, The, Philadelphia, Pennsylvania
16. Dolls for Guys
17. Fag Rag
18. Fountain, The (Portland, Oregon 97204)
19. Free Martin Sostre
20. Gay Liberator
21. Gay Scene Personals (TCS Publications, Rutland, Vermont 05701)
22. Gay Sunshine
23. GEM
24. Hypnotism Revealed, by Melvin Powers, Wilshire Book Co., North Hollywood, California 91605
25. Inez Garcia Defense Committee
26. International Action
27. It's Happening (Newspaper)
28. Kindred Spirits, Chicago, Illinois 60660
29. King Alfred - National Security Council
30. Los Angeles Free Press
31. Lover's Annual, Pendulum Combos, Inc., Los Angeles, California
32. Memoirs of a Paris Madam, The - Marquis de Sade
33. National Informer, The
34. National Informer Reader (Newspaper)
35. National Times (Newspaper)
36. National Times, The
37. Newsletter of the "NationalCommittee for the Defense of Political Prisoners
38. One Bed, Many Loves, by Jackson Delaney
39. Photographs, (nudes, etc..), individual or of persons purported to be somehow related (wife, girl-friend) to resident

11-14-75

40. Rampage
41. Rogue
42. Rogue Manual
43. San Francisco Ball
44. Screw
45. Seekers
46. Select
47. Sensual Madness
48. Sexual Freedom
49. Small Talk Sex to Sexty
50. Swastika, "stickers": "Hitler was Right"
51 Swing (Newspaper)
52. Swingers
53. Swingers International
54. Swingers World Magazine (Los Angeles, California 90046)
55. Truth (Newspaper)
56. TVIS Educational Services, Inc. (Spencer, NC)
57. We Are Aware
58. Win
59. World's Deadliest Fighting Secrets

GEORGE F. DENTON, Director

11-14-75

**279**

## APPENDIX F

STATE OF OHIO

**DEPARTMENT OF REHABILITATION AND CORRECTION**

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

Page 1 of 6

Administrative Regulation 827
Subject: Packages

1. It is the policy of the Department of Rehabilitation and Correction to give residents the opportunity to receive packages sent through the mail and/or brought by families and friends on a visit, who are on the approved visiting list.

 It is the purpose of this regulation to establish certain procedures regarding these packages as well as to provide a comprehensive list of such items.

2. Residents may receive approved packages as frequently as they arrive at the institution, with the exception of food items as stated in paragraph #12.

3. The Managing Officer has the right to limit quantities, where not prescribed in the order. Space, need, and security are some considerations for limiting quantities.

4. Accumulation in excess of allowable limits set by the institution will be confiscated and sent home at the resident's expense or will be disposed of in an appropriate manner.

5. Return of unauthorized items shall be at the expense of the resident.

6. Institutional personnel shall exercise proper care in the handling of resident's personal property. The institution will not assume the responsibility for items lost, stolen, or broken.

7. Routine repair on items shall be made through established institutional procedures at the expense of the resident.

8. Items appearing on the master list shall be considered acceptable at each institution in the Department of Rehabilitation and Correction, with the exception of those items specifically designated for one institution.

9. Exceptions and limitations have been made for a number of reasons including custody levels of population, programs, physical facilities, and control factors.

10. An item such as a personal television set may be severely restricted at a specific institution because of limited electrical power resources, physical facilities, and control factors.

**280**

Administrative Regulation 827
Subject: Packages

11. Approved clothing shall not be restricted as to color, except where
 a specific color designates a security classification at a particular
 institution. Clothing shall not contain slogans, symbols, or writing
 of any kind. At male institutions, civilian shirts may be worn during
 evening free-time, weekends, and on visits only. The wearing of
 civilian clothing may be severely restricted at a specific institution
 because of control factors.

12. One package containing food, with the exception of special items listed
 on page 6, may be received only two times a year. Once in December
 and once at any other time of the year. (Each institution will prepare
 and submit a list of food items to the Director of Institutional
 Operations for approval. Once approved, this list will be made available
 to all residents.) Packages shall not exceed 25 pounds in weight.

13. Food brought into the visiting room by a visitor shall not be left for
 the resident to take into the institution. Excess food should be
 removed from the institution by the visitor who brought it.

14. Changes in these lists shall be made only by approval of the Director
 of Institutional Operations.

15. Approved changes shall be posted and the residents shall be advised.
 Residents will be responsible for advising their family and friends.

16. The managing officer may prohibit or restrict those items that threaten
 the security of the institution or the safety and welfare of those
 residents who are in disciplinary, administrative, or protective isolation.

EFFECTIVE DATE 7-1-73

Administrative Regulation 827
Subject: Packages

APPROVED PACKAGE ITEMS

I. Tobaccos and Accessories

Cigarettes (all brands) - Quantity limited by institution
Cigars (all brands) - Quantity limited by institution
Snuff
Pipe Tobacco
Pipes, cleaners & pouches
Cigarette holders - No glass filters

II. Toilet Articles and Cosmetics

A. General

Talcum Powder
Hand and Body Lotion - Plastic containers, non-alcoholic,
 no medical types
Tube Shampoo
Tube Hair Dressing
Tooth Paste
Denture Adhesives and Cleaners
Tooth Powder
Soap and Soap Dishes
Combs, Hairbrushes and Tooth Brushes
Razors - No straight or Techmatic
Razor Blades - Safety
Shoe Polish
Small Round Plastic Mirrors (SOCF only) - 6" diameter
Small Round Stainless Steel & Glass Mirrors (All except SOCF) - 6" diameter
Deodorant - Cream or non-alcoholic roll-on
Finger nail & toe nail clippers
Tweezers
Depilatory (Magic Shave)
Shaving Brushes
Canned Shaving Cream
After Shave Lotion - Plastic containers, non-alcoholic
Shaving Soap

B. Female Institution Only

Tampons
Sanitary Napkins
Sanitary Belts
Feminine Hygiene Powder
Feminine Hygiene Suppositories

282

Administrative Regulation 827
Subject: Packages

Hair Setting Lotions - Non-alcoholic - no high Pressure aerosol
Emery Boards
Face Make-up
Lipsticks
Eye Make-up
Hand Creams and Lotions - Non-alcoholic - new and unopened
Nail polish & Remover Pads
Sachet Perfumed Cream
Woolyn Sweater Soaps
Curlers
Barrettes
Hair Nets
Bobbie Pins
Hair Clips
Hair Rollers
Shower Caps
Dusting Powder

III. Clothing

 A. General

 Blankets - No electric, solid color
 Bed Spreads - Single cells or ORW only
 Towels - No beach towels
 Wash Cloths
 Handkerchiefs
 Socks
 Prayer Robes (Sunni Muslim) special permission - Chaplain
 Sweaters - Reasonable color - No Turtlenecks (ORW - Cardigan style only)
 Gloves - No gauntlet or rubber
 Stocking Caps - No ski masks
 Baseball caps/Sun visors
 Sweat Pants
 Gym Shoes
 Sweat Shirts
 Sweat Suits
 Gym Shorts (recreation only)
 Dress Shoes
 Shower Shoes - Rubber
 House slippers
 Pajamas
 Bath Robes

 B. Male Institutions Only

 Under clothing (may be nylon)
 Sport Shirts with collars & No Turtlenecks - No leather
 Athletic Supporters
 Dashiki - Hip length

C. Female Institutions Only

 Brassiere, Nylon or Cotton (Limit 6)
 Slip, Nylon or Cotton (Limit 6)
 Panties, Nylon or Cotton (Limit 12)
 Girdles (Limit 2)
 Other personal clothing in keeping with institutional regulations
 Hosiery
 Panty Hose
 Headscarves
 Rain Headscarves (Plastic)
 Rain Sets – Coat and Hood (Plastic)
 Dress Shields
 Hair Ribbons
 Slipper Socks

IV. Miscellaneous

 Baseball gloves
 Football, baseball shoes (outside only – by permission)
 Wrist Watches – Not to exceed $75 value
 Wedding Bands – Not to exceed $35 value
 Rings – Not to exceed $35 value
 I.D. Bracelets – Not to exceed $20 value
 Plastic Mugs and Drinking Glasses
 Radios – As approved by individual institutions – No short wave
 Televisions – As approved by individual institutions
 Earphones
 Cassette Players & 8 Track Players (Administrative Regulation 826)
 Pre-recorded cassette tapes
 Guitars, harmonicas, stringed instruments – No electric
 Typewriters – Manual only
 Electric Razors (LeCI, MCI, SOCF ORW Only)
 Electric Toothbrushes (LeCI, MCI, SOCF ORW Only)
 Nite Stand Clocks – Hand wind, small
 Stationery supplies, pens & pencils
 Playing cards, puzzels & games – Non-gambling
 Sun Glasses (outside use) – No wraparound or excessive size
 Religious Medals & Chains – Approved by Chaplain
 Prayer Beads (Religious) – Approved by Chaplain
 Publications (Per Administrative Regulation 814(b)

 Female Institutions Only
 Earrings, Clasp & Pierced Styles – Moderately Priced
 Crochet Materials
 Knitting Materials
 Tatting Materials
 General Sewing Materials (Needle & Thread)
 Yarns
 Umbrellas

284

Administrative Regulation 827
Subject: Packages

V. Special Food Items

 Instant Coffee (Limit 2)
 Instant Tea (Limit 2)
 Cocoa (Limit 2)
 Malted Milk (Quick)
 Tang, Kool-Aid, Wylers
 Non-dairy creamer - Packets Only
 Cube Sugar (Limit two pounds)

## APPENDIX G

JOHN J. GILLIGAN — GOVERNOR

BENNETT J. COOPER — DIRECTOR

ADMINISTRATIVE REGULATION 814 (b)
SUBJECT: BOOKS, NEWSPAPERS,
MAGAZINES AND OTHER PUBLICATIONS

1. An inmate may receive a reasonable number of books, newspapers, magazines and other publication directly from a publisher or distributor. Materials may be received from other sources, such as the inmate's family or friends with prior approval from the administration. All materials are subject to inspection for contraband.

2. Each institution may make reasonable regulations limiting the amount of printed material that may be kept in an inmate's living quarters at any one time. Such regulations shall be forwarded to the Director for review and approval.

3. Publications may be excluded from an institution for one or both of the following reasons:
 A. The publication is "obscene" under United States Supreme Court standards, that is, the dominant theme of the publication when considered in its entirety, is patently offensive to prevailing community standards relating to the description or representation of sexual matters, and the publication is utterly void of redeeming social value.
 B. The publication is "inflammatory", that is, the presence of the publication in the institution would constitute a clear and present danger of inciting criminal activity, such as rioting or escape. No publication shall be held to be inflammatory soley on the basis of its appeal to a particular ethnic, racial, or religious audience.
 Inmates have the right to refuse to receive such publications.

4. The Director shall appoint an advisory Publication Screening Committee, to be composed of four members. At least one member of the committee shall be an attorney, at least one shall be experienced in the area of literature, at least one shall be a full-time departmental employee, and one shall not be a departmental employee.

5. All incoming publications shall be initially screened by the institution mail office. All such material which is found to be neither obscene nor inflammatory (as defined above) shall be promptly forwarded to the addressee. All such material which the mail office reasonably believes to be either obscene or inflammatory shall be withheld from the inmate and the following procedure followed:
 A. The publication shall be forwarded by the mail office to the Managing Officer or the person designated by him to review publications. The Managing Officer or his designee shall, as soon as is administratively possible after receipt of the publication, make a decision as to the acceptability of the publication. Any decision to exclude a publication must be based on a finding in writing that it is either obscene (as

**286**

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

defined above) or inflammatory (as defined above) and the reason therefore.

B. If the Managing Officer or his designee determines that the publication is neither obscene nor inflammatory, it will immediately be forwarded to the addressee. If the Managing Officer or his designee determines that the publication is either obscene or inflammatory, the following additional procedures will be followed within 3 business days after receipt by the institution:

1. The inmate will immediately be notified, in writing, by the Managing Officer or his designee of the specific reasons for excluding the publications, that the publication has been forwarded to the Publications Screening Committee in Columbus, that the inmate may communicate his written objections to this Committee, and the exact mailing address of this Committee. Any such objection by an inmate must be post marked no later than 3 days after the inmate receives written notice that the publication has been rejected.

2. The Managing Officer or his designee shall, immediately after deciding to exclude the publication, forward the publication and his written reasons for rejecting it to the Publications Screening Committee in Columbus.

3. The Publications Screening Committee shall, within two weeks, but in no event less than 4 days, make a reccomendation to the Director as to whether the publication is obscene or inflammatory. The Committee will use as its criteria the definitions contained in Rule 3 above, and shall consider both the institution's reasons for excluding the publication and the inmate's objections, if any are received.

4. If the Director determines that the publication is neither obscene nor inflammatory, it shall be forwarded to the inmate addressed, and the Managing Officer of the institution from which the publication was excluded shall be informed of the decision.

5. If the Director determines that the publication is either obscene or inflammatory, the inmate to whom it was addressed shall be informed, in writing, that the publication is being excluded from the institution, and the reasons therefore.

6. All publications that are excluded from the institutions by the Director shall be returned to the sender, or held as evidence for criminal prosecution..

7. The Director or his designee shall compile and periodically update a list of publications that have been reviewed and found to be either acceptable or unacceptable. This list shall be forwarded to all institutions, and shall be followed by the institution mail office and the Managing Officer or his designee when determining the acceptability of a publication.

## APPENDIX H

STATE OF OHIO

**DEPARTMENT OF REHABILITATION AND CORRECTION**

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

Page 1 of 1

Administrative Regulation 826
Subject: Tape Players

1. Cassette Tape Players (playback only) and 8-Track Stereo Tape Players (playback only) will be approved as personal items and may be kept in the residents living quarters. Tape Players are to be used for personal listening entertainment and for educational purposes.

2. Such cassette players are to be battery operated and shall be of a reasonable size. No microphone or other recording device shall be authorized. External speakers will not be permitted. Residents must listen to cassette players with earphones.

3. Such 8-track players may be operated on batteries or electric power. 8-track stereo tape players may be part of a stereo AM-FM radio. External speakers will not be permitted. Residents will listen to unit with earphones. The use of electric powered stereo tape players may be severely restricted at a specific institution because of limited electric power resources, physical facilities, and control factors.

4. Prerecorded tapes, both coming into and going out of the institution, are subject to Administrative Regulation 814(b) governing publications and literature and shall <u>not</u> be included in the non-censorship of mail items. Therefore, all tapes are subject to audible review by the staff of the institution. *Tapes not commercially recorded shall be limited to 15 minutes, one side only. Such tapes shall also be limited to immediate family. These measures are necessary because of the increased time that would be required in the audible review.*

If it is determined that a resident has misused the privilege, either through the operation or intended purpose of these tape players, the resident may be charged under Administrative Regulation 804(a), Rules of Conduct, and then the rules of procedure under Administrative Regulation 805 are to be used.

Revised 11-15-73

## APPENDIX I

To go immediat y to the A.R.O.

DATF _____ A.M.

HOUR_____ P.M.

<u>CONDUCT REPORT</u>

On _____ _____, 19____, at ____:____ /____/A.M. /____/P.M.

resident _____ **No.**_____ Lock_____

work assignment_____Verify/____/ Badge/____/ Other_____

engaged in conduct prohibited by the following rule (s):

Class_____Rule_____ _____ /____/A.R.O.

Class_____Rule_____ _____ /____/ A.R.O.

1. The incident took place at _____

2. <u>Describe what happened</u> _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Day (s) issuing Officer not available_____

SIGNATURE OF OFFICER_____Rank_____Shift_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORT OF ADMINISTRATIVE REVIEW OFFICER

This conduct report is /____/Approved /____/Withdrawn /____/Approved but changed to:

Class _____ Rule _____ _____

Class _____ Rule _____ _____

Reason why withdrawn: _____

Signatue of A.R.O. _____ Rank _____ Shift _____

I hereby verify that I personally deliverd a copy of this Conduct Report to the above resident on: _____, 19___, at ____:____ (AM) - (PM)

SIGNATURE_____ Rank _____ Shift _____

I hereby verify that I personally received a copy of this Conduct Report on: _____, 19___, at ____:____ (A.M.) - (P.M.)

SIGNATURE OF RESIDENT _____ No._____

## APPENDIX J

MARION CORRECTIONAL INSTITUTION

HEARING OFFICER'S REPORT

INMATE: _____
 last name first name middle initial number

DATE OF VIOLATION: ____/____/____ DATE OF HEARING: ____/____/____
 mo. day yr. mo. day yr.

1. FINDINGS:

 a. Is there probable cause to believe that a violation of the institutional
 rule(s) occurred? ☐ Yes ☐ No
 b. What rule(s)? _____ ☐ Class I ☐ Class II ☐ Class III
 _____ ☐ Class I ☐ Class II ☐ Class III
 c. Finding of facts:

 _____
 _____
 _____
 _____

2. DISPOSITION: (only Class III sanctions may be imposed)

 _____
 _____
 _____

3. HAS THE INMATE BEEN INFORMED OF THE CHARGE(S) AND THE EVIDENCE PRIOR TO
 THIS HEARING? ☐ YES ☐ NO

4. HAS THE INMATE BEEN INFORMED OF HIS RIGHT TO BE HEARD IN HIS OWN DEFENSE?
 ☐ YES ☐ NO

5. HAS THE INMATE BEEN INFORMED OF HIS RIGHT TO APPEAL THE DECISION OF THE
 HEARING OFFICER? ☐ YES ☐ NO.

 SIGNED: _____
 HEARING OFFICER

 DATE: ____/____/____
 mo. day yr.

cc: Inmate Social Worker
 Court File
 Record Officer

 (Record of Review of this Report on Reverse Side)

FORM 805-2 Side 1
8/72

CHAIRMAN OF THE RULES INFRACTION BOARD — REVIEW

DATE ____/____/____
 mo. day yr.

DISPOSITION OF THE HEARING OFFICER IS: ☐ AFFIRMED

 ☐ MODIFIED AS INDICATED BELOW

 ☐ RETURNED FOR RECONSIDERATION

 ☐ REVERSED

MODIFIED AS FOLLOWS: _____
_____
_____

RETURNED FOR RECONSIDERATION IN LIGHT OF THE FOLLOWING COMMENTS: _____
_____
_____
_____
_____

REVERSED FOR THE FOLLOWING REASONS: _____
_____
_____
_____

SIGNED: _____
 Chm., Rules Infraction Board

FORM 805-2 SIDE 2
8/72

## APPENDIX K

MARION CORRECTIONAL INSTITUTION

REQUEST FOR WITNESS BEFORE THE RULES INFRACTION BOARD

I, _____, request that the following person,
(inmate accused of violation)
_____ appear as a witness at the hearing concerning
(witness)
the alledged violation of the following rule of conduct: _____

_____. The above name Witness will testify as follows:

_____

_____

_____

_____

_____

SIGNED: _____
Inmate Number

DATE: ___/___/___
mo. day yr.

REQUEST APPROVED

REQUEST DISAPPROVED

REASON: _____

_____

_____

_____

_____

_____

_____
Chairman, Rules Infraction Board

DATE: ___/___/___

FORM 805-7 Side 1

**292**

APPENDIX TO RECORD OF PROCEEDING OF RULES INFRACTION BOARD

WITNESS NAME: _____
 last name first name middle initial number

APPEARANCE FOR: _____
 last name first name middle initial number

DATE: _____/_____/_____

SUMMARY OF TESTIMONY: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I HAVE READ THE ABOVE AND FIND THAT IT IS AN ACCURATE SUMMARY OF TESTIMONY
BEFORE THE RULES INFRACTION BOARD.

 SIGNED: _____
 Secretary, Rules Infraction Board

I HAVE READ THE ABOVE AND CERTIFY THAT IT IS A TRUE AND ACCURATE SUMMARY OF
TESTIMONY GIVEN BEFORE THE RULES INFRACTION BOARD ON THE DATE WRITTEN ABOVE.

 SIGNED: _____
 Witness Number

I HAVE READ THE ABOVE - IT IS NOT TRUE AND ACCURATE FOR THE FOLLOWING REASONS:

_____

_____

 SIGNED: _____
 Witness Number

FORM 805-7 Side 2

## APPENDIX L

MARION CORRECTIONAL INSTITUTION

RECORD OF PROCEEDINGS OF THE RULES INFRACTION BOARD

INMATE: _____
last name first name middle initial number

VIOLATION CHARGED: _____ DATE OF VIOLATION: __/__/____
mo. day yr.

I. PROCEEDINGS:

1. PLEA: ☐ GUILTY ☐ NOT GUILTY

2. WAS THE INMATE INFORMED OF HIS RIGHT TO BE HEARD IN HIS OWN BEHALF? ☐ YES ☐ NO

3. WAS EACH WITNESS CALLED BEFORE THE BOARD ADMONISHED TO BE TRUTHFUL TO THE BOARD AND NOTIFIED OF THE PENALTY FOR MAKING UNTRUTHFUL STATEMENTS? ☐ YES ☐ NO

4. WAS THE TESTIMONY OF THE WITNESS(ES) AND THE INMATE ELECTRONICALLY RECORDED? ☐ YES ☐ NO. IF NO, SPECIFY THE METHOD USED FOR RECORDING THE PROCEEDINGS:

_____

_____

5. DID ANY PERSON OTHER THAN A BOARD MEMBER PARTICIPATE IN THE DISCUSSION OF THE BOARD'S FINDINGS? ☐ YES ☐ NO
IF YES, WHO: _____ TITLE: _____

6. WAS THE RESULT OF THE DECISION IMMEDIATELY COMMUNICATED TO THE INMATE? ☐ YES ☐ NO

7. WAS THE INMATE INFORMED OF HIS RIGHT TO APPEAL THE DECISION OF THE BOARD? ☐ YES ☐ NO

8. SUMMARY OF FACTS AS FOUND BY THE BOARD:

_____
_____
_____
_____
_____
_____
_____
_____
_____

9. DECISION:
GUILTY ☐ NOT GUILTY ☐

_____
_____
_____
_____
_____

**294** 

10. DISPOSITION:_____
 _____
 _____

I HEREBY CERTIFY THIS AS A TRUE RECORD OF THE PROCEEDINGS OF THE RULES INFRACTION
BOARD:

 GUILTY NOT GUILTY
SIGNED: _____ ☐ ☐
 Chairman, Rules Infraction Board

 _____ ☐ ☐
 Member, Rules Infraction Board

 _____ ☐ ☐
 Member, Rules Infraction Board

COMMENTS: _____
_____

MANAGING OFFICERS REVIEW OF PROCEEDINGS AND FINDINGS OF THE RULES INFRACTION BOARD
 Date of Review ___/___/_____
 mo. day yr.

1. THE PRECEEDINGS ARE:

 ☐ AFFIRMED ☐ MODIFIED AS INDICATED BELOW
 ☐ RETURNED FOR RECONSIDERATION ☐ REVERSED

 A. Modified as follows:_____
 _____

 B. Returned for reconsideration in light of the following comments:_____
 _____
 _____

 C. Reversed for the following reasons:_____
 _____
 _____
 _____

2. REVIEW TAKEN UPON:☐ APPEAL FROM INMATE ☐ ADMINISTRATIVE REVIEW.

 SIGNED: _____
 Managing Officer

FORM 805-6 Side 2

## APPENDIX M

### MARION CORRECTIONAL INSTITUTION

#### NOTICE OF APPEAL

I HEREBY REQUEST AN APPEAL OF THE DECISION OF ☐ HEARING OFFICER

☐ RULES INFRACTION BOARD RENDERED ON ___/___/___ CONCERNING
mo. day yr.

_____

SIGNED: _____

DATE: ___/___/_____
mo. day yr.
PRINT NAME AND NUMBER _____

_____

FORM 805-5
8/72

296

## APPENDIX N

STATE OF OHIO

DEPARTMENT OF REHABILITATION & CORRECTION

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

1. INSTITUTIONAL RULES

 Rules governing the conduct of offenders and the consequences which may follow from a violation shall be printed and furnished to the inmates together with any explanations that may be necessary for their guidance. Rules shall be corrective, not abusive or punitive, in purpose. They shall be no more numerous or restrictive than is necessary to produce responsible and orderly conduct, and be related to valid institutional concerns.

2. DISCIPLINE

 Enforcement of institutional rules shall be for the purpose of developing patterns of behavior which will be of help to the inmate in his future adjustment in the free community, and the maintenance of order in the institution. Enforcement of institutional rules shall be rehabilitation oriented, and for the purpose of developing self-control and self-discipline. No action shall be taken against an inmate for the violation of a rule except in accordance with established disciplinary procedures. Use of correctional cells with deprivation of cell privileges as punishment is authorized but, should be used only when clearly necessary.

3. RESTRICTIONS ON PERSONAL PRIVILEGES

 Disciplinary restrictions on clothing, bedding, mail, visitations, or the use of toilets, washbowls, and showers may be imposed only following an inmate's abuse of such privileges or facilities or when such action is deemed necessary by the Managing Officer for the safety or security of the institution, or the well being of the inmate, and shall continue only as long as is absolutely necessary.

4. DISCIPLINARY CONFINEMENT BY COURT ORDER

 Under no circumstances shall an inmate be placed in correctional cell confinement or administrative confinement as a result of an entry by sentencing court on the commitment documents.

## APPENDIX O

| STATE OF OHIO | | | |
|---|---|---|---|
| | | 1 of 3 | 816 |

**DEPARTMENT OF REHABILITATION AND CORRECTION**

SUBJECT:

Inter-Institutional
Transfer of Residents

EFFECTIVE DATE: Rev. 2-14-74

AUTHORITY:

BENNETT J. COOPER, DIRECTOR

ADMINISTRATIVE

REGULATION

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

| REGULATIONS AFFECTED | STATUTORY REFEREN |
|---|---|
| 805, 805(a) | 5120.14, 5120.16 5120.17, 5125.05, & 2967.20 |

All transfers shall be either administrative or disciplinary in nature, and shall be made according to the procedures set forth herein.

Administrative transfers are defined as those which may result if any one or more of the following situations exist: Whenever it is determined that the presence of the resident in the transferring institution constitutes an immediate and probable danger to the security of the institution, to residents, staff, institutional property, or the resident himself, or if a transfer is desirable in order to provide rehabilitative experience or health care which are available at another institution, or where the resident, or his representative, makes such a request to the Reclassification Committee or the Institutional Administration.

Disciplinary transfers are defined as those transfers which result from a recommendation by the Rules Infraction Board to the Managing Officer, after a hearing, as defined and outlined in Administrative Regulations 805 and 805(a).

Prior to the transfer of any resident from one institution to another in Ohio, the following shall apply:

A. No transfer shall be made except upon the express order of the Director or his designee, in this case the Chief of the Bureau of Classification and Reception.

B. In those cases where the Institution Administration is requesting the transfer, the Reclassification Committee shall forward to the Managing Officer a written record, taken as provided below, with an appropriate recommendation to the Chief, Bureau of Classification and Reception for transfer.

Where an emergency situation exists at an institution (as determined by the Managing Officer and declared as such by the Director), and residents are transferred from that institution to another institution, and a hearing pursuant to the Administrative Regulation of the Department cannot be accomplished in a timely manner, the resident shall receive a hearing at the receiving institution within a reasonable time subsequent to his arrival at the receiving institution. Hearings after-the-fact shall be conducted in the same manner and pursuant to the same procedures as those which would have been conducted prior to the transfer.

298

STATE OF OHIO

DEPARTMENT OF REHABILITATION AND CORRECTION

ADMINISTRATIVE REGULATION

| PAGE NUMBER | REGULATION NUMBER |
|---|---|
| 2 of 3 | 816 |

SUBJECT:
Inter-Institutional
Transfer of Residents

EFFECTIVE DATE: 2-14-74

The written record shall be made as follows:

1. A resident to be transferred shall be given at least 24 hours notice, except in case of emergency psychiatric or medical cases, or in cases where an emergency situation exists at an institution, that he is to be transferred to another institution, which shall be named in the notice, with the reason (s) therefore. In emergency situations the record shall be reviewed by the Managing Officer or his designee with the Director of Rehabilitation and Correction or his designee (Chief of Bureau of Classification and Reception) by telephone and verbal authorization for transfer may be granted.

2. Where transfer to a mental institution is contemplated, a doctor licensed to practice medicine in Ohio shall submit a written report to the Managing Officer after making an examination of the resident, and make an opinion as to whether or not the resident appears to be mentallyill, mentally disturbed, psychopathic, or mentally retarded, and requires hospitalization or other special care. In addition thereto, he shall submit a prepared statement for the record.

3. On the basis of the written record and documents, the Managing Officer shall submit his recommendation to the Chief, Bureau of Classification and Reception.

4. In those cases where the request of transfer is initiated by the resident or his designee, such request shall be made to his assigned social worker who will write a report to the Reclassification Committee.

5. As soon as practical after the record and recommendations have been received by the Chief, Bureau of Classification and Reception, he shall make the decision to transfer, or such other order that is justified by the record. The Director, or his designee, Bureau of Classification and Reception, may obtain further evidence or hold additional hearings, as is deemed appropriate, prior to a decision.

6. In the event the resident objects to the transfer or to the reasons for the denial of transfer, he may have the decision administratively reviewed by submitting his objection in writing, to the Reclassification Committee of the transferring institution. Thereafter, the Reclassification Committee shall conduct such review as it deems appropriate, and forward its recommendation with the written record to the Chief of the Bureau of Classification and Reception for a decision. Following such decision, the resident may have the decision administratively reviewed through the grievance procedure as set forth in Administrative Regulation 845.

7. This Administrative Order shall have no application to administrative transfers necessitated by medical requirements, excluding mental cases, and where an institution is closed, or its function materially altered, and the resident or residents so transferred, or as a result of disciplinary proceeding in which case the procedures of Administrative Regulation 805 shall apply.

STATE OF OHIO

DEPARTMENT OF REHABILITATION AND CORRECTION

ADMINISTRATIVE REGULATION

| PAGE NUMBER | REGULATION NUMBER |
|---|---|
| 3 of 3 | 816 |

SUBJECT:
Inter-Institutional
Transfer of Residents

EFFECTIVE DATE: 2-14-74

8. Pending a final decision on transfer, the resident may, in appropriate cases, in the discretion of the Managing Officer, be treated as a resident held for investigation pursuant to Administrative Regulation 807. However, in cases where transfer to a mental facility is contemplated, and the transferring institution or facilities are unable to provide proper care for the resident, he may be immediately transferred to such institution with the approval of the Director of the Department of Rehabilitation and Correction and the Coordinator of the Division of Forensic Psychiatry or their designee, upon the recommendation of a doctor, licensed to practice medicine in Ohio, who had examined such resident.

9. The authorization for the transfer of residents is in the Ohio Revised Code, Sections 5120.14, 5120.16, 5120.17, 5125.05, 5143.09 and 2967.20.

**300**

# APPENDIX P

STATE OF OHIO

## DEPARTMENT OF REHABILITATION & CORRECTION

Page 1 of 3

ADMINISTRATIVE REGULATION 805
SUBJECT: RULES OF PROCEDURE

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

1. Whenever it is charged that an institutional rule has been violated, the specific rule violated, its class, and the facts supporting such belief shall be written on the form attached hereto by the person making the charge.

2. All such written forms shall be immediately taken to an officer or officers designated by the institution for administrative review known as Administrative Review Officers to ascertain that:

 a. A rule has been violated.
 b. The inmate charged has violated the rule.
 c. There is evidence to support the alleged violation.

3. During such administrative review, the charge may be changed, corrected, altered, or withdrawn. Unless withdrawn, the inmate charged shall receive a written copy of the charge, as approved on administrative review. The inmate shall receive the copy as soon as possible after the administrative review, but in all cases prior to any hearing on the charge. In the event pre-hearing detention is necessary, a copy shall be immediately forwarded to the Managing Officer with the notation that the inmate has been placed in pre-hearing detention.

4. As soon as practical after the inmate has been given a copy of the charge against him, an informal hearing shall be held. The hearing shall be held before a person designated for the purpose by the Managing Officer and known as the Hearing Officer. One of more staff members may be designated as Hearing Officers. In the event a violation of a rule is found, based upon substantial evidence considering the record as a whole, the authority of the hearing officer shall be limited to:

 a. Discipline through loss of privileges or extra work assignment which shall be individualized as much as possible.
 b. Counselling;
 c. Referral to treatment, classification, or institutional services;
 d. Reprimands or warnings;
 e. Referral to the Rules Infraction Board for further proceedings.

5. The decision of the Hearing Officer, and reasons therefore, shall be in writing. Copies shall be forwarded to the inmate's case worker and appropriate institutional personnel.

6. The hearing by the Hearing Officer shall be informal. The inmate shall be informed of the nature of the charge and the evidence against him, and the right to be heard in his own defense. The inmate shall be informed by the Hearing Officer of his right to appeal the decision to the Chairman of the

Revised 10-30-72

STATE OF OHIO

### DEPARTMENT OF REHABILITATION & CORRECTION

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

of the Rules Infraction Board or his designee in his absence or unavaila-
bility, provided however, that the decision shall not be stayed pending
review. Review shall be within 24 hours. On review, the decision of the
Hearing Officer shall be affirmed if supported by substantial evidence,
considering the record as a whole, or may be modified, or sent back to the
Hearing Officer for reconsideration in light of the written comments made
by the Chairman or his designee in his absence, subject to further review.
In the event the decision of the Hearing Officer is reversed, all records
of the proceeding shall be purged from the inmate's institutional record
used for Class III Rule violations.

7. In the event the Hearing Officer determines that there is probable cause that
there has been a violation of a Class I or Class II Rule, the alleged rule
infraction shall be referred by the Hearing Officer to the Rules Infraction
Board; provided, however, the Hearing Officer may recommend that a Class II
offense be treated as a Class III Rule violation and assess a remedy. If
the Chairman of the Rules Infraction Board accepts the recommendation, the
case shall be closed, subject to appeal by the inmate to the full Board.

8. The Rules Infraction Board shall be composed of three members, all of whom
shall be appointed by the Managing Officer. The inmate's case worker or
other person approved by the Chairman may attend the hearing, take part in
deliberations, but may not vote. Any member of the Rules Infraction Board
with a personal interest in the matter shall disqualify himself and another
member shall be appointed. Under no circumstances shall the person who
initiated a charge be allowed to sit on the Rules Infraction Board hearing
that case.

9. The Rules Infraction Board shall have the authority to assess remedies
for rule infractions up to and including:

 a. Placing the inmate in disciplinary isolation for a period from
 one to 15 days, and/or
 b. Refer the inmate to the Reclassification Committee, with appro-
 priate recommendations; and/or
 c. Recommending the transfer of the inmate to a different insti-
 tution; and/or
 d. Recommending placement of the inmate in administrative isolation;
 and/or
 e. Such other action as may be appropriate, including remedies for
 Class III Rule violations.

10. No inmate placed in disciplinary isolation shall be denied cell privileges,
which shall include:

 a. One book or magazine in each 24-hour period, to be selected by
 the inmate from a special library to be kept in the disciplinary
 isolation area

**302**

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

 b. Mail and kite privileges
 c. Reasonable exercise, not less than one hour twice a week
 d. Sanitary facilities, including toothbrush and toothpaste, and washing material
 e. Adequate bedding to include at least a blanket, sheet, pillow, pillow cases, and mattress
 f. Adequate wearing apparel
 g. Visits by an institutional chaplain and treatment staff
 h. Adequate lighting for reading
 i. Visiting on same basis as general inmate population except where such a visit poses a threat to security as determined by the Managing Officer or his designee. Visits may be in a separate visiting room as available and conducted in the presence of a staff member.
 j. Same as i - 808a
 k. Adequate food with sufficient calories, excluding desserts, as determined by the food manager.

11. Abuse of cell privileges may be dealt with summarily by the staff member on duty in the disciplinary isolation area, after administrative review by his superior; provided however, denial of any cell privilege in isolation shall be directly related to the offensive conduct and shall be immediately referred to a Hearing Officer, who shall make an investigation and report in writing as soon as possible. The results of the investigation and report shall be immediately forwarded to the Deputy of Custody for review; provided however, in no event shall kite privileges be denied or delayed. The denial of a cell privilege shall be in effect for only such period of time needed to correct or deter the offensive conduct. The Chairman of the Rules Infraction Board shall forward to the Managing Officer a weekly list of those inmates in isolation who have had cell privileges denied, the length of time denied, and the reasons therefor.

12. The Managing Officer or his designee shall periodically visit the disciplinary isolation area no less than weekly. A written report shall be made after each visit concerning cell privileges as provided in paragraph 10.

## APPENDIX Q

STATE OF OHIO

### DEPARTMENT OF REHABILITATION AND CORRECTION

Page 1 of 2

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

ADMINISTRATIVE REGULATION 805 (a)
SUBJECT: PROCEDURE BEFORE THE
RULES INFRACTION BOARD ON A CLASS
I OR II OFFENSE.

1. The philosophy of the Rules Infraction Board shall be to provide an administrative hearing to determine as a fact whether or not a rule of conduct has been violated and to make appropriate dispositions. The hearing shall be for purposes of rehabilitating the alleged offender and shall be nonadversary in character.

 Each inmate appearing before the Rules Infraction Board shall be notified of the charge against him and the nature of the evidence against him. He shall be asked to plead "guilty" or "not guilty". If a plea of "guilty" is entered, the Chairman shall examine the inmate and ascertain the factual basis for the plea. If there is no factual basis for the plea, the "guilty" plea shall be withdrawn and a plea of "not guilty" entered.

2. The inmate shall have the right to be heard in his own defense.

3. The inmate may, at the discretion of the Chairman of the Rules Infraction Board, call a reasonable number of witnesses, including inmates, to testify, and to present documentary evidence. The request shall not be unreasonably denied. In determining whether the request is reasonable, the inmate shall be required to state in writing for the record, prior to the hearing if possible, the nature of evidence he intends to produce by such witnesses or documents.

4. Each witness or party giving testimony before the Rules Infraction Board shall be told to tell the truth and notified that disciplinary action can be taken for lying.

5. If a plea of "not guilty" is entered, the person who filed charges shall appear before the Rules Infraction Board in the presence of the inmate and be subject to reasonable questioning by the Rules Infraction Board, said questions to be submitted to the Chairman of the Rules Infraction Board by the inmate. This right to submit questions may be intelligently waived by the inmate, which waiver shall be affirmatively shown in the record.

6. The testimony of each witness and the inmate shall electronically be recorded, which shall be preserved three years. In addition thereto, the record shall include a written summary of the facts as stated by each person appearing before the Rules Infraction Board, the facts as found by the Rules Infraction Board, and all relevant documents. The person testifying shall have the facts read back, or be allowed to read the summary of his testimony. He shall verify its accuracy by signing the handwritten summary.

Revised 3/73

**304**

ADMINISTRATIVE REGULATION 805(a)
SUBJECT: PROCEDURE BEFORE THE
RULES INFRACTION BOARD ON A CLASS
I OR II OFFENSE.

PAGE 2 OF 2

7. Each member of the Rules Infraction Board shall vote separately: (1) as to
whether a rule has been violated by the inmate and (2) the discipline to be
assessed. The record shall state the reasons therefor in writing. A
majority vote shall decide both the issue and the appropriate discipline. The
decision shall be immediately communicated to the inmate. He shall thereupon
be notified of his right to appeal to the Managing Office. The decision to
appeal shall be made by the inmate within 24 hours and shall be acted upon
within the next business day. There shall be no stay of sanction pending appeal.

8. The inmate shall have the right to further appeal the decision of the Managing
Office to the Director or his designee. The inmate shall file his appeal to
the Director within 5 days after the Managing Officer has rendered his decision.
The Director will act upon the appeal in writing within a responable time. The
decision of the Director shall be final and shall be a bar to further appeal.

9. No inmate shall be found to have violated a rule unless the finding is based
on substantial evidence, which may include circumstantial evidence, considering
the written record as a whole. In no event shall past conduct be considered
as to the substantive issue of whether a rule has been violated, but may be
considered for purposes of credibility, intent, and discipline.

10. As soon as possible after the Rules Infraction Board has rendered its decision,
in cases where recommendations for transfer to administrative isolation are
made, the record shall be forwarded to the Managing Officer for review. The
recommendations shall be approved, modified, or not accepted; where modified
or not accepted, the case shall be sent back to the Rules Infraction Board
for reconsideration.

11. After a final decision has been rendered in a Class I, II, or III offense, a
complete record of the proceedings shall be placed in the inmate's institution
file. A summary sheet shall be kept, but only of Class I and II offences.

12. The charge against the inmate shall not be changed during the proceedings,
nor shall the inmate be found guilty of conduct not included in the charge,
although the charging officer may bring a new charge or charges. In such
cases, the hearing shall be recommenced before the Hearing Officer. These
rights may be waived, if such waiver is intelligently made and affirmatively
shown on the record.

13. Where appropriate, in order to clarify the application of the Rules, the
Managing Officer or his designee may cause the publication of the facts of
select cases, the decision reached and discipline assessed, with the names
of the parties deleted, either through the institution newspaper, or other
means of mass communication.

Revised 3/73

# APPENDIX R

STATE OF OHIO

## DEPARTMENT OF REHABILITATION & CORRECTION

Page 1 of 1

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

ADMINISTRATIVE REGULATION 807
SUBJECT: PRE-HEARING DETENTION

1. No inmate shall be placed in a correctional cell, or placed in isolation from the inmate population, or placed in administrative isolation because of an alleged rule infraction prior to his appearance before the Rules Infraction Board unless:

 a. The rule allegedy violated is either Class I or Class II; and
 b. There is an immediate and direct threat or danger to the security of the institution, inmates, staff, institutional property, or the inmate himself; and
 c. Specific authority for pre-hearing detention is given by the Deputy Superintendent of Custody, or person designated to act for him in his absence.

2. The action taken and reasons therefore shall be immediately put into writing, approved by the Deputy Superintendent of Custody or person designated to act in his absence, and forwarded to the Managing Officer.

3. If possible, the hearing of the rule infraction shall be held on the same day the inmate is placed in pre-hearing detention, otherwise the first business day following.

4. The Managing Officer shall forward a monthly summary report to the Director of all inmates placed in pre-hearing detention and the reasons therefore.

5. Inmates placed in pre-hearing detention shall not be denied cell privileges, except for their abuse, in which case, the procedures as contained in Section 805, paragraph 11 shall apply.

**306**

STATE OF OHIO

**FILED**

**DEPARTMENT OF REHABILITATION AND CORRECTION** 73 DEC 14 ₹₁ 1:16

1944 MORSE ROAD, COLUMBUS, OHIO 43229 (614) 469-6190 ;

SECRETA... . . . ...

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

Page 1 of 1 PER ...

ADMINISTRATIVE REGULATION 822
SUBJECT: DISCRIMINATION AND RACIAL ISSUES

It is the policy of the Department of Rehabilitation and Correction to prohibit discrimination with regard to disciplinary action, transfers, institutional program assignments, and other such matters on the basis of race, creed, color or national origin, by any departmental staff member, or by any group, or individual representing the Department.

It shall be the responsibility of the Managing Officer to ensure that discrimination will not be tolerated. Grievances filed by residents shall be processed in accordance with Administrative Order 803.

All pre-service and in-service training and staff development shall include extensive programs in human relations. All employees shall be informed of their obligation to treat all inmates with equal dignity and courtesy. As a significant number of inmates in our institutions and facilities have cultural or linguistic behavioral patterns differing from those of many of the staff, all personnel should be familiarized with said patterns, as any inability to communicate between staff and inmates may lead to institutional tensions or friction. Training shall be aimed at removing communication barriers.

There shall be fair, consistent, and objective classification by committee of all inmates with respect to all aspects of institutional life. So far as possible, institutional programs should reflect the ethnic distribution of the inmate population.

Where security requirements permit, efforts shall be made to involve citizen groups from all communities with inmate groups including minority self-help groups and other administration sponsored activities. Whenever feasible, minority employees shall be encouraged to work with such groups as advisors and counselors. As with all inmate group activities, staff supervision is essential.

In view of its commitment to equal opportunity and its commitment to the maintenance of a working atmosphere free of racial harassment, intimidation, and insult at its institutions, it is the policy of the Department to consider such racial harassment, intimidation and insult of inmates and staff, depending upon its severity and repetition, on the part of the Department's civil service employees to constitute "failure of good behavior" within the meaning of Section 143.27, Ohio Revised Code, authorizing the removal or suspension of or other disciplinary action against such employees.

Revised - Effective December 24, 1973

▮▮▮▮▮▮▮▮

## APPENDIX T

STATE OF OHIO

**DEPARTMENT OF REHABILITATION AND CORRECTION**

1944 MORSE ROAD, COLUMBUS, OHIO 43229 (614) 469-6190

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

**FILED**

73 DEC 14 ᵖ⁄ 1:16

SECRETARY ᵣᵣ ᵣ

PEP ▮▮▮▮▮▮

ADMINISTRATIVE REGULATION 836
SUBJECT: RESIDENT WORK ASSIGNMENTS

1. It is the policy of the Department that no resident shall be assigned, transferred, or removed from a work assignment for punitive purposes, and that such assignment, transfer, or removal shall not be related to discipline for rule infractions except insofar as such infractions are job related and manifest inability on the part of the resident to function in the job in question.

2. The work assignments of residents shall be made by a Classification Committee. The Committee shall be composed of three or more individuals selected by the Superintendent and the Chief of the Bureau of Classification and Reception.

3. The following factors shall be considered by the Committee in determining a work assignment:

 a. Nature and seriousness of the offense for which the resident was committed;

 b. Length of sentence for which the resident was committed;

 c. Mental, physical and psychological development;

 d. Previous experience while on parole, furlough, probation or administrative release;

 e. Nature of prior criminal conduct as shown by official records;

 f. Age;

 g. Work or mental skills, present or potential;

 h. Escape risk;

 i. Potential danger to the resident, either through his own handicaps, actions, or handicaps or actions by others;

 j. Availability of housing, work, vocational, educational, and other programs.

 k. Such other information as is deemed to be relevant to the work assignment determination.

4. All reports, documents, or material used in the classification process shall become a permanent part of the resident's master record file. In addition, such records shall be available to the staff of the institution to which the resident may be transferred, on a "need to know" basis.

# 308

STATE OF OHIO

## DEPARTMENT OF REHABILITATION AND CORRECTION

1944 MORSE ROAD, COLUMBUS, OHIO 43229 (614) 469-6190

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

ADMINISTRATIVE REGULATION
SUBJECT: RESIDENT WORK ASSIGNMENTS

5. The decisions of the Classification Committee shall be recorded, with the reasons for the decision clearly stated.

6. As soon as practicable following the decision of the Classification Committee, the resident shall be informed of the decision, and that if he is in disagreement with the decision he pursue the grievance procedures as outlined in Administrative Regulation 845.

7. The procedures outlined herein for the making of job assignments, transfer, and removals shall not allow for deference to the wishes of job supervisors or fellow residents, nor shall such decisions be based solely upon the self-initative of residents.

EFFECTIVE: DECEMBER 24, 1973

45 Minutes, Module "A"

OUTLINE FOR THE PROGRAM ON THE INTRODUCTION OF THE BLACK
EXPERIENCE

Components

I. Life Styles in the Black Community
 A. Slides of Contemporary America
 B. Excerpts from Speeches and Musical Selections

II. Jargon and Black Concepts

III. Black Reactions To White America
 A. Blacks vs. Blacks (slides)
 B. Blacks vs. Whites (slides)

45 Minutes, Module "B"

BLACK HISTORY

Components

I. Ancient African Kingdoms
 A. Ghana, (Timbucktu), Mali, and Songhay
 B. Legal Systems, Education Systems, and Technological
 Developments
 C. Culture and Art

II. Early America
 A. Slavery and Revolution
 B. The Civil War and Reconstruction

III. Recent American History
 A. Civil Rights Bill
 B. Voting Rights Legislation
 C. Black Leaders
 D. Black Movements

30 Minutes, Module "C"

BLACK CULTURE

Components

 I. The Black Family
 A. The Myth of the Matriarchy
 B. Struggle for Survival

 II. Contributions in the Arts
 A. Jazz
 B. Blues
 C. Spirituals
 D. Art

 III. Religion
 A. The Role of the Black Church
 B. The Store Front Church
 C. The Black Minister as Community Leader
 D. The Modern Non-traditional Black "Church"
 1. Muslims
 2. Moslems
 3. The Church of The Black Madonna

30 Minutes, Module "D"

BLACK AWARENESS

Components

 I. Pride in Self and Race
 A. Hand Shake
 B. Afro Hair Style

 II. Organizational Unity
 A. N.A.A.C.P., SNCC, PUSH
 B. Republic of New Africa, Revolutionary Action Movement

 III. Identity With Africa
 A. Pan-Africanism
 B. Comparative Analysis

30 Minutes, Module "E"

SUMMARY

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

ADMINISTRATIVE ORDER 803
SUBJECT: APPROPRIATE SUPERVISION

1. Inmates shall be subject to reasonable and appropriate supervision by employees of the Department of Rehabilitation and Correction.

2. As used herin, the term "inappropriate supervision" shall mean any continuous, non-forceful method of annoying or needlessly causing trouble to an inmate, such .conduct as abusive language, racial slurs, and the writing of a disciplinary report (ticket) by a staff member against an inmate or groups of inmates for non-existent reasons. All inmates are to be treated as individual human beings, with no favoritism or animosity shown to or against any inmate or group of inmates.

3. Since inappropriate supervision is often a continous affair, and often involves allegations that a staff member writing tickets or conduct reports on a certain inmate or group of inmates for little or no reason, the deputy superintendent of custody or his designee shall keep a record on each staff member of tickets he has written. The record shall be a copy of the ticket and its disposition, and shall be referred to if an inmate complains of the officer's ticket-writing policy.

4. The "Inmate Liason Officer" (hereinafter referred to as the ILO), shall have the responsibility of investigating inmate complaints of inappropriate supervision.

5. In the event of a complaint by an inmate of inappropriate supervision, the following procedure shall apply:
 a. All inmates' complaints shall be in writing. Upon receipt by any official they shall go to the ILO.
 b. The inmate who wrote the complaint shall be interviewed without reasonable delay by the ILO. If, after the interview, the ILO feels the complaint is patently groundless, no further investigation shall be made. However, in such a case, the ILO shall keep a written record of the complaint, the interview, and the reasons why he feels that the complaint is groundless.
 c. If, after the interview, the ILO feels that there are reasonable grounds for believing the inmate's complaint, he shall conduct further investigations. This shall include interviewing the staff member involved, any potential witness, and anyone else the ILO feels may have relevant testimony to give. If relevant to the complaint, the ILO shall review the staff member ticket-writing record.

312

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

d. After the ILO has completed his investigation, he shall write a
report, which shall include the inmate's original complaint, the
ILO's findings of fact, and the evidence upon which he based such
a finding. The ILO shall then make a conclusion as to whether or
not the supervision of the staff member has been appropriate.

e. The ILO shall then forward the entire report to the Managing Officer
who shall review it. He may order supplemental investigations.
After he feels that the incident has been thoroughly investigated,
he shall make the decision as to whether or not the staff member
should be exonerated, or disciplined in accordance with established
personnel procedures.

f. If the Mangging Officer feels that the staff member's conduct warrants
more severe action than either a reprimand or transfer, or both, he
shall forward the report, together with his recommendations, to the
Director of Institutions for review and further action.

g. A copy of all documents shall be permanently kept in the office of
the Managing Officer for review by the Department Ombudsman.

## APPENDIX W

| | PAGE NUMBER | REGULATION NUMBER |
|---|---|---|
| DEPARTMENT OF REHABILITATION AND CORRECTION | 1 of 3 | 834 |

SUBJECT:

Employee Grievance Procedure

FILED

'75 NOV 20 'M 3:02

SEC ADMINISTRATIVE

EFFECTIVE DATE: December 1, 1975(Rev.
AUTHORITY:

GEORGE F. DENTON, DIRECTOR

REGULATIONS AFFECTED STATUTORY REFEREN

James A. Rhodes, Governor PER REGULATION
George F. Denton, Director

1. The term "grievance", as used in this procedure, shall refer to an alleged failure of the Department and/or its agencies, institutions, and facilities to comply with work rules, regulations, policies, or procedures; or an alleged failure to comply with the provisions of Chapter 124 of the Ohio Revised Code, or the Administrative Rules of the Director of Administrative Services.

2. A grievance may be brought by any employee of the Department of Rehabilitation and Correction. If a group of employees desires to file a grievance involving a situation affecting each employee in the same manner, one employee, selected by such group, will process the grievance.

3. An employee having a grievance first shall attempt to resolve it informally with his/her immediate supervisor at the time the incident giving rise to the grievance occurs. At this step there is no need to reduce the grievance to writing. If the employee is not satisfied with the response in the preliminary step, he/she may pursue the formal steps which follow.

4. Step One - Immediate Supervisor.

 4.1. After informal discussion has failed to resolve a grievance, an employee may present it to his/her immediate supervisor or the designated supervisory representative within fourteen (14) calendar days after the event or circumstances giving rise to the grievance has occurred, or within fourteen (14) calendar days of the employee-grievant's knowledge of the event or circumstances not to exceed a total of thirty (30) calendar days after the occurrence of the event. Grievance submitted beyond such time limits will not be honored.

 4.2. The grievance shall be reduced to writing on an appropriate form designated for this purpose. The employee-grievant shall specify the work rule, regulation, policy, procedure, or provision of the Revised Code or Administrative Rules alleged to have been violated and shall indicate the remedy sought. The form shall be date-stamped upon receipt.

 4.3. The immediate supervisor or his/her representative shall schedule a meeting with the employee-grievant within seven (7) calendar days of receipt of the written grievance. The employee-grievant may be accompanied at such meeting by one (1) other employee who is employed at the same facility or location; however, the selected employee may not hold a classification equal to or higher than that of the supervisor hearing the grievance.

**314**

STATE OF OHIO

DEPARTMENT OF REHABILITATION AND CORRECTION

ADMINISTRATIVE REGULATION

| PAGE NUMBER | REGULATION NUMBER |
|---|---|
| 2 of 3 | 834 |
| SUBJECT: | |
| Employee Grievance Procedure | |
| EFFECTIVE DATE: December 1, 1975 (Rev.) | |

4.4. The immediate supervisor shall respond to the grievance in writing and return it to the employee-grievant within seven (7) calendar days following the meeting.

5. Step Two - Administrative Supervisor.

5.1. If the employee-grievant is not satisfied with the written answer received in Step One, within seven (7) calendar days of receipt he/she may submit the grievance to the appropriate administrative supervisor. The grievance shall be date-stamped upon receipt.

5.2. The administrative supervisor or his representative shall schedule a meeting with the employee-grievant within seven (7) calendar days of receipt of the grievance. The employee-grievant may be accompanied at such meeting by one (1) other employee who is employed at the same facility or location; however, the selected employee may not hold a classification equal to or higher than that of the supervisor hearing the grievance.

5.3. The administrative supervisor or his/her designated representative shall respond to the grievance in writing and return it to the employee-grievant within seven (7) calendar days following the meeting.

6. Step Three - Appointing Authority.

6.1. If the employee-grievant is not satisfied with the written answer received in Step Two, within seven (7) calendar days of receipt he/she may submit the grievance to the appointing authority of the institution or agency. In the event that the appointing authority is not stationed at the same location as the employee-grievant, an additional two (2) days shall be allowed for mail delivery. The grievance shall be date-stamped upon receipt.

6.2. The appointing authority or his/her representative shall schedule a meeting with the employee-grievant within ten (10) calendar days of receipt of the grievance. If the appointing authority is not stationed at the same location as the employee-grievant, an additional five (5) days shall. be allowed for arrangements. The employee-grievant may be accompanied by one (1) other employee at the meeting. The appointing authority or his/her representative shall respond to the grievance in writing and shall return it to the employee-grievant within ten (10) calendar days following the meeting.

7. Step Four - Director.

7.1. If the employee-grievant is not satisfied with the written answer received in Step Three, within ten (10) calendar days he/she may submit the grievance to the Director of the Department through the labor relations section in central office. The grievance shall be date-stamped upon receipt. An investigation of the circumstances of and the allegations set forth in the grievance shall be conducted.

STATE OF OHIO

DEPARTMENT OF REHABILITATION AND CORRECTION

ADMINISTRATIVE REGULATION

SUBJECT:

Employee Grievance Procedure

EFFECTIVE DATE: December 1, 1975(Rev.)

7.2. The Director or his designated representative shall respond to the grievance in writing and shall return it to the employee-grievant within fourteen (14) calendar days of receipt. Such decision shall be final.

8. At any step in which a response is not forthcoming within the specified time limits, the employee-grievant may submit the grievance to the next step in the procedure and proceed as though the answer at the prior step had been given and was unsatisfactory. Failure of an employee-grievant to appeal a grievance to the next step of the grievance procedure within the time constraints specified shall be considered as an abandonment of the grievance and acceptance of the last answer given.

9. An employee may initiate a grievance at step three of this procedure after having obtained prior approval from the appointing authority or his/her representative. Such approval shall be granted only if the appointing authority or his/her representative determines that the nature of the grievance is such that only he/she is able to resolve.

10. An employee, who by reason of classification or job assignment normally would assume the position of respondent in this procedure, may seek redress of his/her own grievance by initiating same at the particular step which represents an appeal to his/her own immediate superior.

11. An employee chosen to accompany an employee-grievant to meetings in this procedure may do so during regularly assigned working hours provided that:

11.1. Such employee is employed at the same institution, office, or location.
11.2. An emergency situation requiring the presence of such employee at his/her assigned work situation does not exist.
11.3. The supervisor of such employee has approved the absence and has arranged to have the work area properly covered.

12. An event or circumstance for which a remedy is provided by law or executive order shall not be proper subject matter for a grievance under this procedure.

13. Grievance forms shall be available at each institution, office, or location. Each grievance initiated in written form shall be assigned a consecutive number.

**316**

# APPENDIX X

STATE OF OHIO

DEPARTMENT OF REHABILITATION AND CORRECTION

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

Page 1 of 2

Administrative Regulation 829
Subject: Resident Groups

1. Resident organizations can, under proper circumstances, have a positive influence on rehabilitation and shall be encouraged in each institution.

2. Residents who wish to form a group within an institution shall apply in writing to the Managing Officer, or his designee. The Managing Officer shall submit such program application, along with his recommendations, to the Deputy Director, Program Services or his designee with 15 days after receipt of such application.

3. Approval shall be granted or denied, in whole or in part, in writing, within 15 days after receipt, by the Deputy Director, Program Services or his designee. Such denial shall state the reason(s) therefor.

4. A written application shall state:

 a. The name of the group together with its Constitution or Bylaws, if they have been developed;

 b. Any affiliation, directly or indirectly, with any other group within or without the institution;

 c. The names of the persons forming the group;

 d. The purpose of the group;

 e. The facilities of the institution to be utilized;

 f. The time and place when and where the group would like to meet;

 g. Financial requirements, if any, and how the group expects to obtain the necessary financing;

 h. Group methods, including the obtaining of members;

 i. The necessity of such a group and why no other group within the institution or Departmental organization or procedure is available and capable of meeting the needs of the applicant.

Administrative Regulation 829
Subject: Resident Groups

5. No group shall be recognized, or an active membership permitted, in any group which the Managing Officer has reason to believe constitutes a substantial risk to the security of the institution or personnel, is detrimental to the best interests of the residents, or would work in opposition to the orderly function and operation of the institution.

6. No resident shall be permitted to become an active member in any group inside of an institution or solicit active membership in any group until such group is approved pursuant to the terms of this Administrative Regulation.

7. Residents who are active members of any group in existence at the time this order becomes effective shall have thirty (30) days subsequent to its effective date to submit application for recognition of such groups.

8. Appeals from decisions of the Deputy Director, Program Services or his designee shall be made within five (5) days after receipt of such notice.

9. The decision of the Director shall be made within twenty (20) days after receipt of the appeal. The decision of the Director shall be final.

10. Upon approval of any group pursuant to paragraph three (3), the information required by paragraph four (4) shall be submitted forthwith to the Director or his designee.

11. Each resident group shall submit an annual report to the Managing Officer which shall include the information described in this paragraph. Each Managing Officer shall then submit to the Director an annual report containing a list of all active resident groups. This report shall give the name of each group, its purpose, the number of resident members, its accomplishments during the previous year, its general effect on the resident population, and its benefits, if any, derived by its members.

12. Each resident group shall have a group advisor who shall be assigned by the Managing Officer from the institutional staff. Such group advisor shall have the right to attend all meetings of the resident group.

13. Violations of this Administrative Regulation shall be a Class II offense, pursuant to Administrative Regulation 804(a).

Effective Date: 5/4/73

318

| | PAGE NUMBER | REGULATION NUMBER |
|---|---|---|
| **STATE OF OHIO** | 1 of 3 | 845 |
| **DEPARTMENT OF REHABILITATION AND CORRECTION** | SUBJECT: Grievance Procedures for Residents | |

EFFECTIVE DATE: August 1, 1974 (REV.)

AUTHORITY:

BENNETT J. COOPER / DIRECTOR

REGULATIONS AFFECTED / STATUTORY REFERENCE

ADMINISTRATIVE

REGULATION

JOHN J. GILLIGAN — GOVERNOR
BENNETT J. COOPER — DIRECTOR

1. A complaint, as used herein, is an oral statement of the resident's problem. A kite, as used herein, is a written statement of the resident's problem or request for information. A grievance, as used herein, is a formal request for administrative action commenced by the filing of Form 845-1.

2. The Managing Officer of each institution or facility shall install locked boxes or mail boxes into which residents may place kites. All kites placed in these boxes by residents are to be collected daily and routed directly to the addressee. Residents shall receive either a written or verbal response to a complaint or kite as soon as possible, but in no event in more than ten working days after receipt of the complaint or kite by a staff member or administrator, recognizing that resolution of the problem may take a longer period of time. Normal and routine requests and inquiries shall be handled informally.

3. If the resident does not receive a satisfactory response to his complaint or kite within the ten working days, he may file a formal grievance with the Resident Liaison Officer on Form 845-1. Grievance forms shall be made readily available to all residents at the office of the Resident Liaison Officer. The grievance may be given directly to the Resident Liaison Officer, or placed in a locked box or mail box used for kites. A copy of the grievance shall be immediately forwarded to the Ombudsman by the Resident Liaison Officer.

4. The primary responsibility of the Resident Liaison Officer is to investigate grievances filed by residents, which the resident has not been able to resolve through complaints and kites. The Resident Liaison Officer may also receive and act upon complaints and kites; provided, however, wherever feasible, the complaint or kite shall be referred to the proper staff member or administrator for action, subject to the ten working days response requirement.

5. If the grievance involves no substantial factual dispute, the Resident Liaison Officer shall investigate the grievance, make findings of fact, dispose of the grievance, or make recommendation to the Managing Officer on Form 845-2 & forward it to the Managing Officer or his designee, and one copy to the Ombudsman. If the grievance involves a substantial factual dispute, the Resident Liaison Officer may handle the dispute himself, or refer the dispute to the Institutional Inquiry Board on Form 845-3. Whether or not the factual dispute is substantial shall be determined by the Resident Liaison Officer after a preliminary investigation.

6. Complaints, kites or grievances determined by the Resident Liaison Officer to be wholly without merit may be rejected. Grievances may also, in the discretion of the Resident Liaison Officer, be rejected where the resident has failed, without just cause, to contact the person able to solve his problem before filing the grievance. All rejections shall be made on Form 845-4, and a copy forwarded to the Ombudsman. In the event of a rejection, the Resident Liaison Officer shall: (a) inform the resident of the rejection and the reasons;

STATE OF OHIO

DEPARTMENT OF REHABILITATION AND CORRECTION

ADMINISTRATIVE REGULATION

| PAGE NUMBER | REGULATION NUMBER |
|---|---|
| 2 of 3 | 845 |

SUBJECT:

Grievance Procedures for Residents

EFFECTIVE DATE: August 1, 1974 (REV.

(b) inform the resident of the name of the proper staff member or administrator to contact to solve his problem, if applicable; and (c) inform the resident that he may appeal the rejection of the grievance to the Managing Officer on Form 84'-5, within five working days. In the event it is determined on appeal that the grievance has merit, the grievance shall be referred to the Institutional Inquiry Board for processing.

7. Each Managing Officer shall appoint three employees to serve on the Institutional Inquiry Board. One of these employees shall be designated by the Managing Officer as permanent Chairman of the Institutional Inquiry Board. The Managing Officer shall also appoint several alternate members who may serve in the absence of a regularly appointed Board Member. At least one member of every such Institutional Inquiry Board shall be an officer of lieutenant rank or above, and at least one member shall be from the treatment staff.

8. No employee directly responsible for the condition or action being grieved may sit on the Institutional Inquiry Board that hears that particular case.

9. The Institutional Inquiry Board shall meet at least weekly, provided that one or more grievances have been filed with the Chairman of the Board by the Resident Liaison Officer.

10. A resident shall have an opportunity to personally appear at any investigative hearing whenever there is any substantial factual dispute. Notice of the hearing shall be given to the resident on Form 845-6. In such cases, the resident may request the Resident Liaison Officer to call a reasonable number of witnesses, including residents, to testify, and to present documentary evidence. The request shall not be unreasonably denied. Reasons for denial shall be specified. In determining whether the request is reasonable, the resident shall be required to state in writing for the record the nature of the testimony or documents to be given, on Form 845-7. The hearing body shall have the right to summon any witnesses - residents or staff - or documents it deems appropriate. Requests for witnesses shall be forwarded by the Resident Liaison Officer to the Chairman of the Institutional Inquiry Board when appropriate.

11. The hearing body shall file a written report regarding its factual findings and recommendations with the Managing Officer on Form 845-2 or Form 845-8, as appropriate, within ten working days after the case is received by the hearing body, with one copy to the Resident Liaison Officer, if the Institutional Inquiry Board is the hearing body, and one copy to the Ombudsman.

12. The Managing Officer or his designee, after evaluating the report of the hearing body shall advise the resident in writing on Form 845-9, within five working days, as to what action, if any, he has taken or intends to take. Copies shall be sent to the Resident Liaison Officer, Chairman of the Institutional Inquiry Board, and to the Ombudsman. Copies of the decision, grievance, copies of the report of the hearing body, and copies of the Managing Officer's response to the resident shall be maintained in the office of the Resident Liaison Officer for at least three years. In no event shall such copies be made part of the Resident's Record Office Master File.

320

STATE OF OHIO

DEPARTMENT OF REHABILITATION AND CORRECTION

ADMINISTRATIVE REGULATION

| PAGE NUMBER | REGULATION NUMBER |
|---|---|
| 3 of 3 | 845 |

SUBJECT:
Grievance Procedures for Residents

EFFECTIVE DATE: August 1, 1974 (REV.)

13. If, after receiving the official response from the Managing Officer, the resident still feels that the grievance has not been resolved to his satisfaction, the resident may appeal to the Director of the Department of Rehabilitation and Correction, or his designee, on Form 845-10, within five working days. Upon receipt, one copy shall be sent to the Ombudsman, and one to the resident's Managing Officer and Resident Liaison Officer.

14. The Director or his designee shall review all grievances submitted. Upon request, the Managing Officer shall forward all relevant documents to the Director or his designee. Such request shall be on Form 845-11. If, after reviewing the grievance, the Director or his designee feels that the case is without merit, he will so advise the resident in writing, on Form 845-12, with copies to the Managing Officer, Resident Liaison Officer, and the Ombudsman.

15. If the Director or his designee is of the opinion that the grievance has merit, or that further investigation of the grievance is in order, he will take such administrative action as he deems appropriate.

16. Thereafter, the Director or his designee will make a final determination and so advise the resident in writing on Form 845-12, with copies to the Managing Officer, Resident Liaison Officer, and to the Ombudsman.

## APPENDIX Z

### STATE OF OHIO

**DEPARTMENT OF REHABILITATION AND CORRECTION**

1050 Freeway Drive, North, Suite 403
Columbus, Ohio 43229
(614) 466-6190

JAMES A RHODES, Governor

GEORGE F. DENTON, Director

**FILED**

'76 FEB 10 ⌐ 3: 19

PER_____

Page 1 of 2

ADMINISTRATIVE POLICY: F-014
SUBJECT: PROCEDURE FOR HANDLING
CASH CONFISCATED FROM
INMATES

PURPOSE

The purpose of this policy is to set forth procedures for disposition of

monies (currency or coin) confiscated from inmates.

A. No inmates shall be permitted to have monies in their possession, except

 by authorization of the Superintendent.

B. Any monies found in the possession of an inmate or hidden on institution

grounds or structures shall be considered contraband and confiscated.

C. All monies confiscated shall be logged by the Deputy of Custody showing the

amount, date, from whom received and other conditions of confiscation. The

confiscated property shall then be turned into the institution Cashier's

office within 72 hours for deposit to the Industrial and Entertainment Fund.

The only exception is when the confiscated monies are required as evidence by

the Rules Infraction Board. In such cases, the confiscated monies shall be

forwarded to the Cashier's office upon conclusion of the hearing and any

subsequent appeals.

D. Mail Room Cash

1. Any monies received through the mail for an inmate shall be verified by

2 employees, logged, and promptly returned to the sender. The log shall

indicate amount, date received, from whom received and the signature of

**322**

ADMINISTRATIVE POLICY: F-014

employees verifying.

2. If the sender cannot be identified after a reasonable effort, within 24 hours the monies shall be deposited in an escrow account in the institution cashier's office.

3. If after the conclusion of one year the sender has not claimed monies deposited in escrow, such monies shall be deposited into the Industrial and Entertainment Fund.

4. Nothing in the foregoing shall be regarded as conflicting with Ohio Revised Code Section 5120.13.

E. The Cashier's office shall maintain a record of all confiscated monies, identifying the source and date of deposit, and shall prepare and forward a monthly report of all such deposits to the Superintendent.

F. Records of confiscated cash maintained by the Custody Deputy, Mail Room and Cashier shall be open for inspection by Department representatives at any time.

Approved _George F. Denton_
Director

Effective Date : March 1, 1976